UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

LAREDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| VS. | § CR. NO. 5:17-CR-00560 |
| | § |
| ADRIANA ALEJANDRA GALVAN-CONSTANTINI, ET AL. | § |
| | § |

**GOVERNMENT'S SUPPLEMENT TO NOTICE OF INTENT**
**TO OFFER EXPERT TESTIMONY**

The Government filed its Notice of Intent to Offer Expert Testimony (Docket No. 235) on September 18, 2018. In response to the Court's Order at the December 11, 2018 pre-trial hearing, the Government hereby supplements its original Notice with the details below, which the Government believes goes well beyond the Rule 16 disclosure requirement.[1] *See United States v. Jackson*, 51 F.3d 646, 650-651 (7th Cir. 1995) (Seventh Circuit found the following disclosure sufficient (albeit "barely"): the government disclosed merely that experts "may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics. In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics. Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.").

The Government expects its expert to testify to the effect of the following:

---

[1] However, despite being far more detailed than required, obviously this supplemental notice does not include every single statement the Government's expert is likely to make at trial.

1

Trade-Based Money Laundering involves using what appears to be legitimate trade transactions to transmit and disguise the proceeds of a crime as payment for legitimate trade.

A Black Market Peso Exchange scheme[2] is one of multiple methods of Trade-Based Money Laundering.  A typical or classic Black Market Peso Exchange scheme involves one or more people brokering the sale of illegally-obtained United States dollars, to be used as payment for international trade, for foreign currency.  In a typical or classic Black Market Peso Exchange scheme involving Mexican drug trafficking organizations and international trade with Mexican businesses, the broker(s) arrange for the Mexican drug trafficking organization's illegally-obtained United States dollars to be transferred to United States businesses as payment for goods or services purchased by Mexican businesses.  These arrangements often involve the use of "code words."  The transfer of the illegally-obtained currency typically involves a courier receiving the cash from a drug trafficker or associate during a quick exchange between two people who had never met each other, often in a random parking lot agreed upon over the phone.

The two common ways the illegal United States dollars then are transferred to the United States businesses are (i) physically driving the illegal money to the business, and (ii) depositing the illegal money directly into the bank account of the business.  As for the former, it is common for business owners who receive the illegal money directly to their stores to fail to file or file false Form 8300s because they understand the courier does not want to be identified on one.[3]  As for the latter, it is common for people who deposit the illegal cash into the United States business's bank account to do so in amounts under $10,000 made into multiple branches of the

---

[2] The Government intends to use a demonstrative chart during the expert's testimony to aid the jury in understanding a classic Black Market Peso Exchange scheme.  Attached as A-1.
[3] *See Wilson*, at 362 (expert "testified that narcotics traffickers use Western Union to move money and explained the <u>reasons why</u> they do so."  Emphasis added).

2

same bank because they do not want to be identified on a Currency Transaction Report.[4]  In addition, the latter typically involves an account at a "national" bank, i.e., one with branches throughout the United States.  The banks often close the business account because of the pattern of cash deposits under $10,000, after which the United States business frequently tries to open an account at another bank and then again provide that new account number to its Mexican business client to make cash deposit payments.  The courier typically is paid considerably more than a legitimate courier service to transfer the illegal currency.  The Mexican business typically pays for the illegal United States dollars by transferring an agreed upon amount of Mexican pesos to the broker(s) or an associate.  One effect of a typical or classic Black Market Peso Exchange scheme is to make the illegal United States dollars appear like payment for legitimate international trade, and to make it more difficult for law enforcement to trace the money back to its illegal source.

The expert will discuss the evidence in this case as depicted in the attached (and possibly additional) BCT Charts.[5]

The transactions as demonstrated by the evidence in this case are not consistent with that of common legitimate business transactions.

It is not common legitimate business practice to pay for wholesale goods with large amounts of cash.

It is not common legitimate business practice to disclose its business bank account number to its client so the client can make cash deposit payments directly into the business's

---

[4] *See Wilson*, at 362 (expert "testified that narcotics traffickers use Western Union to move money and explained the reasons why they do so."  Emphasis added).

[5] *See* Attachments A-2 through A-9.  Some of the demonstrative aid charts may be edited slightly before trial for accuracy.  The expert also will base his conclusions on numerous Government Exhibits, including transcripts of audio recordings, video recordings, bank records, Form 8300 filings and lack thereof, and El Reino business transaction ledgers.

bank account. It was not common legitimate business practice to receive payment for goods sold via multiple cash deposits just under $10,000 on the same day directly into the business's bank account.

It is common legitimate business practice to deposit large amounts of cash accumulated from the sale of goods into a business bank account as soon as reasonably possible.

The evidence of transactions in this case (as depicted in the attached Charts) is consistent with a typical or classic TBML and BMPE scheme.

The expert will discuss Government's Exhibit 396, which is based on El Reino's transaction ledgers (Government's Exhibits 359A-1, page 27 and 360A, pages 25 & 44), and the El Reino bank records at JP Morgan Chase and Wells Fargo during the same time periods, and testify about the significance of the amounts, dates, and locations of the cash deposits depicted in the Charts.[6]

The effect of the transactions in this case was to make the illegal United States currency appear to be legitimate payment for international trade and to disguise the true nature and origin of the illegal currency by making it more difficult for law enforcement to trace the money back to its illegal source.[7]

Bank Secrecy Act and the Cash Reporting Requirements:

---

[6] *See United States v. Barber*, 80 F.3d 964, 970 (4th Cir. 1996) (cited as authority on this issue by Fifth Circuit in United States v. $9,041,598.68, 163 F.3d 238, 255 (5th Cir. 1998) (The court "distinguished between expert opinion testimony that describes the significance of a defendant's actions to an illegal enterprise from opinion testimony that a defendant had an *actual* thought or intent." Emphasis added.

[7] *See Barber at* 970-971 (The expert appropriately testified that evidence demonstrated illegal money "can be effectively concealed at several levels. First, because the deposit slip does not show the bills' denominations, it cannot later be determined that a large number of small bills was deposited. Second, because bills used for buying drugs often retain traces of drugs, the deposit eliminates the possibility of linking the money to the drug trade. Third, depositing drug money into an account that contains legitimate income "lends credence or credibility to the [drug] money." And, finally, withdrawals of large bills facilitate physical concealment because one large bill is easier to conceal than several small ones. Agent Semesky thus concluded, 'So, as you can see, there are a number of concealments involved in just that simple series of transactions.'" The court found "no indication in the record that Agent Semesky gave an opinion on Norwood Barber's subjective intent in pursuing a particular activity. Rather, in each instance in which Semesky gave an opinion, he testified that objectively established conduct constituted concealment, an element of money laundering."). Emphasis added.

- "[T]he purpose of the [cash reporting requirements] is to track the movement of large amounts of currency because such amounts are often related to come type of illegal activity." *United States v. Wilson*, 355 F.3d 358, 362 (5th Cir. 2003).

- The circumstances under which Form 8300s, Currency Transaction Reports, and Reports of International Transportation of Currency or Monetary Instruments are required to be filed.

- Information required to be reported in Form 8300s, Currency Transaction Reports, and Reports of International Transportation of Currency or Monetary Instruments.

- People depositing illegal currency over $10,000 into a financial institution, including those involved in TBML and BMPE schemes, often deliberately break up the currency into amounts under $10,000 and make multiple deposits at different branches of the same financial institution so they are not identified in a Currency Transaction Report.[8]  This conduct commonly is referred to as "structuring" or making "structured" cash deposits.

- Couriers delivering payments to businesses consisting of large amounts of illegal cash, including those involved in TBML and BMPE schemes, typically do not want to be identified on a Form 8300 as the person who delivered the illegal cash.[9]

- Business owners and operators who receive large payments consisting of illegal cash, including those involved in TBML and BMPE schemes, often deliberately fail to file, or file false, Form 8300s because they understand the couriers of that illegal cash do not want to be identified as such on a Form 8300.[10]

---

[8] *See Wilson*, at 362 (expert "testified that narcotics traffickers use Western Union to move money and explained the <u>reasons why</u> they do so."  Emphasis added).

[9] *See Wilson*, at 362 (expert "testified that narcotics traffickers use Western Union to move money and explained the <u>reasons why</u> they do so."  Emphasis added).

[10] *See Wilson*, at 362 (expert "testified that narcotics traffickers use Western Union to move money and explained the <u>reasons why</u> they do so."  Emphasis added).

- On multiple occasions related to this case, Form 8300s were required to be filed, but were not.[11]

- The <u>effect</u> of Form 8300 filing failures and "structured" cash deposits is to hinder law enforcement's ability "to track the movement of large amounts of currency [that] are often related to come type of illegal activity," and to disguise the original source of illegal cash.[12]

Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY


<u>/s/ José Angel Moreno</u>
José Angel Moreno
Assistant United States Attorney


Deborah Connor
Chief
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice


<u>/s/ Keith Liddle</u>
Keith Liddle
Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

---

[11] *See Wilson*, at 362 (expert "opined that a CTR should have been filled out in this case . . . .").
[12] *See Barber*, at 970-971 (cited above).

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2018, a true and correct copy of the Government's Supplement to Notice of Intent to Offer Expert Testimony was electronically filed with the Clerk of the Court using the CM/ECF System, which will transmit notification of such filing to all Counsel of Record.

/s/ Keith Liddle
Keith Liddle
Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
