1               IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                       LAREDO DIVISION

4    UNITED STATES OF AMERICA        §    CASE NOS. 5:17-CR-560-11
                                     §              5:17-CR-560-12
5    VERSUS                          §              5:17-CR-560-13
                                     §    LAREDO, TEXAS
6    RAVINDER REDDY GUDIPATI (11)    §    THURSDAY,
     HARSH JAGGI (12)                §    JANUARY 10, 2019
7    NEERU JAGGI (13)                §    8:28 A.M. TO 5:15 P.M.

8                    PRE-TRIAL CONFERENCE;
                     JURY TRIAL DAY TWO
9                    (PARTIAL TRANSCRIPT)

10         BEFORE THE HONORABLE MARINA GARCIA MARMOLEJO
                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:                         SEE NEXT PAGE

13   ELECTRONIC RECORDING OFFICER:    EDGAR HERNANDEZ

14   CASE MANAGER:                    ANGIE TREVINO

15   OFFICIAL INTERPRETERS:           ANA KOENCY
                                      RAUL GONZALEZ
16                                    MEENU BATRA
                                      REKHA GUPTA

17

18

19

20                 TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 ELDRIDGE ROAD, #144
22                  SUGAR LAND, TEXAS 77478
             Tel: 281-277-5325 / Fax: 281-277-0946
23                www.judicialtranscribers.com

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE SOUTHERN DISTRICT OF TEXAS

 3                            LAREDO DIVISION

 4
     UNITED STATES OF AMERICA      §    CASE NOS. 5:17-CR-560-5
 5                                 §              5:17-CR-560-6
     VERSUS                        §              5:17-CR-560-8
 6                                 §
     ADRIANA ALEJANDRA             §    LAREDO, TEXAS
 7   GALVAN-CONSTANTINI (5)        §    THURSDAY,
     LUIS MONTES-PATINO (6)        §    JANUARY 10, 2019
 8   ADRIAN ARCINIEGA-HERNANDEZ (8) §   8:28 A.M. TO 5:15 P.M.

 9
                            PRE-TRIAL CONFERENCE;
10                           JURY TRIAL DAY TWO
                            (PARTIAL TRANSCRIPT)
11

12         BEFORE THE HONORABLE MARINA GARCIA MARMOLEJO
                    UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:                        SEE NEXT PAGE
14
     ELECTRONIC RECORDING OFFICER:    EDGAR HERNANDEZ
15
     CASE MANAGER:                    ANGIE TREVINO
16
     OFFICIAL INTERPRETERS:           ANA KOENCY
17                                    RAUL GONZALEZ
                                      MEENU BATRA
18                                    REKHA GUPTA

19
                         TRANSCRIPTION SERVICE BY:
20

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 ELDRIDGE ROAD, #144
22                   SUGAR LAND, TEXAS 77478
             Tel: 281-277-5325 / Fax: 281-277-0946
23               www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.
```

```
 1                          APPEARANCES:

 2


 3   FOR THE GOVERNMENT:              US ATTORNEY'S OFFICE
                                      Jose Angel Moreno, Esq.
 4                                    11204 McPherson Road
                                      Suite 100A
 5                                    Laredo, TX  78045-6576
                                      956-723-6523
 6
                                      US DEPARTMENT OF JUSTICE
 7                                    Stephanie Williamson, Esq.
                                      Keith H. Liddle, Esq.
 8                                    1400 New York Ave., NW
                                      10th Floor
 9                                    Washington, DC  20005
                                      202-514-5131
10
     FOR THE DEFENDANT, ADRIANA
11   ALEJANDRA GALVAN-CONSTANTINI
     (5):                            ATTORNEY AT LAW
12                                    Oscar O. Pena, Esq.
                                      1720 Matamoros
13                                    Laredo, TX  78040
                                      956-722-5167
14
     FOR THE DEFENDANT,
15   LUIS MONTES-PATINO (6):          ATTORNEY AT LAW
                                      Roberto Balli, Esq.
16                                    PO Box 1058
                                      Laredo, TX  78042-1058
17                                    956-712-4999

18
     FOR THE DEFENDANT,
19   ADRIAN ARCINIEGA-HERNANDEZ
     (8):                            ATTORNEY AT LAW
20                                    Oscar J. Pena, Esq.
                                      PO Box 1324
21                                    Laredo, TX  78042-1324
                                      956-722-5167
22
                                      DEL RIO LAW FIRM, PLLC
23                                    Philip D. Del Rio, Esq.
                                      401 E. Hillside, 2nd Fl.
24                                    Laredo, TX  78041

25
```

```
 1                        APPEARANCES (CONT'D):

 2

 3   FOR THE DEFENDANT,
     RAVINDER REDDY GUDIPATI (11): ATTORNEY AT LAW
 4                                 Scott W. McCrum, Esq.
                                   404 East Ramsey Rd.
 5                                 Suite 102
                                   San Antonio, TX  78216
 6                                 210-225-4851

 7   FOR THE DEFENDANT,
     HARSH JAGGI (12):             McCRUM LAW OFFICE
 8                                 Michael W. McCrum, Esq.
                                   404 East Ramsey Rd.
 9                                 Suite 102
                                   San Antonio, TX  78216
10                                 210-225-7045

11   FOR THE DEFENDANT,
     NEERU JAGGI (13):             LAW OFFICE OF
12                                 EDUARDO A. CASTILLO
                                   Eduardo A. Castillo, Esq.
13                                 402 E. Hillside, Suite 6
                                   Laredo, TX  78040
14                                 956-724-1505

15

16

17

18

19   Also Present:              CARLOS GOMEZ, USM

20

21

22

23

24

25
```

1                          INDEX

2

3    WITNESS:           Direct     Cross    Redirect    Recross

4    FRANCISCO LOZANO
      By Ms. Williamson  24,175      .         .          .
5    Voir Dire
      By Mr. O.J. Pena    175
6

7

8    EXHIBITS:                    Marked    Offered    Received

9    Exhibits were pre-admitted.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      LAREDO, TEXAS; THURSDAY, JANUARY 10, 2019; 8:28 A.M.

2       (Official Interpreters utilized for translation.)

3       (Outside the presence of the jury.)

4           THE CLERK:  All rise.

5                (CALL TO ORDER OF THE COURT)

6           THE COURT:  Thank you.  Please be seated.

7       (Pause in the proceedings.)

8           THE COURT:  All right.  Good morning everyone.  We

9   are back on the Record in Cause No. 5:17-CR-560.  I'm

10  looking around the room.  It looks like everyone is present.

11          Is that correct?  Counsel, you missing anybody?

12          MR. BALLI:  No, Your Honor.  Everybody's here.

13          THE COURT:  Great.

14          Are the headsets working?  Can everybody hear the

15  Interpreters?

16      (No audible response.)

17          THE COURT:  Mr. Hernandez is nodding yes.  That's

18  our Spanish Interpreter.

19          And as to our Hindi Interpreters, Mr. and

20  Ms. Jaggi and Mr. Gudipati?

21      (No audible response.)

22          All right.  Thank you.

23          And Mr. Pena Sr. is adjusting his English --

24  Mr. McCrum are you going to be using one today or no?

25          MR. MICHAEL MCCRUM:  I'd like to have one

1  available, Judge, please.

2          THE COURT:  All right, that's fine.  We'll hand

3  one to you as well.

4      (Court confers with the Clerk.)

5          MR. MICHAEL MCCRUM:  Judge, with respect to your

6  client's adult children, they are on our witness list, are

7  they excused from the rule for opening statements or are

8  they under the rule?  I just can't recall.

9          THE COURT:  That usually depends on the parties.

10 I've had people argue that they shouldn't be here because of

11 what's discussed in opening, but I don't know.

12          Government, what is your position on that?

13          MR. MORENO:  I don't think we have any objections

14 being present until the testimony starts.

15          THE COURT:  Okay.  So, that would be, again, for

16 both sides.  If anybody wants to be here for openings,

17 that'll be okay.

18          All right.  Anything we need to cover before we

19 get started?

20      (No audible response.)

21          THE COURT:  No?

22          I guess that I will remind all the lawyers if we

23 have any kind of medical emergency, obviously don't ask

24 permission to approach the bend.  Just run up, approach the

25 bench and have me call 9-1-1 if it is a true emergency.  It

1  is another type of situation like we had the other day, then

2  let me know as quickly as, you know, you become aware of the

3  situation so that we can excuse the jury out of the room and

4  call the medic.

5       But you all saw what happened last time; I don't

6  even know that we have a medic in the building.  And so, if

7  there really is a situation that requires medical attention

8  and we need to excuse the jury, just stand up and say,

9  "Judge, may we excuse the jury from the room?" or, you know,

10 approach and we'll excuse the jury, but I want to make sure

11 that we deal with those matters as efficiently, you know, as

12 we can.

13      I don't feel like we did that last time, but last

14 time I think, you know, Ms. Jaggi had hurt herself in the

15 morning.  I wasn't aware of it.  You know, I think she sat

16 there with bandages and by the time I was notified that she

17 was bleeding, I was still asked to just get her some more

18 bandages and Tylenol.

19      And so, we really have got to assess these

20 situations better and I can't do it without your help.  And

21 so, when things like that happen, I'm relying on you all to

22 let me know.  Please.

23      Ms. Jaggi, how is your hand?  Is it fine now?

24      DEFENDANT NEERU JAGGI:  Yes.

25      THE COURT:  Okay, ma'am.  Thank you.

1        COURT INTERPRETER:  Your Honor, may we have a

2   second?  I believe we're having problems with the headset.

3        THE COURT:  You're having problems with the

4   headset for Mr. Hernandez?

5        COURT INTERPRETER:  Yes.

6        THE COURT:  Okay, thank you.

7        Government, you had asked that the Court consider

8   not having trial tomorrow and I think I put out a notice

9   saying that there's not going to be any trial on Friday.

10  I'm standing by that, so don't worry.  We don't have trial

11  tomorrow, but what I'm wondering is, are you all flying out

12  tonight or do you leave until tomorrow?  Because flights are

13  limited, so.

14       MR. MORENO:  Unless we finish, like, at 3:00 so we

15  can make the last 4:00 o'clock flight, there's no way --

16       THE COURT:  Okay.

17       MR. MORENO:  -- I think they could make it out

18  there.

19       THE COURT:  Right.

20       MR. MORENO:  So, they have to fly out in the

21  morning.

22       THE COURT:  Okay, but they are flying out?

23       MR. MORENO:  Some of them, I believe are.  I don't

24  know if all of them.

25       THE COURT:  Okay.

1          MR. MORENO:  And some of the witnesses, too.

2          THE COURT:  Right.  And I know that we have local

3    counsel, we have out of town counsel, so I'm sure

4    everybody's already made arrangements so I'm not bringing

5    anybody in tomorrow.

6          Mr. Patino also has a headset.

7          Can you hear, Mr. Patino?

8      (No audible response.)

9          THE COURT:  He indicated yes.

10         Ms. Trevino, let's go through -- we had already

11   talked about how much time everybody had asked for and I had

12   given them.

13         I'll ask you all to police your own time.

14         Let's just go through the minutes.

15         MS. TREVINO:  These are for on Monday, Judge.  In

16   reference to the opening statements, the two McCrums and

17   Mr. Castillo did ask for 45 minutes, Mr. Oscar O. Pena, Sr.,

18   and Mr. Balli had requested 15 minutes, the Court did

19   mention 30 minutes --

20         THE COURT:  They get 30 minutes for the ones that

21   asked for 45 is the way I recall, but do you all have

22   another interpretation?

23      (No audible response.)

24         THE COURT:  I think those of you that said 15, I

25   said that's fine, 15.  Those of you that said 45, I said 30.

1          MR. O.J. PENA:  Your Honor, may I amend my request

2    and ask for a little bit more time.  I had originally said

3    15.  I wrote down my outline yesterday and I believe that it

4    might take a little bit longer.  I would say maybe about

5    20 minutes roughly, Your Honor.

6          THE COURT:  That's fine.

7          MR. O.J. PENA:  Thank you, Your Honor.

8          THE COURT:  Government, you're sticking to 15?

9          MS. WILLIAMSON:  I would say approximately

10   15 minutes, Your Honor.  I would ask the Court's indulgence

11   if it becomes 16.

12         THE COURT:  That's fine.

13         MS. WILLIAMSON:  But I don't expect it to go much

14   further than that.

15         THE COURT:  You're fine.  Okay.

16         As for as equipment is concerned, does everybody

17   have their equipment ready to go?  It seemed to work fine

18   when everybody was switching over to the PowerPoints.

19         Have you all tested it this morning?

20         MR. BALLI:  I haven't, but what I was told was

21   that as long as you put that cable in, it should be ready to

22   go and it worked yesterday that way.

23         THE COURT:  So, it's as simple as plugging in a

24   cable then?

25         MR. BALLI:  It is.  It used to be you had to

1    connect, but now you don't.

2            THE COURT:  Every table has that cable, I guess?

3            MS. TREVINO:  And only one can be connected per

4    table.  So, they have to switch.

5            THE COURT:  So, one per table?  So, one of you

6    finishes then it goes to the next person?

7            MR. BALLI:  Yes.

8            THE COURT:  Okay.

9            As you all know, Defense, you're not required to

10   deliver opening statements.  I take it all of you are going

11   to.  And so, give me your line up so that I can invite you

12   up by name.

13           Who's going to be up first?

14           MR. O.J. PENA:  I will go first, Your Honor.

15   That's Oscar Pena, for the Record.

16           THE COURT:  All right.

17           Who's second?

18           MR. BALLI:  I'll go second.

19           THE COURT:  All right.

20           Third?

21           MR. SCOTT MCCRUM:  I'll go third, Your Honor.

22           THE COURT:  Fourth?  Do we have a fourth?

23           MR. O.O. PENA SR.:  I'll go fourth.

24           THE COURT:  Mr. Pena Sr.  Yes, sir.

25           Fifth?

1           MR. CASTILLO:  I'll go fifth, Judge.

2           THE COURT:  And that only leaves one person.  All

3    right.  So, Michael McCrum will go last.  Okay, thank you.

4           And Ms. Williamson, since I've been talking to you

5    about the time, you're going to deliver the opening

6    statement for the Government.

7           MS. WILLIAMSON:  I am, Your Honor.

8           I have a demonstrative that I intend to put on the

9    ELMO during the opening statement.  May I approach to make

10   sure that it's properly done?

11          THE COURT:  Yes, ma'am.

12          MS. WILLIAMSON:  I have shared it with defense

13   counsel.

14          THE COURT:  Yes, you may.

15          MS. WILLIAMSON:  Thank you.

16       (Counsel confer.)

17          MS. WILLIAMSON:  Thank you.

18          THE COURT:  You're welcome.

19          I will also tell all of you, there's a lot of

20   exhibits that have been pre-admitted.  Just a reminder, when

21   you put them up on the screen, reference them for the

22   record.  Just say, you know, "On the screen is now Exhibit

23   whatever it is," so that the Record stays clean.  You don't

24   have to ask permission to approach the ELMO, just approach

25   it as necessary.

1          I'm trying to think is there anything else?  I

2    guess regarding opening statements, remember they're not

3    arguments.  It's a road map.  If you object to each other's

4    opening statements, you'll have to approach the bench.  So,

5    I'll leave that up to all of you.

6          I trust that you're not going to agree as to

7    respective road maps and what they're going to mean or not

8    mean, but if you believe someone is saying something

9    improper, you know, for example, someone is shifting the

10   burden or they're saying something that you are compelled to

11   object to, feel free to do your job, but it will require

12   that you approach and so that is going to interrupt the flow

13   of your respective arguments.  But again, I'll leave that up

14   to you.

15         Do we have all the jurors here yet?

16      (Court confers with the Clerk.)

17         THE COURT:  Okay.  And I told them 8:45 so they're

18   still on time here.

19         I just thought we would have more to talk about.

20         MALE SPEAKER:  If we're done, Your Honor, can I

21   step out for a couple of minutes?

22         THE COURT:  Yes.  Go ahead, sir.

23         MALE SPEAKER:  Thank you.

24      (Court confers with the Clerk.)

25         THE COURT:  All right.  Thank you, Ms. Trevino.

1          Ms. Trevino to remind you all, and I think it's a

2     valid point, that, obviously, you all can no longer use the

3     restrooms over here because of the jury.  You know, these

4     are now their restrooms.  And so, use the restrooms out in

5     the hallways.  That is a valid matter, sometimes we take

6     things for granted or get used to doing something or other.

7          Okay, we're waiting for one.  She still has five

8     minutes to make it in.

9       (Pause in the proceedings.)

10          THE COURT:  I see the two Hindi Interpreters are

11     way in the back.

12          The range, I know you all have tested the range,

13     it's good?

14          COURT INTERPRETER:  Yes, Your Honor.

15          THE COURT:  Okay, perfect.

16       (Pause in the proceedings.)

17          THE COURT:  In case anybody is wondering who the

18     young man is in the blue suit over there -- Mr. Chappa, if

19     you'll stand -- he is a college student.  He's one of my

20     interns and he thinks he's applying to law school.  In fact,

21     he's pretty convinced he's going to be applying to law

22     school.

23          Is that correct, Mr. Chappa?

24          MR. CHAPPA:  That's correct.

25          THE COURT:  Okay.  So, welcome.

1          And he was very impressed by all of you yesterday.

2   He's very glad to be here.

3          MALE SPEAKER:  May I get some coffee, Your Honor?

4          THE COURT:  Yes, sir.

5      (Pause in the proceedings.)

6          THE COURT:  I'm going to give all my staff extra

7   days off after this trial, I think.  Mr. Youst (phonetic)

8   has been making coffee like three times a day and

9   Ms. Trevino, also, is just very helpful to all of you guys.

10         MR. MORENO:  Judge, just for planning purposes, I

11  guess, if everybody uses their time on the openings and

12  maybe take a 10-minute break about 11:45, does the Court

13  expect to start testimony then or take a lunch break first

14  and then start testimony?

15         THE COURT:  No, we'll take a lunch break and then

16  we'll start testimony.

17         MR. MORENO:  Thank you, Your Honor.

18      (Court confers with the Clerk.)

19         MR. O.O. PENA:  May I get some water, Your Honor?

20         THE COURT:  Yes, Mr. Pena.

21         If anybody happens to run into Judge Song today, I

22  don't know that you would, but today is her birthday.

23         MR. SCOTT MCCRUM:  Why would she be here today

24  then, Your Honor?

25         THE COURT:  Because we work on our birthdays,

1   Mr. McCrum.  And we're going to have a little luncheon for

2   her here at noon anyway, so.

3           And after you hit a certain age, you're not

4   terribly excited about another birthday anyway.  And she's

5   young, she's young but still, you know what I mean.

6           MR. DEL RIO:  I'm not there yet, Your Honor.

7           THE COURT:  You're not quite there yet, Mr. Del

8   Rio?

9           MR. DEL RIO:  No, Your Honor.

10          THE COURT:  You look forward to all your

11  birthdays?

12          MR. DEL RIO:  Absolutely.  Ten minutes for

13  opening.

14          THE COURT:  Yeah.  Wait till you hit 40, that'll

15  change.

16      (Pause in the proceedings.)

17          THE COURT:  Everyone's here?  Perfect.

18          All right, let's go.  Everybody's back in the

19  room?  I think so.  Let's go ahead and bring the jury out.

20      (Pause in the proceedings.)

21          THE COURT:  They're in the elevators?  Oh, okay.

22  I thought they were ready to come out.  That's fine.

23  Doesn't hurt to stand a little.

24          We're going to have to do something about this.

25  At some point, we're going to have to have working stations,

1   standing stations or something because I think it's hard on

2   everyone to sit all day.

3            MALE SPEAKER:  Or they have the desks, you know,

4   that elevate.

5            THE COURT:  Right.

6            So, after we get the microphones --

7            THE COURT:  Let's work on the microphones first

8   and then we'll work on --

9            MALE SPEAKER:  We can start with the chairs

10  reaching over to the desk.  They keep getting lower and

11  lower.

12           THE COURT:  Oh, we need to work on the chairs,

13  too?

14           MALE SPEAKER:  Not if we want to stay away from

15  the chairs.

16           THE COURT:  That's right.  Well, I guess he wants

17  the option of having a chair, too, though.

18       (Pause in the proceedings.)

19           THE COURT:  J.J., are you here just in case

20  something goes wrong?

21           J.J.:  Yes, I adjusted the microphones, so if you

22  want to wait a little bit?

23           THE COURT:  That's fine.  You're welcome to stay.

24           Thank you.

25       (Pause in the proceedings.)

1          THE COURT:  We're going to take a picture of you

2    guys.  Judge Saldana, remember the case used to belong to

3    her?  She wanted to see how packed we all were in here.

4          THE CLERK:  All rise.

5      (Jury enters courtroom at 8:50 a.m.)

6      (Excerpt 8:50 to 11:22 a.m. previously transcribed can

7    be found at Docket 375.)

8          THE COURT:  All right.  Well, it is 11:20.

9    Ladies and gentlemen, let me go ahead and excuse you to the

10   jury room.  I need to talk to the lawyers and we're either

11   going to bring you back out and start testimony or we're

12   going to break for lunch.  Thank you.

13         THE CLERK:  All rise.

14     (Jury exits courtroom at 11:23 a.m.)

15     (Outside the presence of the jury.)

16         THE COURT:  All right, the jury is now out of the

17   room.

18         And Government, who is the first witness going to

19   be?  Is it going to be Mr. Lozano?

20         MS. WILLIAMSON:  Yes, it is, Your Honor.

21         THE COURT:  Okay.  So, let's start up testimony

22   with Agent Lozano at 11:30.  We can at least get half an

23   hour before we break for lunch.  Let's take a 10-minute

24   recess and we'll commence.

25         MR. BALLI:  Judge, can I small request?

1                THE COURT:  Yes.

2                MR. BALLI:  The request is this, during opening

3    statements when I had the Interpreters, there's two?  When

4    the Interpreter closest to me is interpreting, it's

5    difficult for me to hear.  When the Interpreter farthest

6    from me is interpreting, it's not.  And so, it didn't matter

7    during opening, but during witness questions, especially,

8    Lozano, it will be very important to hear and so I would

9    just ask that the speaker switch places.

10               THE COURT:  That's fine.  I'm sure they will

11   accommodate you.

12               All right.  Ten-minute break.  We'll start up

13   with Agent Lozano at 11:30 a.m.  Thank you.

14          (Recess taken from 11:24 a.m. to 11:30 a.m.)

15                        AFTER RECESS

16        (Outside the presence of the jury.)

17               THE CLERK:  All rise.

18               THE COURT:  Thank you.  You may be seated.

19               MALE SPEAKER:  We need a few minutes, then we'll

20   be finished setting up.

21        (Pause in the proceedings.)

22               THE COURT:  All right, everybody.  We're going to

23   get started again.  I'm going to bring the jurors back.

24   Just give me a moment.

25               Government, a couple of things.  Again, reminder,

1  if you're referring to specific exhibits, make reference to

2  the number before you publish and maybe do a little heads up

3  as to what the particular exhibit is in case anybody wants

4  to request a cautionary or wants to raise anything else.

5  That way they know what you're about to get into.

6            Are you ready?

7            MS. WILLIAMSON:  For the exhibits that have been

8  pre-admitted, do I need to ask the Court's permission to

9  publish them?

10            THE COURT:  No, the ones that have been

11  pre-admitted, you can publish.  They're already in evidence.

12  I'm just suggesting that you say, you know, to your

13  witness, --

14            MS. WILLIAMSON:  Yes.

15            THE COURT:  -- "I'm not going to talk to you

16  about Exhibit 21, which appears to be a call between this

17  person and that person."  That will alert the Defense

18  exactly which one we're talking about.

19            And Defense, if at that point you believe a

20  cautionary is merited, warranted, then get up and let me

21  know.

22            MS. WILLIAMSON:  Thank you, Your Honor.

23            THE COURT:  Also, Government, another caution.

24  Begin with your non-hearsay testimony before you get into

25  any hearsay testimony.

1              MS. WILLIAMSON:  Yes, Your Honor.

2              THE COURT:  And that what's the case law requires

3    that you all do.

4              Anything else from anyone before we bring the

5    jury in?

6         (No audible response.)

7              THE COURT:  All right.  I'm not hearing anything

8    from anyone, so let's bring the jury in.

9         (Pause in the proceedings.)

10             THE COURT:  Mr. Scott McCrum, at one point when

11   you were delivering your opening statement, I saw your

12   client did not have a headset, was that intentional?

13             MR. SCOTT MCCRUM:  He takes it off now and then.

14             THE COURT:  Okay.

15             MR. SCOTT MCCRUM:  Thank you.

16             THE COURT:  But he chooses to take it off?

17             MR. SCOTT MCCRUM:  That's correct.

18             THE COURT:  All right.  I didn't want to

19   interrupt you to point out that he didn't have the headset,

20   but.

21             MR. SCOTT MCCRUM:  Yes.

22             THE COURT:  Okay.

23             MR. SCOTT MCCRUM:  No, he takes it off.  He's

24   fine, thank you.

25             THE CLERK:  All rise.

1           (Jury enters the courtroom at 11:39 a.m.)

2                THE COURT:  Thank you, ladies and gentlemen.

3    Please be seated.

4                And everyone else may be seated.

5                All right, ladies and gentlemen, what you heard

6    were the opening statements by the lawyers, with one lawyer

7    who reserved an opening statement.  I remind that opening

8    statements are not evidence.  You have not yet heard any

9    evidence.  Not to say they're not important, I know you were

10   paying attention as you should, but we will now begin with

11   the part of the trial where witnesses are called and you'll

12   start to hear evidence in the case.

13               Government, are you ready to call your first

14   witness as this time?

15               MS. WILLIAMSON:  Yes, Your Honor, we are.

16               Government calls Task Force Officer Francisco

17   Lozano.

18               THE COURT:  All right.  Officer Lozano, make your

19   way to the front.  Stand in front of the microphone and

20   raise right hand to be sworn.

21        (Witness sworn.)

22               THE WITNESS:  I do.

23               THE COURT:  All right, sir.  If you will have a

24   seat right over here.  Make sure that you adjust the

25   microphone so that we can all hear you clearly.  Thank you.

 1          And you may begin, Counsel, whenever you're

 2   ready.

 3              DIRECT EXAMINATION OF FRANCISCO LOZANO

 4   BY MS. WILLIAMSON:

 5       Q.    Good morning.

 6       A.    Good morning.

 7       Q.    Would you please state your name and spell your

 8   first and last name for the Record?

 9       A.    It's Francisco Lozano.  Francisco is

10   F-R-A-N-C-I-S-C-O, Lozano is L-O-Z-A-N-O.

11       Q.    Where do you work, sir?

12       A.    I work with the District Attorney's Office and

13   I'm assigned to the Drug Enforcement Administration as a

14   Task Force Officer.

15       Q.    How long have you been a law enforcement officer?

16       A.    I started my career in 2005 with the Webb County

17   Sheriff's Office.

18       Q.    And could you explain to the jury what kinds of

19   cases you've mainly investigated during the course of your

20   law enforcement career?

21       A.    Back whenever I started, I started on patrol.

22   So, I patrolled the whole Webb County and just traffic

23   violations and responding to emergencies.

24       Q.    And in your subsequent roles, what kind of cases

25   have you investigated?

1      A.   In 2006, I was moved to a different department

2  within the Sheriff's Office.  I started working for a group

3  called Crime Stoppers and our main -- I, basically, became

4  an investigator, but I didn't get the title.  I started

5  investigating narcotics and any type of call that came in

6  through Crime Stoppers, fugitives, stolen items.  Basically,

7  that's all I've worked.

8           And from April 2006 to April 2009, that's what I

9  worked on, Crime Stoppers.  Mainly investigating narcotics.

10  And within those investigations, again, we seized narcotics,

11  we seized money from stash houses, we were able to

12  confiscate stolen items from people and arrest felons.

13           And in April 2009, I then transferred over to the

14  District Attorney and got deputized as a Task Force Officer

15  within DEA

16      Q.   What are your duties and responsibilities as a

17  DEA Task Force Officer?

18      A.   To conduct narcotics investigations, money

19  laundering investigations, investigate cartels, investigate,

20  also, money laundering organizations.

21      Q.   Have you received any on the job training or

22  experience as regards to the money laundering investigations

23  you described?

24      A.   Yes, DEA has provided training for us.

25      Q.   Could you briefly describe the kind of training

1   you've had on that subject?

2        A.   I forget the span of time, but they teach us what

3   to look for, what the structuring is, how people -- how

4   money is hidden within vehicles that travel down to the

5   border, they teach us how schemes that are used to layer

6   money to make it look clean.

7        Q.   You said the word "structure" and not everyone

8   might be familiar with it in context.

9             Could you explain what you mean by that?

10       A.   In the banking system, if you don't want the

11   Government to be investigating you for receiving large

12   amounts of cash, you structure your money.  You know, some

13   people call it, there was a term also used.  It was called

14   "Smurfing."  Right?  Because if you think about the Smurf,

15   there's several thousands of them in the thought process and

16   all of them bring in small quantities of money to get the,

17   let's say, $20,000 into a bank account.  So, you'll send

18   $500 at a time to eventually equal the $20,000 that you want

19   to pay me.  So, you send several different people.  You

20   know, $20,000 is just an example I thought of.

21       Q.   In the course of your work, have you become aware

22   of any other common themes or methods in cases such as the

23   one you're testifying about today?

24       A.   Yes.

25       Q.   Could you briefly explain?

1       A.   It would be the Black Vessel Market Exchange.

2       Q.   Can we agree to abbreviate that as BMPE, Black

3  Market Peso Exchange?

4       A.   Yes, BMPE.

5       Q.   Could you briefly explain to the jury what a BMPE

6  is?

7       A.   Yes, with a BMPE, what occurs is that in Mexico

8  you get a peso broker and that peso broker in this

9  investigation they identify it as Ippolito Ochoa-Rivera and

10 his nickname was Tio Polo.  And his main thing was to act

11 like an agent with cartels, with drug traffickers.  He would

12 get information of where there is money in the U.S. that's

13 been generated through drug sales.

14            So, he then tells the cartels, the drug

15 traffickers, "Hey, I can get that money down to you in

16 Mexico without having to cross the border.  There's no money

17 really crossing the border.  There's money in the U.S. and I

18 can it to you here in Mexico a lot faster without you having

19 to risk it bringing your drug dollars down," you know,

20 because a lot of these drug money is not on the border when

21 it starts off.  It starts off where the bigger sales are.

22 You know you got the bigger cities, Chicago, New York,

23 that's where the drug money is at.

24            So, what -- I'm going to call him Tio Polo, what

25 he does, he then gets money couriers, that we identified

1  also in this investigation, like Adriana Galvan and Luis

2  Patino.  Tio Polo hires them to go pick up the money in,

3  I'll just say, for example, North Carolina.  They go up to

4  North Carolina, pick up the money, that money is then

5  brought down to the border.  Then we obtained a Confidential

6  Source.

7              THE COURT:  I'm sorry.  Hold on a second.

8              MR. MICHAEL MCCRUM:  Judge, can we approach the

9  bench?

10             THE COURT:  Is the objection narrative?

11             MR. MICHAEL MCCRUM:  That's one of them.

12             THE COURT:  All right.  Yes.

13             MR. BALLI:  And hearsay.

14             THE COURT:  You may approach.

15        (Bench conference begins at 11:48 a.m.)

16             MS. WILLIAMSON:  I can certainly break up this

17  testimony.

18             THE COURT:  What is the other objection?

19             MR. BALLI:  Judge, as you know, we were still

20  supposed to have a Daubert hearing on the nature of these

21  organizations and how it may relate to this and whether or

22  not there's a valid to prove that up.  He's not just frankly

23  describing a link in this alleged scheme to the specific

24  parties in this case.  And so, he's linking it and the very

25  thing that the expert is allegedly going to but we haven't

1  had a Daubert hearing on it.

2          THE COURT:  All right.  I would say the same

3  thing.  I thought at the hearing, I thought he was the

4  expert and then (indiscernible) it's somebody else.

5          MR. GOMEZ:  Agent Gogley.

6          THE COURT:  I will tell you all, Government, it's

7  one thing for him to say, "Look, I'm trained to conduct

8  investigation involving money, the movement of money.  The

9  BMPE is generally this," but he's going too far.  And I'll

10 tell you this, if you want to do this with this witness then

11 we can have the Daubert hearing with him, but I'm not going

12 to allow him and the expert to basically say the same

13 thing."

14         MS. WILLIAMSON:  No, Your Honor, and I'll make

15 sure that he does not mention any of the Defendant's names.

16         THE COURT:  Right, but I guess the point is if

17 he's now describing how these transactions work and how

18 moneys are concealed then he's really done nothing more than

19 to say, "I have some training doing this," and hasn't

20 elaborated beyond 30 seconds on what his training is or his

21 expertise.

22         And I will you that we're not going to have two

23 pseudo-experts and when you have an agent, people think of

24 them as experts whether you want to label him "expert."  I

25 wasn't expecting this from him.  I thought he was going to

1  say, "I'm a case agent.  I've been looking at the facts of

2  this case, let's get right into the offense."

3          MR. MICHAEL MCCRUM:  He's now being listed as an

4  expert and we didn't get notice of him as an expert?

5          MR. MORENO:  He's not testifying as an expert.

6  He's describing what he did in the investigation and how it

7  works.

8          THE COURT:  Right, but except we haven't gotten

9  to that part.  If you want to take him through, "This is how

10 I'm familiar with how these schemes work and this is what I

11 did," get right to what he did.

12         MS. WILLIAMSON:  Yes, Your Honor.

13         MR. MICHAEL MCCRUM:  But when we start to go into

14 descriptions of, "People in Mexico say this and that,"

15 That's an extensive type of testimony that is expert in

16 nature.

17         THE COURT:  Right, and so we're stopping that

18 right now.

19         MR. O.J. PENA:  Your Honor, as to the Record, I

20 would ask that the testimony be stricken.

21         THE COURT:  No, it's not going to be stricken.

22 You have all objected and I granted your objection and we're

23 moving on.  Thank you.

24     (Bench conference ends at 11;50 a.m.)

25 BY MS. WILLIAMSON:

1        Q.   Let's talk a little bit more about the basics of

2   this investigation before we get into the more confusing and

3   detailed aspects.   And I'll start by asking you, do you

4   speak Spanish, Agent Lozano?

5        A.   I do.

6        Q.   Do you ever speak Spanish as part of your work?

7        A.   I do.

8        Q.   Was that important in this case?

9        A.   Yes.

10       Q.   Why is that?

11       A.   The people we were dealing with spoke Spanish.

12       Q.   So, what was your role in this investigation?

13       A.   When the investigation started, whenever I became

14   part of the investigation back in March of 2012, I was asked

15   to assist in the recruitment of a Confidential Source.

16       Q.   And why exactly were you interested in recruiting

17   a Confidential Source?   What was it you were investigating

18   that you were looking for assistance on?

19       A.   There was -- the information I received was that

20   there was a person that had received money from a --

21            BY MR. BALLI:   Objection as to relevancy and

22   hearsay.

23            THE COURT:   All right.   Approach.

24       (Bench conference begins at 11:52 a.m.)

25            THE COURT:   Tell me the specific question.

1          MS. WILLIAMSON:  Why were you interested in

2    recruiting a Confidential Source for this investigation?

3          THE COURT:  How is that not relevant, Mr. Balli?

4          MR. BALLI:  Well, the agent starts to say the

5    answer is that he was told that there was some people, I

6    guess, laundering money or something to that effect, so he's

7    bringing in hearsay.

8          THE COURT:  People don't recruit CIs just out of

9    the blue.  They don't wake one day and say, "I think I'm

10   going to look for a CI."  There has to be some context as to

11   what launched this investigation and why they began looking

12   for a cooperator.

13         Can you do that in a way where you avoid hearsay?

14   In other words, is there just come background?

15         MS. WILLIAMSON:  Other than background, he had to

16   have conversation with someone --

17         THE COURT:  Right.  Without saying what that

18   person may have said to him.

19         MS. WILLIAMSON:  I do not intend to get into

20   specifics.

21         THE COURT:  We became aware that A, B, C, and D

22   without saying, "I spoke to this person and this is what

23   they told me."

24         MS. WILLIAMSON:  Yes, Your Honor.

25         MR. BALLI:  And just the reason I bring it up,

1   too, is because in opening we had a similar remark about we

2   had information with the DA to go follow this plan.

3            THE COURT:  Right, but that's legitimate

4   contextual background.  You all have described this CS as

5   being married to the Government.  They're about to say how

6   it is that they entered into this marriage.

7            MR. BALLI:  Okay.

8            THE COURT:  Thank you.

9       (Bench conference ends at 11:54 a.m.)

10           THE COURT:  And ladies and gentlemen, you know, I

11  know we talked to you about this at the two days of jury

12  selection, we're not doing anything secretive up here, but

13  remember I'm the judge of the law and I have to decide what

14  you can lawfully consider and there's, you know, a lot of

15  different rules and so that's what we're doing up here.

16  We're just going through the different rules, making sure

17  that the way the testimony is presented and what is

18  presented actually meets muster for our rules.

19           So, go ahead.

20  BY MS. WILLIAMSON:

21       Q.  So, the question I had asked, Officer Lozano, and

22  without getting into any specific conversations you may have

23  had on the matter, was, what in general was happening in the

24  course of your investigation that make the DEA interested in

25  recruiting a Confidential Source?  What were you looking for

 1  assistance with?

 2       A.   To investigate a money laundering organization.

 3       Q.   And where did you believe that money laundering

 4  organization was based?

 5       A.   In Mexico.

 6       Q.   Was Laredo, Texas also a hub of activity?

 7       A.   Yes.

 8       Q.   Is Laredo, Texas within the Southern District of

 9  Texas?

10       A.   Yes.

11       Q.   So, was the DEA successful in recruiting a

12  Confidential Source?

13       A.   Yes.

14       Q.   How did the DEA establish contact with the person

15  who became that Confidential Source?

16       A.   The initial contact?

17       Q.   The initial contact of the Laredo office, the

18  investigation that you, yourself, participated in.

19       A.   I was asked by my group supervisor to assist

20  Special Agent Stan Petri to conduct a traffic stop on a

21  potential source and we conducted that traffic stop and

22  approached the source.

23       Q.   And roughly when was that?

24       A.   In March of 2012.

25       Q.   So, how did that traffic stop proceed?

1      A.   We were in contact with each other using our

2  radios that we use for work, and I conducted the traffic

3  stop on the now source and approached the driver's side of

4  the vehicle, identified myself.

5      Q.   What language were you speaking when you

6  identified yourself?

7      A.   English.

8      Q.   Did the Confidential Source appear -- did the

9  person appear to understand you?

10      A.   No.

11      Q.   So, if anything, did you do?

12      A.   I reverted to speaking Spanish with the now

13  source.

14      Q.   And did the person appear to understand you when

15  you were speaking in Spanish?

16      A.   Yes.

17      Q.   Did you continue to speak exclusively in Spanish

18  during your communications with this person on that day?

19      A.   Yes.

20      Q.   And did you seem to have any trouble

21  communicating with the person?

22      A.   No, no problem.

23      Q.   Did the person appear to have any trouble

24  understanding you when you were speaking Spanish?

25      A.   No issues.

1      Q.   All right.  So, you began a traffic stop in

2   English, you switched to Spanish.  What did you say at the

3   introductory part of the traffic stop?

4      A.   That we had an investigation and we wanted to ask

5   the now source questions and if the person was willing to

6   come over to our office to conduct that interview.

7      Q.   Did you learn that person's name?

8      A.   Yes.

9      Q.   What is that person's name?

10      A.   Corina Blake.

11      Q.   And was Ms. Blake willing to go with you to

12   answer some additional questions?

13      A.   Yes, she came over to our office.

14      Q.   What does the building where your office is look

15   like?

16      A.   It's a six-story building.

17      Q.   Is it more like this courthouse or more like a

18   generic office building, would you say?

19      A.   I'd say more like a generic office building, but

20   I'm pretty sure that 99 percent of people in Laredo know

21   that it's a federal building.

22      Q.   What kind of room were you in when you had this

23   discussion?

24      A.   We have an interview room that we brought

25   Ms. Blake into.

1    Q.    And how many law enforcement officers were

2  present, roughly speaking, during this conversation?

3    A.    I believe there was three of us.

4    Q.    Did you speak to the Confidential Source,

5  Ms. Blake, in Spanish during this meeting?

6    A.    Yes.

7    Q.    Was everything translated for her into Spanish?

8    A.    Yes.

9    Q.    About how long did the meeting go on?

10   A.    I don't recall, but it had to have been at least

11 an hour.

12   Q.    But far less than half a day, would you say?

13   A.    Yeah.

14   Q.    Not into the night, for example?

15   A.    No.

16   Q.    And what was the purpose of the meeting as far as

17 you were concerned?

18   A.    For the recruitment of the Confidential Source.

19   Q.    And as the conversation began, what was the kind

20 of questions you were asking?

21   A.    I'm trying to remember.

22   Q.    For example, did you ask Ms. Blake if she was, in

23 fact, involved in a money laundering organization?

24   A.    Yes.

25   Q.    And at the beginning of the conversation, as you

1  were starting to talk to Ms. Blake, what kinds of answers

2  was she giving?

3       A.   At first, she denied knowledge.

4       Q.   And did she ever change that denial during the

5  course of this meeting?

6       A.   She did.

7       Q.   And what kinds of information were you getting

8  from her by the end of this meeting about her potential

9  involvement with a money laundering organization?

10       A.   That she would receive money from money couriers

11  and then that she would then distribute into Laredo-based

12  businesses.

13       Q.   So, is it fair to say she was no longer denying

14  or minimizing her participation by the time you finished the

15  interview with her?

16       A.   Correct.

17       Q.   Is it common for people you interview about

18  potential involvement in criminal activity to start their

19  conversations with you by --

20            BY MR. BALLI:  Objection as to relevancy and

21  improper questioning.

22            MS. WILLIAMSON:  May I be heard on this, Your

23  Honor?

24            THE COURT:  Yes, but come up to the bench.

25       (Bench conference begins at 12:00 p.m.)

1          THE COURT:  I think you're going to go with, "Is

2   it common for people to start with denials?"  You're

3   certainly not going to try to tie that back into any of the

4   Defendants, right?

5          MS. WILLIAMSON:  No, Your Honor.  It's one

6   questions that merely contextualizes for the jury.

7          THE COURT:  People involvement and then they end

8   up admitting guilty.

9          MS. WILLIAMSON:  Yes.

10          THE COURT:  I think that's fair because I think

11   you all are going to challenge her credibility and you're

12   going to tell the jury first she lied.  So, I think it's a

13   fair question but let me hear your objection.

14          MR. BALLI:  Well, Your Honor, it's expert

15   testimony.

16          THE COURT:   He has not been designated an

17   expert, he's an agent.

18          MR. BALLI:  Right, but you would be allowing him

19   to be the judge of what's true and what's not true.  He's

20   saying that they tell the truth, at first, they lie and then

21   they tell the truth.  So, he's judging her by --

22          THE COURT:  He's not going to say whether she

23   told the truth.  The question is it common for people to

24   begin with denials.

25          MR. BALLI:  But denials are lies and then --

1          THE COURT:  We don't know that denials are lies.

2    (Indiscernible) getting to and then she told the truth.

3          MS. WILLIAMSON:  No, I do not intend to ask him

4    this additional question on the subject.

5          THE COURT:  Then she made statements or then she

6    made admissions but she's not going to say true, not true,

7    which I think their allowed to, you know, at some point she

8    gave a truthful account, but I'd rather stay away from his

9    opinion on truth or lies.

10          MS. WILLIAMSON:  That is my intention, Your

11   Honor.

12          THE COURT:  The question right now stands.

13          MR. BALLI:  Actually it's the same thing and I

14   object.

15        (Bench conference ends at 12:02 p.m.)

16   BY MS. WILLIAMSON:

17        Q.   Officer Lozano, the question is:  Iin your

18   experience as a law enforcement officer, is it common for

19   people you interview about potential criminal activity to

20   begin their discussions with you by minimizing or denying

21   their roles in suspected criminal activity?

22        A.   Yes.

23        Q.   Sir, over the course of the rest of your

24   investigation into the suspected money laundering

25   organization, did you have very much interaction with

1   Ms. Blake?

2        A.   Yes.

3        Q.   Were there additional times in your investigation

4   when it seemed to you that Ms. Blake was hiding information

5   from you?

6        A.   No.

7        Q.   Did it seem to you, during the course of the rest

8   of your investigation, that Ms. Blake was describing her

9   role as less important than it appeared to you?

10       A.   No.

11       Q.   So, back to the first conversation you had with

12  Ms. Blake on March 19th, as you were asking questions, were

13  you gathering information from her about the money

14  laundering organization you were investigating?

15       A.   Yes.

16       Q.   What kinds of questions did you ask?

17       A.   How does it -- what happens, like who calls you,

18  how do you get a call, how do you know who's calling you?

19  Just trying to get a basis of how this money laundering

20  organization works.

21       Q.   Was she able to describe, for example, how she

22  moved money for the money laundering organization?

23       A.   Yes.

24       Q.   Was she able to give you the names of some people

25  she worked with?

1          A.    Yes.

2               THE COURT:  All right, Counsel.  It's noon and I

3    think right now you've established that this is how he met

4    Ms. Blake.  This might be a good stopping point for lunch.

5               I do have just two very brief questions regarding

6    what you already talked about.

7               When you conducted the traffic stop, do you

8    remember the approximate time?

9               THE WITNESS:  It was, I think, a little bit

10   before lunchtime.

11              THE COURT:  Before lunchtime?  And then you said

12   that she willingly went with you to your offices?

13              THE WITNESS:  Yes.

14              THE COURT:  Okay.

15              And then, the interview itself, it was at least

16   an hour, but you're not sure how long the meeting lasted?

17              THE WITNESS:  Correct.

18              THE COURT:  Okay.  Those are my brief questions

19   on that.

20              So, let's break right now for an hour for lunch

21   and we'll be back at 1:00 p.m. to continue with his

22   testimony.  Thank you.

23              THE CLERK:  All rise.

24          (Jury exits courtroom at 12:05 p.m.)

25          (Proceedings continue outside the presence of the

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    43

 1 | jury.)

 2 |         THE COURT:  All right, the jury is now out of the

 3 | room.  Is there anything I need to consider or hear from

 4 | anyone before you all take your lunch break for an hour?

 5 | Anything?

 6 |      (No audible response.)

 7 |         THE COURT:  No?  Okay.  Thank you.

 8 |      (Lunch break taken from 12:05 p.m. to 1:00 p.m.)

 9 |                     AFTER RECESS

10 |      (Outside the presence of the jury.)

11 |         THE CLERK:  All rise.

12 |         THE COURT:  Thank you.  Please be seated.

13 |         Can we bring the jury out?

14 |         MR. BALLI:  Found a solution, Judge.

15 |         THE COURT:  I'm sorry.

16 |         MR. BALLI:  We found a solution to --

17 |         THE COURT:  Oh, good.

18 |         MALE SPEAKER:  Me, too.

19 |         MR. BALLI:  -- The noise situation.

20 |         THE COURT:  Okay.

21 |         FEMALE SPEAKER:  It'll be very clear.

22 |         MR. BALLI:  Yeah.

23 |         THE COURT:  That's great.

24 |         Everybody ready?

25 |         FEMALE SPEAKER:  Yes, Your Honor.

1              THE COURT:  Okay.  Let's go ahead and bring the

2    jury out.

3              THE CLEKR:  All rise for the jury.

4         (Jury enters the courtroom at 1:01 p.m.)

5              THE COURT:  Thank you, ladies and gentlemen.

6              All right.  Everyone else may be seated.

7              Ms. Williamson, you may continue.

8              MS. WILLIAMSON:  Thank you, Your Honor.

9              DIRECT EXAMINATION OF FRANCISCO LOZANO

10   BY MS. WILLIAMSON:

11        Q.   Officer Lozano, before the lunch break, we were

12   discussing your initial meeting with the Confidential Source

13   and you had recently explained, I believe, the kinds of

14   questions that you asked during that meeting.  Based on the

15   investigation she gave you, how would you describe her role

16   in the money laundering organization you were investigating?

17        A.   She, in the organization, was a member that

18   received money brought in by money couriers and then she

19   either/or make a delivery of that money to a predetermined

20   location that she was directed to or she was instructed to

21   sell that money.

22        Q.   And without specifically attaching a role to this

23   investigation, what is money courier in the context of a

24   money laundering organization?

25        A.   Their responsibility is to go pick up money at a

1  location -- a predetermined location, a place that they've

2  already been instructed to go to, and to pick up that money

3  and bring it to wherever they want it be brought.  In most

4  instances, it's to the U.S./Mexico border or straight into

5  Mexico.

6          Q.   And you said that Ms. Blake, you discovered she

7  was also responsible for making deliveries.  What was she

8  delivering?

9          A.   Bulk cash.

10         Q.   To whom was she delivering it, in general,

11 without naming any particular names?

12         A.   To Mexico business owners, to local, Laredo-based

13 stores, and to a warehouse forwarding -- like a warehouse

14 and forwarding business.

15         Q.   Through the course of your investigation, were

16 you able to fill in additional details about the structure

17 of the money laundering organization?

18         A.   Yes.

19         Q.   And was that consistent with a Black Market Peso

20 Exchange?

21         A.   Yes.

22         Q.   Now, before we move too much farther into this

23 particular money laundering organization, I want to briefly

24 revisit how the DEA, how you in particular as part of this

25 DEA investigation, became aware of Ms. Blake.  Was there any

1  particular conduct that made you focus on her as a potential

2  target or cooperating source?

3      A.   I wasn't the one to target the Confidential

4  Source, it was the agent before me and it was due to the

5  fact that there was an investigation where a controlled

6  delivery of cocaine was done to Tennessee and then the

7  payment was done for that cocaine and the money were brought

8  back down to San Antonio and part of that money was then

9  divided and approximately 180,000 were brought down to

10  Laredo where Ms. Blake picked up the money from a

11  tractor-trailer driver.

12      Q.   So, specifically, what was Ms. Blake's role in

13  all that activity you just described?

14      A.   To pick up the money from the tractor-trailer

15  driver, which would be a money courier.

16      Q.   And did the DEA surveil that pickup?

17      A.   Yes.

18      Q.   And did Ms. Blake, in fact, pick up a large

19  amount of money?

20      A.   Yes.

21      Q.   And again, what amount of money was that?

22      A.   Approximately 180,000.

23      Q.   So, back to then your conversation with her that

24  resulted from those earlier incidents --

25              THE COURT:  I'm sorry, Government.  I would like

1  to know when that incident took place, the one you just

2  described, the $180,000.  What was the date?

3           THE WITNESS:  I believe it was in August 2011.

4  Approximately around that.

5           THE COURT:  August of when?

6           THE WITNESS:  2011.

7           THE COURT:  2011?

8           THE WITNESS:  Yeah.  I'm not sure on the month,

9  but I know it's within that.  It might have even been

10 September.  I don't remember the exact.

11           THE COURT:  Okay, all right.

12 BY MS. WILLIAMSON:

13      Q.   Did she give you the names of any people she was

14 working within the money laundering organization that you

15 were investigating?

16      A.   At the initial briefing?

17      Q.   Yes.

18      A.   Yes.

19      Q.   Who were the people she told you about?

20      A.   She mentioned Alejandro Gomez, Tio Polo.  At that

21 time, he was not identified.

22      Q.   So, that was a nickname, Tio Polo?

23      A.   Yeah, they used --

24      Q.   An alias.

25      A.   Yeah, she used that alias, Tio Polo.  And

 1   Adriana --

 2          BY MR. SCOTT MCCRUM:  Judge, I'll object to

 3   further hearsay.

 4          THE COURT:  Overruled.  Go ahead.

 5   BY MS. WILLIAMSON:

 6       Q.   And what, if anything, did Ms. Blake tell you

 7   about how she communicated with other people in the money

 8   laundering organization?

 9       A.   The organization was --

10          MR. SCOTT MCCRUM:  Excuse me.

11          THE COURT:  I'm sorry.  Hold on a second.

12          MR. SCOTT MCCRUM:  That would be hearsay, Judge.

13          THE COURT:  Why don't all of you approach for a

14   moment?

15       (Bench conference begins at 1:07 p.m.)

16          MS. WILLIAMSON:  Your Honor, may I make an offer

17   of proof?

18          THE COURT:  Yes.

19          MS. WILLIAMSON:  The testimony is intended to

20   elicit that they communicated via phone and Push to Talk

21   radio and Officer Lozano will further testify later in his

22   direct that he then used those methods of communication with

23   members of the conspiracy.

24          THE COURT:  I guess what he's saying is she's got

25   to make an offer to how is it that they go to Blake to all

 1  of these individuals.

 2          Can you do that though without eliciting

 3  statements that she may have made?

 4          MS. WILLIAMSON:  Sure, Your Honor.  I can ask for

 5  his observations about her communications.

 6          THE COURT:  Okay.  So, observations about

 7  communications?  All right.

 8      (Bench conference ends at 1:08 p.m.)

 9  BY MS. WILLIAMSON:

10      Q.   Without jumping forward to the subject matter of

11  anything you observed, did there ever come a time when you

12  observed Ms. Blake communicating with members of the --

13  people you suspected were members of the money laundering

14  organization?

15      A.   Yes.

16      Q.   What methods of communication or method, as many

17  as there were, did you observe her using?

18      A.   A Push to Talk cell phone device.

19      Q.   What's Push to Talk?

20      A.   It's similar to a Walkie-Talkie.  It was a

21  service that, at that time, Sprint and Nextel were

22  providing.

23      Q.   Have you ever used Push to Talk?

24      A.   Yes.

25      Q.   In what context?

1        A.    We, actually, at DEA have had phones with the

2    same capabilities.

3        Q.    And based on your use of Push to Talk, does a

4    Push to Talk subscriber have the equivalent of a phone

5    number?

6        A.    Yes.

7        Q.    What does such an identifier look like?  Does it

8    look like a traditional phone number or does it look like

9    something else?

10       A.    It looks like something else.  The number, just

11   as an example, can be 123*45*6.

12       Q.    And you said that you had observed Ms. Blake

13   communicating in Push to Talk?

14       A.    Yes.

15       Q.    Is the Push to Talk device she used, is it one

16   device with a cell phone or is it a separate device?

17       A.    It's one device.

18       Q.    So, does the same device also have cell phone

19   capabilities?

20       A.    Yes.

21       Q.    And did you ever observe Ms. Blake used the cell

22   phone portion of her device?

23       A.    Rarely, but yes.

24       Q.    Did you, yourself, ever use a traditional

25   cell phone with a traditional phone number during the course

1  of your investigation to communicate with members of the

2  money laundering organization?

3       A.   Yes.

4       Q.   So, Ms. Blake agreed to cooperate with you,

5  right?

6       A.   Yes.

7       Q.   Was there ever a written agreement about her

8  participation in your investigation?

9       A.   Yes, there was.

10      Q.   Did she have to fill out a form as part of that

11 written agreement?

12      A.   She had to initialize the form.  We call it a

13 Form 473.

14      Q.   And generally speaking, what's the kind of

15 information contained in a Form -- 73 or 473?

16      A.   473.

17      Q.   A 473 form.

18      A.   You will report to your controlling agents, you

19 are not a police officer, don't break the law, no drug use.

20      Q.   Who was her controlling agent in this

21 investigation to whom she was supposed to report?

22      A.   I was.

23      Q.   Could you describe the process of filling out the

24 form?  Did she do it in your office, for example?

25      A.   Yes.  It would be myself in the presence of

1    another agent, there's always a witness.  And we prove the

2    form and they read each of the instructions or the rules,

3    and then they initial next to the rule saying that they

4    understand it.

5         Q.   And is that the process that you and another

6    officer followed in this case?

7         A.   Yes.

8         Q.   Did you, at any time, make any promises to

9    Ms. Blake that were not contained in the written agreement?

10        A.   No.

11        Q.   Did any other officer in your presence ever make

12   such promises?

13        A.   No.

14        Q.   And what was the length of the cooperation she

15   was agreeing under the terms of the agreement?

16        A.   To give us the method of operation of the money

17   laundering organization.

18        Q.   Did it have an end date?

19        A.   The contract, the 473, has specific dates and, at

20   that point in time, whenever we signed the 473, I believe it

21   was a one-year contract, but then it's renewed.

22             Now, with a newer obligations that DEA makes us

23   do, it's every 90 days.

24        Q.   But at the time that Ms. Blake began cooperating

25   with you, how long was she agreeing to cooperate for?

1        A.    For one year.

2        Q.    Did she continue to cooperate after that ine

3   year?

4        A.    Yes.

5        Q.    Approximately what was the total length of her

6   cooperation with the DEA?

7        A.    She still currently is signed up with the DEA.

8   So, since March of 2012 to present day.

9        Q.    Under the terms of the cooperation agreement, she

10  entered, was Ms. Blake going to be entitled to any money in

11  exchange for her cooperation?

12       A.    I don't recall that there's a section on the 473

13  that talked specifically about that, but we did pay

14  Ms. Blake.

15       Q.    Do you have an estimate as to the approximate

16  total amount of money she's received in exchange for her

17  cooperation with the DEA?

18       A.    Approximately $50,000.

19       Q.    Over what period of time?

20       A.    Since -- I don't remember the first date of the

21  payment, but it's approximately from March till maybe a year

22  ago.

23       Q.    So, roughly six years?

24       A.    Yes.

25       Q.    And how did you determine or how did someone --

1  are you aware of how the determination was made that she

2  would receive a payment at a particular time?

3       A.   It was something that between the case agents and

4  group supervisors made a decision on it.  Even on the

5  amounts, also.

6       Q.   During the course of her cooperation, did she

7  ever receive any additional money or gifts that you have not

8  yet described from anyone at the DEA?

9       A.   No.

10      Q.   And was there anything other than the money that

11 she stood to gain from her cooperation?

12      A.   No.

13      Q.   Was it possible that her exposure to the

14 consequences of her criminal activity would be limited or

15 non-existent if she cooperated?  Which is to say was it a

16 possibility she would not be prosecuted due to her

17 cooperation?

18      A.   Yes.

19      Q.   After recruiting Ms. Blake as the Confidential

20 Source in your investigation, how did the DEA plan to

21 proceed with its investigation?

22      A.   From the initial, we just were wanting to

23 understand what exactly the process is.  We, kind of, had a

24 clue, but we wanted to see well, once a money courier comes

25 into contact with you, what happens next?

1      Q.   So, did you instruct her to inform you of any

2   times that a courier contacted her?

3      A.   Yes.

4      Q.   Now, aside from recruiting a Confidential Source,

5   did the DEA use any other investigative methods to gather

6   evidence in this investigation?

7      A.   Surveillance, part of the --

8      Q.   What do you mean when you say surveillance?

9      A.   When we conduct surveillance, we follow people

10  around, try to find out their daily routine to see, you

11  know, if we received information that they're selling drugs

12  or picking up money, we try to surveil them and find out

13  what exactly their routine is.

14     Q.   What other methods, if any, were in play in this

15  investigation?

16     A.   Part of the 473 again, going back to that, is we

17  ask that the CS try to have an agent infiltrate the

18  organizations.

19     Q.   And did you, at some point, have a successful

20  infiltration of the money laundering organization?

21     A.   Yes.

22     Q.   And we'll get to that in time.

23     And what about wiretaps?  We heard in opening

24  statement the word "wiretap," I think.

25     A.   Yes.

1    Q.    Can you tell the jury whether or not there were

2    wiretaps in this investigation?

3    A.    Yes, we had wiretaps, which is an interception of

4    the cellular phone devices.  So, any communications that

5    were done through the CS, there was what we called "a

6    consensual" because she's allowing us to intercept her phone

7    when she's making phone calls.  So, we had that, and then we

8    also had agents get an authorized interception on two

9    individuals -- and two other interceptions we had through

10   Court Order.

11   Q.    So, when you say "authorized," what you mean is

12   Court-ordered wiretap?

13   A.    Yes.

14   Q.    And who were those other two individuals on whom

15   you sought and received Court-ordered wiretaps?

16   A.    It was Adriana Galvan-Constantini and Gabriel

17   Arturo-Castillo.

18   Q.    Were you here for opening statements this

19   morning?

20   A.    Yes.

21   Q.    So, when you say Gabriel Arturo-Castillo, is that

22   the same person represented to be someone who worked with

23   Adrian Arciniega?

24   A.    Yes.

25   Q.    And would you describe the process you used to

1  get the consensual wiretap for Corina Blake's device?

2      A.   What we do is that we have a form that says, "I'm

3  allowing special agents to intercept calls," and those

4  consensuals are like a one month or 30 days at a time.  So,

5  every 30 days you have to renew it.  And we then send that

6  form to -- I don't want to mess up their title, I think it's

7  Chief Council there at Houston DEA.  They draft up a form

8  that they send out to -- for example, for the CS, it would

9  be Sprint.  So, they would send a letter out to Sprint that

10  tells Sprint, "Please allow us to intercept these calls.

11  Here's all the proper paperwork."

12          And then, from Houston, what we call, they flip

13  the switch where we start listening in to the conversations.

14      Q.   Were those conversations recorded?

15      A.   Yes.

16      Q.   And when you say you start listening into

17  conversations, does that include both conversations to the

18  phone number associated with the device, as well as the Push

19  to Talk associated with the device?

20      A.   Yes.

21      Q.   So, you were capturing both traditional

22  telephone, cell phone calls and also the radio, Push to Talk

23  communications?

24      A.   Yes.

25      Q.   And when did the DEA begin with its consensual

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    58

1  wiretap of the Confidential Source, approximately?

2       A.   I think it was in April 2012.

3       Q.   And approximately how long did that consensual

4  wiretap continue, if you look at all of the, I guess, 30-day

5  agreements that she entered into?

6       A.   Approximately late December 2013 or early 2014.

7       Q.   And you said that those conversations were

8  recorded.  What's the process for making a recording?  Is

9  that just part of the wiretap process?

10       A.   Yeah, that's part of the system.  The system is

11  located in Houston and then we have a similar system in our

12  office where we can just plug in.  And let's say there's

13  calls 1 through 10 and I want to listen to call number 5.

14  You know, I go in, press 5, and listen to call number 5.

15       Q.   And what happens to those recordings?  For

16  example, are they archived or maintained?

17       A.   Yes, Houston will archive those calls.

18       Q.   Now, let's talk a little bit about the

19  nonconsensual wiretaps.  You said you had two.  Other than

20  seeking judicial authorization, is this sort of general

21  process and procedure similar to what you just described

22  with the consensual?

23       A.   Yes.

24       Q.   And are those nonconsensual wiretaps calls and

25  Push to Talk communications recorded?

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                59

1          A.   Yes.

2          Q.   And are those recordings archived?

3          A.   Yes.

4          Q.   You said that one of the people on whom you

5    sought a wiretap was Adrian Galvan.  Did you come to know

6    what that person looks like?

7          A.   Yes.

8          Q.   Is that through the course of your investigation?

9          A.   Yes.

10         Q.   Do you see her in the courtroom today?

11         A.   I do.

12         Q.   Would you point her out please by where she's

13   sitting and an article of clothing she's wearing?

14         A.   From the three tables that are there, the center

15   table on the top right, she's wearing what appears to be a

16   black jacket, black blazer.

17              MS. WILLIAMSON:  Your Honor, will the Record

18   reflect the witness has identified Ms. Galvan-Constantini?

19              THE COURT:  The Record will so reflect.

20         (Defendant Galvan-Constantini identified.)

21   BY MS. WILLIAMSON:

22         Q.   Now, you said you made recordings through the use

23   of the wiretaps.  Did you do any other kinds of recordings

24   in this investigation?

25         A.   Yes.

1       Q.   Could you describe what that involved?

2       A.   We provided our Confidential Source a

3  recording -- what we call the "recording devices" and they

4  can vary from a key fob, like similar to when you lock and

5  unlock your cars, and we also used a purse that we equipped

6  with audio and video recording.

7       Q.   And were there any occasions on which you also

8  placed video recorders in an automobile in order to record

9  events or conversations?

10      A.   Yes.

11      Q.   And with the regard to the recordings captured

12 from key fobs, the purse, and the other video recorders, are

13 those videos archived and kept?

14      A.   Yes.

15      Q.   What about traffic stops as an investigative

16 tool?  We heard about at least one traffic in opening.  Is

17 that something you're familiar with?

18      A.   Yes.

19      Q.   Could you describe how that might come about or

20 how it came about in this investigation?

21      A.   Well, there was one traffic stop that we asked

22 for the assistance of Laredo PD.

23      Q.   And is that, generally, how a traffic stop in a

24 DEA investigation might take place?

25      A.   For the most part, yes.

1      Q.   And you mentioned that you participated as an

2  undercover infiltrator in the money laundering

3  organizations, did other agents also play undercover roles

4  in this investigation?

5      A.   Yes.

6      Q.   Was that a regular part of the investigation?

7      A.   Yes.

8      Q.   So, let's move forward now to the actual parts of

9  an investigation.  Did the DEA have a particular term for

10  the pieces of the investigation that it uncovered?

11      A.   I'm not sure if I follow.  Like transactions that

12  we were -- there's bulk currency transactions.

13      Q.   And what's a "bulk currency transaction" in

14  regular people terms?

15      A.   It is a -- we call them bulk currency

16  transactions because within X amount of money, an example

17  100,000, within those 100,000, there were several

18  transactions that occurred within -- they were bulk

19  currency, so from those 100,000, 20,000 went out, 30,000

20  went out, 40,000 when out.  So, that's why we considered it

21  a bulk currency transaction.

22      Q.   So, you're talking about cash most of the time?

23      A.   Yes.

24          THE COURT:  But I'm sorry, I'm not sure I

25  understood that.

1          Does it always have to originate with one large

2    amount one about and then smaller amounts coming out of a

3    large amount or not necessarily?

4          THE WITNESS:  Yes, but also, the whole entirety

5    of the bulk cash can just also be moved also at one time.

6    It would just depend on what the instruction was given by

7    organization on what to do.

8          THE COURT:  Okay.  So, it would either be just

9    one amount that is moved in whole or it begins with one

10   amount and then there's different portions of that amount

11   that are distributed?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.

14   BY MS. WILLIAMSON:

15        Q.   So, for example, a bulk currency transaction

16   could be $100,000 coming in on one lump sum and the $100,000

17   going out in one lump sum?

18        A.   Yes.

19        Q.   But is it accurate to say a bulk cash transaction

20   could equally consist of $100,000 coming and five separate

21   payments of $20,000 going out?

22        A.   Yes.

23        Q.   Let's talk about the first bulk -- how many bulk

24   cash transactions involve?

25        A.   41.

1        Q.   So, let's talk about the first one.  How did you

2   become aware that it was happening?

3        A.   It was days after we got the Confidential Source

4   who agreed to work with us.  Within a couple of days, the

5   Confidential Source called me up and said, "There's a money

6   courier on his way to drop off money at my residence and"--

7             BY MR. O.J. PENA:  Your Honor, may we approach

8   very briefly, Your Honor?  It's not an objection, Your

9   Honor, but it's for preservation of the Record, Your Honor.

10            THE COURT:  That's fine.

11         (Bench conference begins at 1:27 p.m.)

12            MR. O.J. PENA:  Your Honor, there were a number

13   of Confidential Sources in this case leading up to the

14   involvement of this Confidential Source, Corina Blake, and

15   for the Record to be clear later on down the line, I would

16   respectfully request that the Court ask the Government to,

17   instead of using the phrase "Confidential Source," which can

18   be very confusing and I know that it has been very confusing

19   because that's the phrases that we had in our reports,

20   Instead of using that phrase, that he use her name when he

21   is referring to her so that we know who he is referring to.

22   I don't know if there is going to be any testimony about any

23   other Confidential Sources --

24            THE COURT:  They've already said there is not.

25   So, for purposes of this case, when they're talking about

1   the Confidential Source, they're talking about Ms. Blake.

2            So, just to clear that out, every time you're

3   referring to a Confidential Source, you're referring to

4   Ms. Blake.  But as far as me telling them we must call her

5   Ms. Blake, I'm not going to do that.

6            MR. O.J. PENA:  I'm not doing it for stylistic

7   reasons, I'm doing it because I may ask some questions

8   having to do with other Confidential Sources, Your Honor.

9            THE COURT:  Okay.  You're welcome to do that.

10           MR. O.J. PENA:  And I'll try to keep that clear.

11           THE COURT:  You're welcome to do that.

12           MR. O.J. PENA:  Thank you, Your Honor.

13           THE COURT:  Thank you.

14       (Bench conference ends at 1:28 p.m.)

15   BY MS. WILLIAMSON:

16       Q.   Officer Lozano, to make sure that the record is

17   clear when you are referring to the Confidential Source in

18   the context of your testimony, are you referring to

19   Ms. Blake?

20       A.   Yes.

21       Q.   Was there anyone else in this investigation or

22   this case the DEA or you considered to be "the Confidential

23   Source?"

24       A.   No.

25       Q.   Will you be careful during the course of your

1  testimony not to refer to any other potential participants

2  and the Confidential Source and to use that source to refer

3  to Ms. Blake?

4       A.   Yes.

5       Q.   Thank you, sir.

6            Now, you said that the CS, Ms. Blake, had

7  contacted you about a delivery that she was expecting,

8  right?  That's what we were talking about?

9       A.   Yes.

10       Q.   And what, if anything, did you do in response to

11  that information?

12       A.   We received the information that money was going

13  to be brought over to Ms. Blake's residence so what we did

14  is get a surveillance team together there at the office and,

15  from the information that was provided, we headed out to the

16  residence and, in the vicinity, set up to see who would show

17  up, based on the information that was provided.

18       Q.   Were you a part of that surveillance team?

19       A.   Yes.

20       Q.   What was your role on the surveillance team?

21       A.   It was more supervisor and being in contact with

22  the Confidential Source.

23       Q.   So, you were able to maintain contact with the

24  Confidential Source in the window of time before the

25  delivery she was expecting?

1        A.    Yes.

2        Q.    And were you also able to keep in contact with

3   the other officers who were performing surveillance?

4        A.    Yes.

5        Q.    Were there any challenges to this particular area

6   in the surveillance?

7        A.    Yes.

8        Q.    Could you elaborate, please?

9        A.    The residence that we were looking at has a

10  horseshoe, so you're looking similar to a cul-de-sac.  So,

11  the residence is right at the top of the horseshoe, so it's

12  very difficult for us to try to get a good, what we call the

13  "eye," a good visual of what's occurring, right, without any

14  obstructions from trees or vehicles or -- so, that was a

15  challenge for us.

16       Q.    Did the surveillance team see any activity that

17  you believe was relevant to this investigation?

18       A.    Yes.

19       Q.    Could you describe what the surveillance team

20  saw?

21       A.    A subject shows up and enter the residence

22  carrying something.

23       Q.    When you say "carrying something," what do you

24  mean?

25       A.    A bag.

1       Q.   And what, if anything, happened next, as far as

2  you know?

3       A.   There was a meeting inside, then the person

4  departed.  And at that point, we decided as case agents

5  supervising the surveillance team is let's divide the

6  surveillance team into two.  One group will stay with the

7  person that showed up to what Ms. Blake told us was going to

8  drop off money.  We're going to follow that person around,

9  see what happens.  Because we don't know whether or not he's

10 going to commit other crimes.  We were just trying to gain

11 more knowledge on what he's going to do.  And the second

12 group -—

13          (Loud noise in the courtroom.)

14          THE COURT:  Sorry.

15          MS. WILLIAMSON:  Should we take a moment, Your

16 Honor?

17          THE COURT:  No, no.  It's okay.  It's fine.  You

18 can continue.

19          THE WITNESS:  The second group is then told to

20 follow the Confidential Source from her residence back to a

21 predetermined location that we had already chosen to meet

22 up.  And when we met up, the Confidential Source provided

23 me, I believe it was a box full of bulk currency cash in

24 vacuum sealed bags.

25          MS. WILLIAMSON:  May I approach the witness, Your

 1  Honor?

 2          THE COURT:  Yes, you may.

 3  BY MS. WILLIAMSON:

 4      Q.   Officer Lozano, I've just handed you one of the

 5  many binders of exhibits that are involved in this case and

 6  if I could direct your attention please to Exhibits 14, 15,

 7  and 16, could you take a moment to review them, please?

 8      A.   Okay.

 9      Q.   Do you recognize Exhibits 14, 15, and 16?

10      A.   Yes.

11      Q.   What are they?

12      A.   That's the box that was brought over by Ms. Blake

13  to us.

14          MS. WILLIAMSON:  Could we display Exhibit 15,

15  please?

16  BY MS. WILLIAMSON:

17      Q.   And while that's going on, I'll continue to ask

18  you some questions about it.

19          Where was this picture taken?

20      A.   That was a picture taken within one of our

21  processing rooms there at our office?

22          MS. WILLIAMSON:  Could we display Exhibit 16,

23  please?

24  BY MS. WILLIAMSON:

25      Q.   What is that specifically a picture of?

1        A.   What was inside the box.

2        Q.   So, that's a lot of cash.  What happened to it?

3        A.   We asked the Confidential Source what the next

4   step was.

5        Q.   What did you mean by that?

6        A.   Again, trying to gain knowledge on how this money

7   laundering organization worked.  Prior to this, all we knew

8   was that money couriers would bring money to Ms. Blake.  So,

9   from here it was finding out brand new things, like okay,

10  what's the next process.  And so, we asked Ms. Blake, "What

11  do you do next with this money?"

12       Q.   Did you see her take further action?

13       A.   Yes, she started placing calls on her Push to

14  Talk phone trying to get instruction on where the money was

15  to go to.

16       Q.   And without getting into the details, did she

17  eventually distribute any of that money?

18       A.   Yes.

19       Q.   Would a diagram be helpful in explaining how that

20  money distribution occurred?

21       A.   Yes.

22            MS. WILLIAMSON:  I'll have copies for opposing

23  counsel, but I also emailed them this afternoon.  If I could

24  have a moment to distribute them?

25            THE COURT:  Yes, ma'am.

 1          (Pause in the proceedings.)

 2               THE COURT:  If you can just let me figure out

 3    whether I have destroyed my screen here.

 4          (Pause in the proceedings.)

 5               MS. WILLIAMSON:  Your Honor, does the Court have

 6    a preference as to how the Government marks the

 7    demonstratives?  Should we start at 400?

 8               THE COURT:  I don't have a preference.  I'll

 9    leave that up to you.

10    BY MS. WILLIAMSON:

11          Q.  As Government's 400, are you familiar with this

12    diagram?

13          A.  Yes.

14          Q.  Have you previously reviewed it before coming to

15    court?

16          A.  Yes.

17          Q.  Does it accurately depict the transactions in

18    BCT-1 that you investigated?

19          A.  Yes.

20          Q.  And would it aid you in explaining BCT-1 to the

21    jury?

22          A.  Yes.

23               BY MR. SCOTT MCCRUM:  Judge -- I'm sorry. Go

24    ahead.

25               THE COURT: Yes.

 1              MS. WILLIAMSON:  May the demonstrative be

 2    published to the jury, Your Honor?

 3              THE COURT:  Any objections?

 4              MR. SCOTT MCCRUM:  I would object, at this point.

 5    The foundation hasn't been made.  There's hearsay within

 6    that --

 7              THE COURT:  I don't know what you have now handed

 8    him.  Can you hand me a copy, please?

 9              MS. WILLIAMSON:  Yes, Your Honor.  May I

10    approach?

11              THE COURT:  Yes.

12              MR. SCOTT MCCRUM:  Did you want us?

13              THE COURT:  You're very welcome to approach, too.

14         (Bench conference begins at 1:38 p.m.)

15              MR. SCOTT MCCRUM:  This is a lot of information

16    in here that he would have gotten from the source.  It's

17    based in hearsay what that information was, all the money

18    was going to the Jaggi's and we really haven't even gotten

19    to how he would get that information other than from her, as

20    I said, which is hearsay.

21              THE COURT:  Yeah, I --

22              MS. WILLIAMSON:  The witness will testify that

23    the CS's was commission was determined by the DEA and did

24    come from the CS because, of course, the DEA.

25              THE COURT:  I understand that admission part but

1  the arrows point in the other direction.  How can we explain

2  that?

3            MS. WILLIAMSON:  The witness will explain that

4  the DEA surveilled the delivery and, as you can see, I've

5  covered the portion about the Form 8300 because this witness

6  will not discuss.

7            THE COURT:  Okay, so we correct that.  Okay, this

8  is a 398.  Surveillance shows this part of it, right here,

9  going to the right place and this is the money that was

10  seized.

11            MS. WILLIAMSON:  Yes, Your Honor.

12            MR. SCOTT MCCRUM:  And the rest of it disbursed

13  to the regular business?

14            MS. WILLIAMSON:  There was surveillance conducted

15  on those transactions as well, but we're not going to get

16  into details because those businesses are not here in this

17  case.

18            THE COURT:  Does that satisfy your objections?

19            MR. MICHAEL MCCRUM:  What was the last language,

20  please?

21            THE COURT:  What did you say last?

22            MS. WILLIAMSON:  The rest of the Laredo

23  businesses, we will not discuss any of those in detail

24  because those businesses are not here in this case, in this

25  courtroom.

1          THE COURT:  So, basically, it's going to be this

2    is determined by DEA and this transaction was surveilled.

3    And that's the extent of that?  And this is covered.

4          MR. O.J. PENA:  Your Honor, this number, here, is

5    that in addition to the money she was paid as part of the

6    contract?

7          THE COURT:  I don't know but we need to figure

8    that.  They said 50,000, total.  So, we discuss 1500 as part

9    of the 50,000.

10          MR. O.J. PENA:  I'm not assuming, that's why I'm

11   asking.

12          THE COURT:  No, I don't know, but they haven't

13   gotten to it yet, they haven't testified about this yet.

14          MS. WILLIAMSON:  I can make some additional

15   foundation before we publish this diagram to the jury.

16          THE COURT:  That's fine.

17          MR. SCOTT MCCRUM:  And this information?

18          MS. WILLIAMSON:  That's a co-conspirator, as

19   you're all aware, and he's going to testify about a call

20   wherein the CS received instructions related to him.

21          MR. SCOTT MCCRUM:  That would be based on

22   hearsay.

23          MS. WILLIAMSON:  And that's a co-conspirator

24   statement.

25          THE COURT:  What are you going to say about this?

1   You're just going to say, who is that individual?

2            MS. WILLIAMSON:  Yes, the co-conspirator.

3            THE COURT:  Has it come to that?

4            MS. WILLIAMSON:  Yes, and in later testimony, it

5   will come out because delivery on his behalf.

6            THE COURT:  Right, in later testimony.

7            MS. WILLIAMSON:  Yes, Your Honor.

8            THE COURT:  Okay, thank you.

9        (Bench conference ends at 1:41 p.m.)

10            MS. WILLIAMSON:  Could we show Exhibit 15, I

11   think?  I want to make sure we see 14, 15, and 16.

12   BY MS. WILLIAMSON:

13        Q.   And just because it's a little bit difficult to

14   see with the lights on, can you read that name that's on

15   whatever is in that box, Officer Lozano?

16        A.   Arturo Castillo.

17        Q.   Thank you.

18        Now, directing you back to the demonstrative, how much

19   money was contained in that box?

20        A.   $299,244.

21        Q.   And how did you come to that determination?  Did

22   somebody count it?

23        A.   Yes.

24        Q.   Is that part of standard DEA procedure?

25        A.   Yes.

1      Q.    Are there very many procedures in place when DEA

2   handles money when DEA agents handle money?

3      A.    Yes.

4      Q.    Could the briefly clarify for the jury what some

5   of those are?

6      A.    The main one is have witnesses present whenever

7   you encounter money or even if you were to seize money, it's

8   an immediate you out into an evidence bag.  In this

9   instance, we were working the organization to where we were

10  going to conduct deliveries, so that's why the reason why we

11  had to count the money before it was sent out.

12          From what Ms. Blake had previously told us, part

13  of her job was to receive the money in bulk cash and count

14  it and report back to the peso broker and tell him, "This is

15  how much money I received."

16          So, that's the reason we counted the money, also,

17  so she can continue acting as part of the organization

18  still.

19      Q.    And do you know if Ms. Blake communicated with

20  the person you described as the peso broker?

21      A.    Yes.

22      Q.    And who was that in this case in this particular

23  instance?

24      A.    I believe it was Tio Polo.

25      Q.    Did Ms. Blake receive any of the money from this

1   transaction?

2        A.   Yes.

3        Q.   Is that a commission, so to speak?

4        A.   Yes, there's a commission fee that -- people that

5   work in this line of business don't do it for free, so

6   there's going to be money being made.

7        Q.   And how much money did she make for this

8   transaction?

9        A.   For this transaction, it was 1,500.

10       Q.   And is that one part of the $50,000 you described

11  earlier she received as part of her work in this case?

12       A.   Yes.

13       Q.   And you were starting to describe what happened

14  to the money.  I think you said the CS, Ms. Blake, made some

15  phone calls.  Did she eventually formulate a plan as to what

16  to do with the money?

17       A.   Yes, it was to deliver to various persons

18  throughout Laredo?

19       Q.   Are any of the persons or people she was going to

20  deliver to in the courtroom today?

21       A.   Yes.

22       Q.   Could you identify that person or people based on

23  location and an article of clothing?

24       A.   Yes, one of the persons would be Mr. Harsh Jaggi

25  and he's on the far table, sitting in the middle with a

1  blue-collar shirt and a black sweater.

2          And then, next to him would be his wife,

3  Ms. Neeru Jaggi, and I think she's also wearing a black

4  sweater.

5          MS. WILLIAMSON:  Your Honor, will the Record

6  reflect the witness has correctly identified Mr. and

7  Ms. Jaggi.

8          THE COURT:  Yes, the Record will so reflect.

9      (Defendants Harsh Jaggi and Neeru Jaggi identified.)

10          THE COURT:  Before you move on into anything

11  else, though, I have a question because you asked about

12  this.  Where it says Arturo, is that Castillo?

13          THE WITNESS:  Yes.

14          THE COURT:  Was it like when you opened the box

15  or did you all write that in and place that in there or how

16  did that get there?

17          THE WITNESS:  The CS placed that in there.

18  It's a calculator.  The CS told us whenever the money was

19  brought over to her house, she did quick calculations.  If

20  you see the bundles in vacuum seals have a 10, 10 and 10, so

21  the courier is telling them, "Okay, this is bundle has 10,

22  this bundle has 10, this bundle has 10," and so she's

23  calculated the total that it should round up to.  And if you

24  see on that piece of paper, it says 299,250.

25          THE COURT:  Whose writing is that?

1              THE WITNESS:  I believe that's the Confidential

2    Source.

3              THE COURT:  And the item that we see there that

4    has the name Arturo Castillo, that's actually a calculator

5    facing down?

6              THE WITNESS:  Yes.

7              THE COURT:  And so, that was all in the box and,

8    I guess, sealed at some point?

9              THE WITNESS:  Whenever it was brought over there,

10   the flaps were --

11             THE COURT:  The flaps were --

12             THE WITNESS:  Yeah, were closed.

13             THE COURT:  Were covered in.  Okay.

14             MR. O.J. PENA:  Your Honor?

15             THE COURT:  Yes.

16             MR. O.J. PENA:  If the agent knows that the flaps

17   were closed, then the identification would be hearsay.

18             THE COURT:  All right.

19             MR. O.J. PENA:  Because it was --

20             THE COURT:  Okay, so you received the box and it

21   was closed?  Or who received the box?

22             THE WITNESS:  It was myself and Agent Stan

23   Petrie.

24             THE COURT:  Okay.  Did you all open it?

25             THE WITNESS:  Yes.

1          THE COURT:  And the contents looked like they do

2   in the other photograph?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay, so that's what you visually

5   observed?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.

8          MR. O.J. PENA:  The identification that I was

9   referring to was of the --

10         THE COURT:  Of the CS saying that's her writing

11  or that --

12         MR. O.J. PENA:  No, no.  I'm talking about the

13  import identification because if he was there, then he

14  couldn't observe the other one because they were --

15         THE COURT:  No, no, no.  I think that might be a

16  separate matter, but you can cross-examine on that portion.

17         MS. WILLIAMSON:  I can clear that up.

18         THE COURT:  Okay, go ahead.

19  BY MS. WILLIAMSON:

20     Q.   You mentioned that the Confidential Source had

21  instructions to go to a previously determined meet up point

22  after the received the delivery of cash?

23     A.   Yes.

24     Q.   Did she go to that point?

25     A.   Yes.

1      Q.    Where'd she go after that?  Do you know?

2      A.    Ms. Blake?

3      Q.    Ms. Blake, yes.

4      A.    We brought her back to our office.

5      Q.    Is your office where these photos of the box and

6  the cash were taken?

7      A.    Yes.

8      Q.    And did she arrive at the predetermined meet

9  point with the box?

10      A.    Yes.

11      Q.    And did the box then make the same journey as she

12  did to your office?

13      A.    Yes.

14      Q.    And were you present at the predetermined meetup

15  point?

16      A.    Yes.

17      Q.    Were you present at the office with Ms. Blake and

18  the box?

19      A.    Yes.

20      Q.    All right.  So, you were testifying that she

21  formulated a plan on where to take the money and that part

22  of that plan included the Jaggi's.  How was she going to

23  meet the -- or did the DEA observe the meeting with the

24  Jaggi's?

25      A.    We asked the, you know, again, the Confidential

1    Source to keep -- everything was already set in place.  It

2    wasn't something new that we could control and tell the CS,

3    "Meet them up at a parking lot or meet them up somewhere

4    else," this is something that's already set in place so that

5    CS told us that --

6              THE COURT:  Wait, hold on a second.  Don't get

7    into what she told you then.  Just tell us what you did.

8              MS. WILLIAMSON:  Or what you observed.

9              THE COURT:  Or what you observed.

10             THE WITNESS:  Okay.

11             THE COURT:  Yes.

12             THE WITNESS:  We took the $30,000 to El Reino.

13   BY MS. WILLIAMSON:

14        Q.   And at some point, did you turn over that money

15   to Ms. Blake?

16        A.   Yes.

17        Q.   And what, if anything, did she do after the

18   received the money?

19        A.   Went and delivered to El Reino.

20        Q.   Did DEA surveillance see her enter El Reino?

21        A.   Yes.

22             BY MR. O.J. PENA:  Your Honor, I misunderstood

23   earlier.  I withdraw the objection.  I'll deal with any

24   other questions on C ross.

25             THE COURT:  Yes, sir.  That's fine.  Thank you.

1          MS. WILLIAMSON:  Your Honor, I intend to publish

2   the demonstrative, at this stage.

3          THE COURT:  All right.  Any additional

4   objections to publishing the demonstrative?

5          MR. BALLI:  No, Your Honor.

6          THE COURT:  Thank you.

7      (Pause in the proceedings.)

8   BY MS. WILLIAMSON:

9      Q.   The diagram has one more thing we haven't talked

10  about with regard to this -- well, two things, I suppose.

11  You mentioned that Ms. Blake delivered $30,000 to El Reino.

12  Did she make any other deliveries with the money she that

13  received?

14     A.   Yes.

15     Q.   Without getting in specifics, can you broadly

16  describe what that involves?

17     A.   Making deliveries to several different subjects

18  and businesses.

19     Q.   And who Rodriguez Gonzalez?

20     A.   He is what we identified as a Mexican business

21  owner.

22     Q.   And does he have an alias?

23     A.   Yes, he has a couple that we know of.  One of

24  them was Puma.

25     Q.   And is Rodriguez Gonzalez, to the best of your

1   knowledge, the same person as the Jose Luis Rodriguez-

2   Gonzalez that was part of some of the opening statements

3   earlier today?

4        A.   Yes.

5        Q.   And did you come to understand about whether

6   Ms. Blake and Mr. Rodriguez-Gonzalez had a relationship or

7   knew each other?

8        A.   Yes, they did.

9        Q.   And who's the person in the striped dress in the

10  middle of the diagram?

11       A.   That was identified as Neeru Jaggi.

12       Q.   And do you recognize the location where she's

13  standing there?

14       A.   Yes.

15       Q.   Where is it?

16       A.   At the entrance of El Reino.

17       Q.   And do you know how that photograph came to be?

18       A.   One of the agents on surveillance took that

19  photograph.

20       Q.   Did you discover any other businesses that

21  Ms. Blake regularly delivered money to during the course of

22  the 41 BCTs?

23       A.   Yes.

24       Q.   Is there anyone in the courtroom who is

25  associated with any of those businesses?

 1      A.   Yes.

 2      Q.   Could you point that person or people out by

 3 location and an article of clothing?

 4      A.   Yes.  Within the center table, on the right side

 5 in the middle, there's Mr. Ravinder Gudipati.

 6      Q.   How is Mr. Gudipati involved?

 7      A.   He is the owner of NYSA Impex.

 8      Q.   And do you know what kind of business NYSA Impex

 9 is or was?

10      A.   A perfume shop.

11           THE COURT:  Can you spell NYSA for the Record,

12 please?

13           THE WITNESS:  N-Y-S-A.

14 BY MS. WILLIAMSON:

15      Q.   Let's move on to BCT-2 and I'll ask you the same

16 question.  Would a diagram be helpful in explaining what

17 happened?

18      A.   Yes.

19           MS. WILLIAMSON:  For the Record, I've handed the

20 witness a diagram and I'll now pass copies to opposing

21 counsel.

22           THE COURT:  All right.

23           And this will be 401 or 400-A?

24           MS. WILLIAMSON:  Will call this 401, Your Honor.

25 Thank you.

1          (Counsel confer.)

2               THE COURT:  Okay.

3               And remember, all counsel, we will keep an

4    original.  The demonstratives will still be part of the

5    Record.

6               MS. WILLIAMSON:  Yes, Your Honor.

7    BY MS. WILLIAMSON:

8         Q.   And you've been handed a copy of Government's

9    401.  Are you familiar with this diagram, Officer Lozano?

10        A.   Yes.

11        Q.   Have you previously reviewed it before coming to

12   court?

13        A.   Yes.

14        Q.   Does it accurately depict the transactions in

15   BCT-2 that you investigated?

16        A.   Yes.

17        Q.   Would it aid you in explaining BCT-2 to the jury?

18        A.   Yes, it would.

19        Q.   Before we publish the exhibit to the jury, can

20   you explain, please, how did BCT-2 begin?

21        A.   Similar to one in a way that Ms. Blake contacted

22   us and told us there's a money courier coming down to drop

23   off money, but this time it's going to happen in the middle

24   of the night because that's the way this money courier

25   works.

1    Q.   And what was the date that the CS was expecting

2  the money courier?

3    A.   The date?

4    Q.   Yes.

5    A.   It was late March.

6    Q.   What, if anything, did you do in response to

7  contact from Ms. Blake?

8    A.   We set up, again, surveillance to attempt to

9  corroborate the information that we had just received from

10  Ms. Blake.

11    Q.   Did you also provide her with a recording device?

12    A.   Yes.

13    Q.   What kind of recording device?

14    A.   I believe it was, again, like a key fob because

15  the CS told us that the courier is --

16         BY MR. O.J. PENA:  Objection, Your Honor.

17  Hearsay.

18         THE COURT:  All right.  Just don't tell us what

19  anybody said to you.  Just tell us what you observed and

20  what you did or what they did.

21         THE WITNESS:  Okay.

22         MS. WILLIAMSON:  Your Honor, the Government is

23  also soliciting the information, not for the truth but to

24  show future action, namely why Officer Lozano and the DEA

25  selected that recording device.

 1          THE COURT:  Okay, that's fine.  Go ahead.

 2   BY MS. WILLIAMSON:

 3      Q.   I believe the question was, did you provide a

 4   recording device?

 5      A.   Yes, we did.  It was a key fob and it was placed

 6   inside the vehicle Ms. Blake was going to be driving.

 7      Q.   And did Ms. Blake, in fact -- did surveillance

 8   reveal that Ms. Blake, in fact, went to meet a courier?

 9      A.   Yes.

10      Q.   And were you part of that surveillance?

11      A.   Yes.

12      Q.   Could you describe what you, please?

13      A.   What is I saw was we conducted surveillance, the

14   information was that a bus line was going to stop at the, I

15   think, it's the Marriot Spring Hills.  If you guys are

16   familiar with the Golden Corral off Santa (indiscernible)

17   there's a hotel right there.  The bus was going to stop

18   there and drop off the money courier and that's where

19   Ms. Blake was to pick up the money courier.

20      Q.   And did your surveillance observe Ms. Blake

21   picking up a person?

22      A.   Adriana Galvan-Constantini.

23      Q.   And what, if anything, did you see Ms. Galvan-

24   Constantini do during the course of your surveillance?

25      A.   She arrived with a rolling luggage and that

1  rolling luggage was placed in Ms. Blake's vehicle.

2       Q.   And did Ms. Galvan-Constantini get into

3  Ms. Blake's vehicle?

4       A.   Yes.

5       Q.   Directing your attention to Exhibit 24-A, in that

6  binder, do you recognize Exhibit 24-A?

7       A.   Yes.

8       Q.   What it is?

9       A.   It's the transcript to the recorded conversation

10 that the key fob picked up.

11      Q.   Have you previously reviewed that transcript?

12      A.   Yes.

13      Q.   Who are the people on the phone call?  Excuse me.

14 Who are the people on the recorded conversation?

15      A.   It is Ms. Blake and Adriana Galva-Constantini.

16           MS. WILLIAMSON:  Could we play the clip, please,

17 of Exhibit 24?

18        (Exhibit 24, a recording, was played to the Court and

19 jury.)

20           THE COURT:  All right, hold on a second.  Pause.

21 Pause, pause.

22           Does it sound like this or is it the equipment

23 that's making it sound like this?

24           MS. WILLIAMSON:  I think it's a combination of

25 the two, Your Honor.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    89

1          THE COURT:  Okay, because we have people here

2    from IT, so do we need to take a break or are all the tapes

3    going to -- it is just this tape or all the tapes going to

4    sound like this?

5          MS. WILLIAMSON:  I think many of them may have a

6    similar sound quality, combination of --

7          THE COURT:  Okay, let me excuse the jury.

8          Please step out, ladies and gentlemen.

9          THE CLERK:  All rise.

10        (Jury exits the courtroom at 2:00 p.m.)

11        (Outside the presence of the jury.)

12        THE COURT:  Okay, they stepped out and, look, I'm

13   hearing these for the first time.  You have had them for a

14   year to work with them.  The accuracy of the

15   transcription/translations has not been challenged.  We now

16   have a transcript on screen, but I just want to make sure

17   that we can really hear them because, otherwise, I mean,

18   I'll say I've got some concerns.

19        So, let's play it again.  I mean, ultimately,

20   they'll have to decide if they can hear the same things

21   themselves, I guess, but --

22        MS. WILLIAMSON:  Well, Your Honor, the recordings

23   are in Spanish, so it won't be the words on them, I mean, it

24   will be but it won't be the words on the screen.

25        THE COURT:  Right, right, right.  But I just want

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                90

1   to make sure I can understand the words that are being

2   spoken.  I couldn't understand the words spoken.

3         I wasn't even sure the language we were hearing

4   when you all were playing it.

5       (Parties testing the equipment.)

6         MALE SPEAKER:  Judge, can I have two minutes down

7   the hall?

8         THE COURT:  Yes, sir.

9         MALE SPEAKER:  Thank you.

10      (Pause in the proceedings.)

11        THE COURT:  All right, Counsel.  I was just

12  notified Juror No. 12 wants to talk to me.  I don't know

13  what about.  I'm going to bring her to the bench and, of

14  course, we are on the Record.

15      (Bench conference with Juror No. 12 begins at

16  2:04 p.m.)

17        JUROR NO. 12:  I don't know if there's anyway,

18  because I'm not going to be paid by my job and I'm going to

19  be left without -- a month without pay.  Is there anything

20  you recommend me to do or something?

21        THE COURT:  Ma'am, (indiscernible) jury

22  selection, you were told then.  I'm not sure what to tell

23  you.  We told you this case was going to last at least two

24  weeks, could be three.  I mean, you should be paid as a

25  juror, but your job cannot stop paying you.  I think by law,

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                91

1  they have to continue paying you.  I don't think they can

2  deny you a paycheck because you're serving on the jury.

3          JURY NO. 12:  That's what I don't know.

4          THE COURT:  Who's your employer?

5          JUROR NO. 12:  UISD.

6          THE COURT:  They can't stop paying you is my

7  understanding.

8          JUROR NO. 12:  But it's within the UISD, but

9  it's an afterschool program.

10          THE COURT:  Right.

11          JUROR NO. 12:  So, I don't know if it's

12  independent from then but UISD still pays us.

13          THE COURT:  I don't think that can legally

14  refrain a check.  You know, we can make some calls, but this

15  is not the time to be disclosed to us because you can't be

16  sitting there worried about whether you're going to get paid

17  or not.  I can't excuse you right now and (indiscernible)

18  we'll take a break in the afternoon if you want to try to

19  make a call, but I think that legally they cannot not pay

20  you.  Okay?  But this kind of communication is not

21  (indiscernible).

22          JUROR NO. 12:  Yes, I'm so sorry, but I just that

23  like that would have been something I would be able to be

24  excused for.

25          THE COURT:  Well, I don't know, if you

1  (indiscernible) that's something that could have been

2  discussed, but right now (indiscernible).

3           JUROR NO. 12:  I understand.

4           THE COURT:  And believe that (indiscernible)

5  situation (indiscernible) that's not a reason to be excused.

6  I don't want (indiscernible) to be coming and talking about

7  it and being (indiscernible) something that has to happen or

8  it's an emergency but what you're describing is a situation

9  issue that should have been described during jury selection.

10 So, the only thing, again, I can say or that I can tell is

11 make a call to your employer, find out (indiscernible) They

12 certainly not fire you.

13          FEMALE SPEAKER:  If she's a part-time employee,

14 (indiscernible).

15          THE COURT:  You're fulltime?

16          JUROR NO. 12:  Part-time.

17          THE COURT:  You're part-time.  Okay.  Well, make

18 some inquiries and then let us know what your particular

19 situation is.

20          JUROR NO. 12:  Okay.

21     (Bench conference ends at 2:08 p.m.)

22          THE COURT:  All right, and tell me what her

23 number is.

24          FEMALE SPEAKER:  I believe he said 12.

25          THE COURT:  That was Juror No. 12?

1          All right.  So, Juror No. 12 just came up and

2    reported that she's very concerned because she doesn't know

3    whether her employer is going to pay her for the next couple

4    of weeks.  She doesn't know whether she's going to receive a

5    paycheck.  My response to her is that I wish she had

6    communicated that concern during jury selection, she

7    obviously did not.  She says she's still not sure and she

8    was asking me for advice on what she should do.  And so,

9    what I said to her is obviously I can't give her advice,

10   it's my opinion, but I don't know that employer, I know that

11   they can't fire them, I didn't think they could withhold

12   payment, but obviously, we're going to look into that

13   situation.  I also instructed her though that she has to be

14   focused on everything that we're doing here today and can't

15   be worried about whether she's going to get a paycheck.

16          Now, for everyone that lives paycheck to

17   paycheck, it's not a matter to be taken lightly.  Obviously,

18   I can understand why she would be very concerned and so

19   she's going to make an inquiry during the break and get back

20   to us on that, but you know, obviously, those are exactly

21   the kinds of things that should come up during jury

22   selection and did not.  So, that's where we're at.

23          Does anybody want to add anything?

24          MS. WILLIAMSON:  Could I just ask, Your Honor, is

25   this the same juror who thought she might be working night

1    shifts?

2              THE COURT:  No, it is not.

3              MS. WILLIAMSON:  Thank you for that

4    clarification.

5              THE COURT:  That juror we've already written the

6    letter and I think that juror is fine.  This is somebody

7    else and I think she indicated that she works part-time.

8    It's part of the UISD, but it's an afterschool program and

9    so I don't know.  I don't know whether part-time employees

10   whether there's different rules, contract workings, I

11   honestly don't know.  I don't deal with that, but we'll look

12   into it and if, in fact, she confirms she's not going to get

13   paid and expresses her inability to stay focused then I'll

14   leave it up to all of you whether you want to keep her or

15   not.  Thankfully, we have two alternates.

16             So, we'll just see.  I'll keep you posted on the

17   development of that.

18             All right.  Are we ready to play the audio or

19   we're still working on this?

20        (No audible response.)

21             THE COURT:  Mr. Hernandez, can you look into that

22   as well?  Can you send a message downstairs to look into the

23   pay situation?  Or Ms. Trevino will do it?

24             THE CLERK:  I'll do it.

25             THE COURT:  Okay, thank you.

1              All right, and I know that there wasn't an

2    objection from defense counsel, I intervened.  If you all

3    are happy that is sounds like this, I'll back off, but, I

4    mean, let me hear from all of you.

5              MR. O.J. PENA:  Your Honor --

6              THE COURT:  I'm just wondering because I couldn't

7    understand it.  I wasn't even sure if it was English or

8    Spanish so -- again, you guys have heard these, you all

9    weren't objecting.

10             MR. O.J. PENA:  May I have one moment, Your

11   Honor, to discuss this with Mr. Balli since we're kind of

12   both in the same?

13             THE COURT:  Okay.  I mean, I could be interfering

14   with your defense strategy here.  Certainly, not my intent,

15   so let me know.

16         (Pause in the proceedings.)

17             THE COURT:  All right, Counsel.  We're still on

18   the Record.  I was just advised by the CSO that Juror No. 14

19   wants to know if they have a question, can they ask it.  And

20   so, obviously the response is no, not at this point.  They

21   have to wait until everybody finishes their questioning

22   before they can write their -- well, not before they can

23   write it, but before we'll look at whatever question they

24   might have.

25             So, when they come out, I'll remind them, you

1  know, that they can start writing down questions they think

2  they may have, but we're not going to get to any of that

3  until you guys are done with your Cross-examination and

4  Redirect examination.

5          MR. O.J. PENA:  Your Honor?

6          THE COURT:  Yes.

7          MR. O.J. PENA:  I admit it's a strategic

8  decision, but the reality is we're going to waste a lot of

9  time.

10          THE COURT:  So play as-is.

11          MR. O.J. PENA:  And I'm going to everybody

12  already knows the argument is that whatever their

13  transcripts have they're based on trash in, trash out.

14  Basically, at this point, Your Honor, if they want to play

15  the audio, I was going to allow them to, but you've heard

16  it, Your Honor, and if you are--

17          THE COURT:  I haven't really heard it.  I heard a

18  little portion of it.  I just stopped it because I was

19  wondering if it was all like that if there was something

20  wrong with the equipment, I didn't know.  I figured,

21  obviously, that if there were issues you all would have

22  brought it up before, but nobody has or had so, again,

23  you're prepared to just let them play as-is?

24          And look, even if you say no, I'm not saying I'm

25  going to go along with you.  I'm just trying to figure out

1  what's your position?

2           MR. O.J. PENA:  I will -- Your Honor, I'm going

3  to stick to my position, Your Honor --

4           THE COURT:  Which is let them play.

5           MR. O.J. PENA:  -- which is to allow them to

6  listen to the call.

7           THE COURT:  Okay.  That's fine, that's fine.

8           And look, these were all transcribed so somebody

9  listened to it and whether it took them five minutes to

10  transcribe or five hours, I don't know, but they're in

11  evidence at this time, nobody's challenging the accuracy,

12  and I'm sure you all know what you all are doing.  I'll

13  leave it at that.

14           Okay, it sounds the same, Mr. Lankos (phonetic)?

15           MR. MORENO:  We don't have any sound yet.

16           THE COURT:  Oh. We don't have sound yet.

17           MR. MORENO:  They've (indiscernible) the cables

18  (indiscernible) no sound at all.

19           THE COURT:  We now have lost sound.

20       (Pause in the proceedings.)

21           THE COURT:  All right.  Lawyers, while we're

22  trying to figure this out, my clerks are doing some research

23  on the whole fulltime/part-time salary situation.  They're

24  looking at the Texas Employer Handbook.  But before we can

25  maybe give her our advice, and I don't know that I'm even

1  required to do that, they need to know a little bit more

2  about her employment.  Are there any objections to me

3  sending -- well, we can bring her out and my clerks just

4  need to ask her a couple of questions about where she works

5  and so forth.

6              Any objections from anybody?

7              MALE SPEAKER:  No, Your Honor.

8              THE COURT:  Okay, so let's bring that same juror

9  out.  You all can just talk to her right here and ask her

10 some more questions about her employment situation.

11        (Pause in the proceedings.)

12             THE COURT:  Yes, sir.  You may step out, yes.

13             MR. BALLI:  Your Honor, is it okay if I step out?

14             THE COURT:  Yes.

15        (Pause in the proceedings.)

16             THE COURT:   Why don't we just go off the Record

17 here for 10, 15 minutes until we figure this out?  Everybody

18 can take a break.  Thank you.

19        (Recess taken from 2:19 p.m. to 2:24 p.m.)

20                       AFTER RECESS

21        (Outside the presence of the jury.)

22             THE COURT:  Okay, are we back on the Record?

23             So, another situation.  I guess, the Hindi

24 Interpreters don't speak Spanish so they can't interpret

25 what they're hearing on the tape to Hindi so they're going

1    to need a copy of the transcripts to be able to interpret or

2    the client's themselves read and speak English to be able to

3    read the transcripts.

4              So, how do you all want to handle that?

5         (No audible response.)

6              THE COURT:  Anybody?

7              MR. MORENO:  They can get copies of the

8    transcripts, but it's going to say exactly the same thing

9    because it's in English.

10             THE COURT:  Right, and so can the clients, can

11   the Defendants look at the screen and read it for themselves

12   or does that portion also require translation?

13             COURT INTERPRETER:  Your Honor, I think we're

14   missing a lawyer.

15             MALE SPEAKER:  I think we're missing a few, Your

16   Honor.

17             THE COURT:  Oh, we're missing Mr. Balli.

18             It looks like we're still missing a bunch of

19   people.

20             All right.  Well, anyway, start to think about

21   that issue.  The other part of it is we did our research

22   and, apparently, because she is a part-time employee, they

23   can, in fact, withhold her paycheck.

24             MALE SPEAKER:  They can?

25             THE COURT:  Yes, they can.  Never a perfect

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                100

1    trial.

2              MR. MICHAEL MCCRUM:  Your Honor, we do not agree

3    to excuse her.

4              THE COURT:  You do not agree to excuse - Okay,

5    then you don't have to.  That's why I said to her, "This is

6    something --

7              MALE SPEAKER:  I didn't hear.  You do not agree

8    to excuse--

9              THE COURT:  They're saying they do not agree to

10   excuse her.  And you know, again, we tell them, "Is there

11   anything in your life?  Is there anything going on?  Is

12   there anything you want to talk about?  Is there anything

13   that concerns you?"  It is what it is.  All right.

14             MR. MORENO:  Just for the Record, is that all of

15   them or just two of them?

16             THE COURT:  Well, I'll ask each one individually

17   what their position is.

18             Mr. Del Rio -- well, let me ask the lawyers that

19   are here.  What's your position?

20             MR. DEL RIO:  We would like to keep her, Your

21   Honor.

22             THE COURT:  I'm sorry.

23             MR. DEL RIO:  We would like to keep her, Your

24   Honor.

25             THE COURT:  You would like to keep here.  All

1  right.

2          Mr. Castillo, what is your position?

3          MR. CASTILLO:  Your Honor, I agree with

4  Mr. McCrum.  Having discussed the issue, we do not agree to

5  release her.

6          THE COURT:  Okay, and I'll wait for the other

7  lawyers to come in.  I'll ask them the same question.

8          Government, what's your position?

9          MR. MORENO:  I'm trying to picture which one it

10 is.  I didn't see her when she came back up.  I think we're

11 fine with her being excused because have the other two.

12         My concern is that if that's going to be the

13 case, no matter what we tell her, she's not going to be

14 paying attention.  It's going to be just as bad as having a

15 juror who's not full into the case and so I don't know if

16 that benefits anybody.  Definitely doesn't benefit us if

17 she's not paying attention because she's concerned with

18 outside matters.

19         MR. MICHAEL MCCRUM:  That's a hypothetical

20 concern.

21         MR. MORENO:  Well, we can bring her out and ask

22 her.

23         THE COURT:  Do you all want me to bring her out

24 and ask her or are we just saying you're not going to be

25 excused and you're still tasked with paying attention and

 1  just leave it at that?

 2          MR. MICHAEL MCCRUM:  I would just leave it at

 3  that, Judge.  I would not ask any further questions.

 4          THE COURT:  But just so that you all know, the

 5  Government has raised a hypothetical, which is probably a

 6  reality, but if you all don't want to probe further at this

 7  juncture, which would be the right time --

 8          MR. MORENO:  We do.

 9          THE COURT:  No, I know you do but they're saying

10  that there's no need to ask any other questions.

11          MR. MICHAEL MCCRUM:  In my experience, even when

12  jurors are not excused, they pay attention.  It's just a

13  fear.  I've heard that said in courtrooms by lawyers, but

14  I've never seen it happen when a juror's not excused.  They

15  sit there, they listen just like anyone else.  They may not

16  be as happy, but that's what it is.

17          THE COURT:  All right.  I want the defense

18  lawyers to discuss it with your clients because later on, I

19  don't want them to say, we should have asked follow-up

20  questions, we should have excused her because she could have

21  been worried about her paycheck, didn't pay attention to us,

22  didn't give us a fair trial, didn't follow the law because

23  she was so preoccupied because I'm willing to bring her in

24  so all of you can ask her questions.

25          But the defense is telling me, "No, don't bring

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                   103

1   her in.  No, no follow-up questions.  And no, we don't

2   excuse her," and that's fine if that's what you all want to

3   do, but I want your client's consent on that so that later

4   on they don't argue that all of you, number 1, made the

5   decision without then, and number 2, were ineffective for

6   having done so.  So, take a moment to talk to your clients.

7           MR. O.J. PENA:  Your Honor, as an aside, you said

8   she worked for UISD; is that correct?  I believe UISD

9   receives federal funding.  I wouldn't be surprised if

10  there's not a rule --

11          THE COURT:  She's a part-time employee, counsel.

12  Why don't you talk to your other co-counsel?  They can brief

13  you on what we were talking about, --

14          MR. O.J. PENA:  Yes, Your Honor.

15          THE COURT:  -- but talk to your clients and I

16  want information from your clients if that's their decision

17  as well.

18          MR. O.J. PENA:  Yes, Your Honor.

19      (Pause in the proceedings.)

20          MR. BALLI:  Your Honor, I conferred with Luis

21  Montes-Patino and he's in agreement that we should try to

22  keep the juror to the extent possible and not ask further

23  questions.

24          THE COURT:  All right, thank you.

25          Let me hear from each counsel individually.

1          Mr. Scott McCrum?

2          MR. SCOTT MCCRUM:  Yes, Your Honor.  On behalf of

3    Reddy Gudipati, I talked to him and yes, we do not want to

4    bring her in for questioning nor do we want to excuse her.

5          THE COURT:  All right.

6          Michael McCrum?

7          MR. MICHAEL MCCRUM:  I've spoken with Harsh

8    Jaggi.  I'm in agreement with my co-counsel and their

9    position, I do want her excused and I do not want her to be

10   asked any questions.

11         THE COURT:  Mr. Castillo?

12         MR. CASTILLO:  Yes, Judge.  Good afternoon.  I've

13   spoken with my client, she is present in the courtroom and

14   having spoken to her, we submit the same announcement.

15         THE COURT:  Thank you.

16         Mr. Oscar O. Pena?

17         MR. O.J. PENA:  On behalf of Adriana Galvan-

18   Constantini, who is next to me and who has been consulted,

19   we also agree with our other defense counsel's position.

20         THE COURT:  Mr. Pena Sr.?

21         MR. O.O. PENA:  We think, Judge, that the juror

22   should stay.  I have spoken to my client and he feels the

23   same way.

24         THE COURT:  Thank you.

25         Did I cover everyone?  I think I did.

1              All right.  And additional fact that I just

2    learned, which could make all of this moot, but I wanted to

3    still air on the side of caution is she apparently works

4    from 3:00 to 6:00 every day.  She worked 3 hours every day,

5    she gets paid $9 an hour, she's making $27 a day.  So, she's

6    actually making more money by being with us here each day

7    because she's getting $50 from us.  At least now because we

8    still have some appropriations.  That could change though is

9    the Government situation worsens, but they'll still get paid

10   retroactively so she's actually making more money.

11             MR. BALLI:  Does she know that?

12             THE COURT:  We're going to tell her.

13             MR. LIDDLE:  Your Honor?

14             THE COURT:  Yes.

15             MR. LIDDLE:  You think I could be an alternate

16   because I'd be making more money.

17             THE COURT:  Sure.  Why not?  Stranger things have

18   happened.

19             All right.  So, that takes care of that

20   situation.  We're ready with the audio now?

21             MR. MORENO:  We're ready.  We're going to -- just

22   to explain to the Court, I think this first part has three

23   clips, if I understand correctly.  The first one's the bad

24   one because they're in the car, I think the windows are down

25   and you can hear the blinker, the road noises, and whatever.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                     106

1  Then they get into the house and it's not clear, but it is

2  what it is.

3              THE COURT:  Okay.

4              MR. MORENO:  So, there's not much we can do to

5  improve it (indiscernible).

6              THE COURT:  Okay.

7              MR. MORENO:  I don't know what they decided on

8  the transcript or the --

9              THE COURT:  Oh, yes.  What have you all decided

10  for the Hindi speaking Defendants, who also speak English

11  but we have Interpreters just as an additional measure?  Do

12  they want to just review the transcripts or do we need to

13  give a copy of the transcripts to the Interpreters to

14  interpret for them?

15              MR. MICHAEL MCCRUM:  On behalf of my client, he

16  cannot read that fast English.  He's somewhat familiar with

17  in English, as you'll hear, but he just can't read that fast

18  so it'll be of no use to put it in front of him.

19              THE COURT:  Mr. Castillo, same announcement?

20              MR. CASTILLO:  I spoke to my client and yes, it

21  is the same announcement.

22              THE COURT:  Mr. McCrum, Scott, same announcement?

23              MR. SCOTT MCCRUM:  Either way, Judge.  Same

24  announcement, Judge.

25              THE COURT:  Okay, all right.  So, let's get the

1  Interpreters copies of the transcripts so that they can

2  translate.

3           MS. WILLIAMSON:  Your Honor, if I may inquire

4  through the Court, the Government did not anticipate the

5  need to bring a copy of the transcripts for the translators

6  and, for that, I apologize.  However, I do note that defense

7  counsel had three sets of binders between them and none of

8  them seem to be actively using them at this moment and I

9  wonder if they might have a copy to loan.

10          THE COURT:  Yes, please.  Give us a copy, let's

11 them over to the Interpreters.  Help us out with this.

12          MR. O.J. PENA:  I've brought an electronic copy,

13 Your Honor.

14          THE COURT:  Whatever you guys have, if you could

15 just hand over a copy so that we could get this done.

16 Otherwise, I look forward to seeing you for the next month

17 here in trial.

18          MR. O.J. PENA:  Your Honor, what I'm saying is

19 that I digitized it and saved it on my computer.

20          THE COURT:  Oh, so you can't.

21          Does anybody have a physical?

22          MALE SPEAKER:  I'm in the same position.

23          MALE SPEAKER:  Same, Judge.

24          THE COURT:  Nobody has a physical copy?

25          MR. O.J. PENA:  I don't have a paper copy.  We

1  had a box, but it was too cumbersome.

2          THE COURT:  All right.  We have one, got it

3  covered.  What transcript number is this?

4          MS. WILLIAMSON:  24, Your Honor.

5          THE COURT:  24.

6          MR. O.J. PENA:  We had the boxes, Your Honor, but

7  they were too cumbersome so I digitized so I wouldn't have

8  to carry it.

9          THE COURT:  And if you could just maybe kind of

10  give us a couple of number on what you hope is next and so

11  forth, and we'll get them --

12          MS. WILLIAMSON:  Yeah, and we may be able to come

13  up with another set of binders.  If not by the end of the

14  day, then certainly for next week.

15          THE COURT:  All right.  Yeah, I don't know about

16  the end of the day, but just right now we'll use our copies.

17          COURT INTERPRETER:  Your Honor, if we may.  We

18  can just (indiscernible).

19          THE COURT:  Thank you so much.  Yes, all right.

20  Wonderful.  Problem has been solved because we actually

21  apparently don't have a copy.  Oh, we don't have a 24

22  because that would make too much sense.

23          All right, it's the one number we're missing.

24  That's good.  We apparently don't.

25          COURT INTERPRETER:  Your Honor, (indiscernible)

1  to stand.

2          THE COURT:  You're welcome to whatever you need

3  to do, ladies.

4          COURT INTERPRETER:  Okay.

5          THE COURT:  Thank you.

6          I think everyone is back, let's go ahead and

7  bring the jury in.  Thank you.

8       (Jury enters the courtroom at 2:38 p.m.)

9          MALE SPEAKER:  Your Honor, did we tell the juror?

10          THE COURT:  Do you want me to tell her now?

11          MALE SPEAKER:  Sure.

12          THE COURT:  I will.

13          Juror No. 12.

14          Juror No. 12, let me have you come to the bench

15  just for one moment.  I just have an answer to the question

16  that you posed.

17          Everyone else, you may be seated.  We had a

18  question from Juror 14.  Apparently, I guess, you have a

19  question and were wondering if you could, I don't know if

20  your question was whether "Can we write it down?" or "Can we

21  ask it?"  Let me just clear that up for all of you.  You

22  have some yellow notepads in front of you.  Some of the

23  witnesses are going to be on the stand for a very long time

24  and so, of course, if you're wondering certain things, you

25  can start to write down your questions on the yellow pad,

1  but you cannot ask it right now in the middle of testimony,

2  as you've seen me ask some clarifying questions, because you

3  have to wait.  You know, they're obviously not done.

4  They're like pretty much at the beginning.

5            You've got to wait for the Government to finish

6  all their questioning and then all of these lawyers, whoever

7  decides they want to ask questions, they get to Cross-

8  examine the witness.  Government gets to come back and do a

9  Redirect, if they would like, and then only at that point,

10 assuming that question that you had, assuming that it still

11 hasn't been answered, and again, that should be a clarifying

12 question, then at that point, you would write it down, hand

13 it to the Court's security officer, we all come up here,

14 field objections for the Rules of Evidence, and then it

15 would get asked.  And so, no, it can't be done in the middle

16 of things.

17            Does everyone understand?

18            Okay, everyone is nodding in the affirmative.

19       (Bench conference begins at 2:40 p.m.)

20            THE COURT:  We did some research.  We were able

21 to find out that because a part-time employee, but I've been

22 told that you work three hours and make $9 an hour, so

23 that's a total of $27.  Right?

24            JUROR NO. 12:  Yes.

25            THE COURT:  You're actually going to be making

 1  more money with us, you're going to making $50 a day.

 2              JUROR NO. 12:  I understand that.

 3              THE COURT:  Okay.

 4              JUROR NO. 12:  But it's just it's the time being

 5  that when I receive the check.

 6              THE COURT:  No, and we're going to be working

 7  with all of you to get you paid as quickly as possible.

 8  You're actually going to be making more money and so I just

 9  need to know whether everything that we discussed during

10  jury selection, that you will be fair and impartial, that

11  you will have paid attention, does all of that still stand?

12              JUROR NO. 12:  Yes.

13              THE COURT:  Okay, ma'am.  Thank you very much.

14        (Bench conference ends at 2:40 p.m.)

15              THE COURT:  All right.  You may continue.

16              MS. WILLIAMSON:  Your Honor, I have one more

17  question --

18              THE COURT:  Yes.

19              MS. WILLIAMSON:  -- for the Court before I

20  continue my questions of Officer Lozano.

21              Would the Court inquire of the jury whether they

22  can see the projector over me or whether I'm blocking?

23              THE COURT:  They have screens in front of them as

24  well.

25              MS. WILLIAMSON:  Oh, perfect.

1              THE COURT:  And their screens, because their

2    mute, the quality is even better than it is on this screen.

3              MS. WILLIAMSON:  Very good.  Thank you, Your

4    Honor.

5              THE COURT:  Right, ladies and gentlemen?  Am I

6    right about that?

7              Everybody's nodding, "yes."

8              All right.  You may continue.

9         DIRECT EXAMINATION OF FRANCISCO LOZANO (RESUMED)

10   BY MS. WILLIAMSON:

11        Q.   Officer Lozano, before we continue with

12   Exhibit 24, I want to clarify a couple of things.  You said

13   that there was a recording device in Ms. Blake's car during

14   this meeting, right?

15        A.   Yes.

16        Q.   Do you know where that recording device was

17   placed?

18        A.   The vehicle had a small compartment on the

19   dashboard, like right underneath by where the steering wheel

20   is.  We just popped it open and we placed the key fob in

21   there and closed the small compartment.

22        Q.   Was part of this discussion, based on your

23   observations and surveillance, occurring while the car is

24   driving?

25        A.   Yes.

1      Q.    And does that potentially create some additional

2   noise in the recording?

3      A.    Yes.

4      Q.    And have you reviewed this transcript?

5      A.    Yes.

6      Q.    Did you find it to be relatively accurate?

7      A.    Yes.

8      Q.    You said you speak Spanish as part of your job.

9   Do you have any formal Spanish training?

10      A.    I have a bachelor's degree in Spanish.

11            MS. WILLIAMSON:  With that, if we could play

12   Exhibit 24, please.

13         (Exhibit 24, a recording, was played to the Court and

14   jury.)

15            THE COURT:  All right, I'm sorry.

16            COURT INTERPRETER:  It's going too fast.

17            THE COURT:  Okay.  The transcript part of it is

18   going too fast?

19            COURT INTERPRETER:  Yeah.

20            THE COURT:  That just how it plays.

21            COURT INTERPRETER:  Okay, okay.  I'm going to try

22   to keep up.

23            THE COURT:  Try your best.

24            COURT INTERPRETER:  Yes.

25            THE COURT:  Thank you.

1        MS. WILLIAMSON:  And can we play the second clip,

2   please?

3       (Exhibit 24 continues to be played for the Court and

4   jury.)

5   BY MS. WILLIAMSON:

6       Q.   And just as a refresher because we took a longer

7   than expected break when the transcript says CS, who is

8   that?

9       A.   Corina Blake.

10      Q.   And when the transcript says, "Adriana," who is

11  that?

12      A.   Adriana Galvan-Constantini.

13      Q.   At the time this transcript was recorded, did you

14  know who Adriana Galvan-Constantini was?

15      A.   We didn't have her fully identified.

16      Q.   So, at this time, did you take any further steps

17  to identify the woman you saw getting off the bus and

18  getting into Ms. Blake's car?

19      A.   Yes.

20      Q.   And what was that?

21      A.   We had a United States Border Patrol Agent within

22  our group that's also a deputized Task Force Officer.  So,

23  we asked him to head over to the Checkpoint to identify

24  Adriana.

25      Q.   Without getting into any particular action that

 1   he may have taken or the result of any action, are you aware

 2   as to whether that Border Patrol Agent did go to the

 3   Checkpoint for that purpose?

 4        A.   Yes.

 5        Q.   To the best of your knowledge, is that based on

 6   the DEA's instructions to him?

 7        A.   Yes.

 8             MS. WILLIAMSON:  Could we display Exhibit 22,

 9   please?

10   BY MS. WILLIAMSON:

11        Q.   Could you take a look at Exhibit 22?

12        A.   (Witness complies.)

13        Q.   Do you recognize that picture?

14        A.   Yes.

15        Q.   What is it?

16        A.   A picture of the bulk currency that was brought

17   that evening.

18        Q.   And how did the DEA come to possess that

19   currency?

20        A.   We met with the Confidential Source after Adriana

21   Galvan-Constantini departed Laredo at a predetermined

22   location and she provided us with those packages.

23        Q.   And through the course of your investigation and

24   from reviewing the recording, are you aware of whether

25   Ms. Galvan-Constantini received payment for her services

1   that evening, that is bringing the cash to Laredo?

2        A.    Yes.

3        Q.    And how much money was that?

4        A.    $3,000.

5        Q.    And did Ms. Blake receive any money for her

6   services in this transaction?

7        A.    Yes.

8        Q.    And how much money was that?

9        A.    1,500.

10            BY MR. O.J. PENA:  Your Honor, may we approach?

11            THE COURT:  Yes.

12        (Bench conference begins at 2:48 p.m.)

13            MR. O.J. PENA:  I'm trying to clear something up,

14   Your Honor.  He says that he knows that my client got paid

15   $3,000 and I'm trying to determine if that's hearsay or

16   whether he knows that because of something he heard on the

17   recording.

18            THE COURT:  I'm assuming he's the one that paid

19   her the $1,500, right?

20            MS. WILLIAMSON:  He's talking about the 3,000.

21            MR. O.J. PENA:  No, I'm talking about my client.

22            THE COURT:  Oh, your client.  Your client got

23   paid 3,000.

24            MS. WILLIAMSON:  He testified that as a result of

25   listening to the recording.

1            THE COURT:  Oh, listening to the recording.

2            MS. WILLIAMSON:  We didn't play the whole

3    recording.

4            THE COURT:  So, he hears the recording and that's

5    how he's aware of that.  Let ask you all this too since your

6    all on the Record, so let me bring him up here.  When did

7    the tapes and transcripts become available to defense

8    counsel?  How have they had the tapes and transcripts?

9            MR. MORENO:  We started putting out discovery in

10   March.

11           THE COURT:  March of?

12           MR. MORENO:  Last year.

13           THE COURT:  2018.

14           MS. WILLIAMSON:  Which included the audio

15   recordings.  The transcripts have been made available as the

16   Government received them.

17           THE COURT:  Okay, so all counsel have had the

18   audio recordings since 2018 and then the transcripts were

19   given to you guys or made available as the Government

20   received them.  I bring that up because none of these

21   Defendants should be listening or seeing these transcripts

22   for the first time.

23           So, to the extent that I believe the Interpreters

24   are struggling to keep up, they're not seeing these or

25   hearing these for the first time.  I trust all of you

1  reviewed this information with your clients.

2          Second of all, you all have been communicating

3  with your clients in the English language is my

4  understanding.  You all requested the Court a Hindi

5  Interpreter for purposes of the trial in case something more

6  complicated came up that you all had previously discussed,

7  but I just wanted to make sure the Record reflected that

8  because the Interpreter just stood up and said, "It's going

9  to fast, we're not keeping up," and I don't want anybody to

10  think that their hearing or seeing this for the first time

11  and somehow being deprived of their right to understand the

12  evidence that is being brought in against them.

13          Does anybody want to add anything?

14          MR. O.J. PENA:  That was not what my complaint

15  was about.

16          THE COURT:  No, I know.  You're complaining about

17  where does he know that your client got $3,000.

18          MR. O.J. PENA:  Yeah, whether it was told to him

19  or whether it was something he heard on a recording and I

20  have read it and there's so much data that I can't remember

21  every single thing and so I wanted to clear that up.  I

22  think that the proper thing to do was to clear it up.

23          THE COURT:  That's fine.

24          MR. BALLI:  And my client has seen it but, as far

25  as I know, he doesn't speak any English but I speak to him

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    119

1   in Spanish.

2           THE COURT:  You're Spanish speaking.

3           MR. BALLI:  Yes.

4           THE COURT:  Right, but again, if there were any

5   issues with him understanding what was on there, there's

6   some versions that are translated to Spanish, that's on you

7   to you say, "My client doesn't understand these transcripts

8   and these tapes."  You-all will have to clean them up.

9           MR. BALLI:  No issues, judge.

10          THE COURT:  All right.  Thank you.

11          MR. MICHAEL MCCRUM:  Just so you know, the reason

12  we asked for Hindu translator is because things are spoken

13  so quickly in here and my client does not understand English

14  nor Spanish that quickly.  When I do explain to him, I

15  explain in English but slowly and in verbiage that is more

16  basic.  And so, it was necessary in my opinion to ask for a

17  Hindu Interpreter.

18          THE COURT:  No, and the Court agreed with you.

19          MR. MICHAEL MCCRUM:  Okay.  I just didn't know if

20  you were questioning that now as if we had something

21  inappropriate.

22          THE COURT:  No, no, no.  Let me clear up.  First

23  of all, if I didn't think you had articulated the basis, I

24  would not have brought in two Hindi Interpreters.  It's

25  actually very expensive to have them here.  You all

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    120

1  articulated the cause, I brought them in, and I understand

2  the reasons.

3            The only point I was trying to make is that these

4  are being played and I have the Interpreters saying, "You're

5  going too fast."  It's a whole trial record.  I don't want

6  the Appellate Court to think, "Oh my goodness.  They weren't

7  even aware of the evidence coming against them."

8            So, I just wanted to clear that up.

9            Okay, thank you.

10       (Bench conference ends at 2:52 p.m.)

11  BY MS. WILLIAMSON:

12       Q.   Officer Lozano, what did Ms. Blake do with the

13  money after she and Ms. Galvan left each other's company?

14       A.   She gave us, DEA, the money.

15       Q.   And how did that come to pass?

16       A.   We met up at a predetermined location.  It was

17  the middle of the night, so we just told her to give us the

18  money.  I believe it was on a Saturday night that we got the

19  money so we had Sunday to play with to set up the deliveries

20  that were to occur.

21       Q.   And did Ms. Blake receive instruction on what

22  deliveries to make?

23       A.   Yes.

24       Q.   And what deliveries did she make that were

25  relevant to your investigation?

1      A.   Again, she made deliveries to Laredo businesses

2 and to subjects here in Laredo.  One of them was also a

3 delivery to Velasquez Transportes warehouse.

4      Q.   Is there anybody in particular in the courtroom

5 today who is associated with any of the deliveries you just

6 described?

7      A.   Yes.

8      Q.   And who is that person.

9      A.   That's Adrian Arciniega-Hernandez.

10     Q.   Do you see him in the courtroom today?

11     A.   Yes.

12     Q.   And would you identify him by where he's sitting

13 and something he's wearing?

14     A.   Yes, in the middle table on the top left wearing

15 a maroon jacket.

16     Q.   And how much money did Ms. Blake take to the

17 Velasquez Warehouse?

18     A.   30,000.

19     Q.   What date was that?

20     A.   On March 26, 2012.

21     Q.   And is that the same date on which she met with

22 Ms. Galvan-Constantini?

23     A.   No, it was either the day after or --

24     Q.   When you say the "day after," does that mean like

25 it was the middle of the night and then significantly later

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    122

1   on the same day?

2        A.   Yes.  Within 24 hours, yes.

3        Q.   Okay.  Could you describe for the circumstances

4   of the delivery she made to the other individual you

5   mentioned?

6        A.   There was another individual named Rita Molina.

7        Q.   And where did that delivery take place?  What

8   kind of setting?

9        A.   The money was delivered at a parking lot.

10            MS. WILLIAMSON:  And that this point, I'm going

11  to publish Demonstrative BCT-2 to the jury.

12            THE COURT:  All right.

13            Any objections, defense counsel?

14            MR. SCOTT MCCRUM:  No, Your Honor.

15            THE COURT:  Okay.

16            MR. BALLI:  No, Your Honor.

17            THE COURT:  No objections, at this time.

18            I'm going to remind you, also, that when you

19  talking about a date, make sure you give us the year.  I

20  heard you say March 26, I'm not sure on the year.

21            2012?

22            THE WITNESS:  2012.  Yes, Your Honor.

23  BY MS. WILLIAMSON:

24        Q.   Is that a summary of what we just described?

25        A.   Yes.

1        Q.    And in regards to the delivery to RM, as it's

2   noted, did you take any further action with regard to that

3   individual?

4        A.    I'm not sure I follow the question.

5        Q.    For example, did you speak to another law

6   enforcement agency regarding that individual?

7        A.    Yes.

8        Q.    Could you describe what you communicated, please?

9        A.    We provided the information on the description of

10  the vehicle.

11       Q.    Why did you do that?

12       A.    To conduct a traffic stop and for seizure of the

13  money.

14       Q. Is that consistent with the way that you previously

15  described that traffic stops were a part of your

16  investigation?

17       A.    Yes.

18       Q.    And looking at this reminds me I have a

19  clarification question on the previous diagram, so I'll put

20  that back up.

21            With regard to BCT-1, I previously asked you if

22  Ms. Blake formulated a plan for what to do with the money

23  and I think I didn't use words as clearly as I should have.

24            Based on your observations of what she did while

25  she was in the presence of you and other DEA officers at the

1  DEA office, did she decide what to do with the money or did

2  she receive instructions on what do to with the money?

3       A.   She received instructions.

4       Q.   And from whom did she receive those instructions?

5       A.   From Ochoa-Rivera.

6       Q.   That's the person whose alias is Tio Polo, right?

7       A.   Correct.

8       Q.   Was that generally consistent throughout the

9  course of your investigation?  That she was receiving

10 instructions as to how to deliver the money.

11      A.   Yes.

12      Q.   So, when I said, "Did she formulate a plan?" and

13 you said yes, she didn't come up with the plan on her own,

14 right?

15      A.   Correct.

16      Q.   Now, directing your attention to BCT-3, would a

17 diagram be helpful in explaining what happened?

18      A.   Yes.

19           MS. WILLIAMSON:  And Your Honor, for the Record,

20 I've now provided copies to each member of the defense.

21           THE COURT:  Okay.

22 BY MS. WILLIAMSON:

23      Q.   Showing you what's been marked as "Government

24 Exhibit 402," for identification, are you familiar with that

25 diagram?

 1        A.   Yes.

 2        Q.   Have you previously reviewed it before coming to

 3   court?

 4        A.   Yes.

 5        Q.   Does it accurately depict the transactions in

 6   BCT-3 that you investigated?

 7        A.   Yes.

 8        Q.   And will it aid you in explaining BCT-3 to the

 9   jury?

10        A.   Yes.

11        Q.   How did BCT-3 begin?

12        A.   Again, the CS gave us information that money was

13   available to be picked up.

14        Q.   And was she going to be going somewhere to pick

15   up this money at this time?

16        A.   Yes.

17        Q.   Where was she going?

18        A.   To Velasquez Forwarding, Transportes.

19        Q.   And did she communicate that information to you?

20        A.   Yes.

21        Q.   What, if anything, did you do in response?

22        A.   Set up our surveillance team and headed out to

23   where the warehouse is located, which is at 8202 Saint

24   Gabriel Avenue in Laredo, Texas.

25        Q.   Directing your attention to Exhibit 6 in that

1  binder, do you recognize it?

2       A.   Yes.

3       Q.   What is it?

4       A.   That's the warehouse.

5            MS. WILLIAMSON:  Could we display Exhibit 6,

6  please?

7  BY MS. WILLIAMSON:

8       Q.   Is that where Ms. Blake went on April 20th, 2012?

9       A.   Yes.

10      Q.   What was your understanding of what she was going

11 to do while she was there?

12      A.   To pick up money.

13      Q.   Did she receive any money?

14      A.   Yes.

15      Q.   And was the DEA conducting surveillance there

16 during her visit?

17      A.   Yes.

18      Q.   How much money did she receive?

19      A.   $149,970.

20      Q.   What did she when she left Velasquez Transportes

21 with the money?

22      A.   We met with the CS at a predetermined location to

23 get the money from the CS, from Ms. Blake, sorry.

24      Q.   I beg your pardon.  Directing your attention to

25 Exhibits 32, 33, and 34, do you recognize them?

1      A.   Yes.

2      Q.   what are they?

3      A.   That's the box that Ms. Blake received the money

4 in.

5           MS. WILLIAMSON:  Could we display Exhibit 32,

6 please?  And Exhibit 33?

7 BY MS. WILLIAMSON:

8      Q.   Officer Lozano, do you see Exhibit 33?

9      A.   Yes.

10      Q.   And what is it?

11      A.   A white box, cardboard box.

12           MS. WILLIAMSON:  Could we display Exhibit 33,

13 please?

14 BY MS. WILLIAMSON:

15      Q.   What's the view that we're looking at there?

16      A.   The bulk cash that's inside the white box.

17      Q.   Is that how the box arrived in DEA's possession?

18      A.   Yes.

19      Q.   And where is that photograph taken?

20      A.   That's in one of our workspaces.

21           MS. WILLIAMSON:  And could we move to Exhibit 34,

22 please?

23 BY MS. WILLIAMSON:

24      Q.   And what is that a picture of?

25      A.   What was inside the box.

1      Q.    And did DEA count the money like you previously
2  described?
3      A.    Yes.
4      Q.    How much was it?
5      A.    $149,970.
6      Q.    And was Ms. Blake at the DEA office at this
7  point?
8      A.    No.
9      Q.    Had she gone to the DEA office or did she meet
10 you at a predetermined location to hand off the money?
11     A.    She met us at a predetermined location and handed
12 off the money.
13     Q.    Are you aware of whether she received
14 instructions on what to do with the money?
15     A.    Yes.
16     Q.    How do you know that, if she wasn't there?
17     A.    She told us.
18     Q.    Did you set up surveillance in response to that?
19     A.    Yes.
20     Q.    Are you aware of whose instructions she was
21 operating under?
22     A.    Ochoa-Rivera, Tio Polo.
23     Q.    At this point in your investigation, did you
24 deploy any new audio or video recording equipment?
25     A.    I believe we started using what we call our video

1    recording device.  It's a purse that we set up to have

2    capabilities to record audio/video.

3         Q.   Could you turn to Exhibit 31 or 31A, excuse me?

4         A.   (Witness complies.)

5         Q.   Is Exhibit 31A a photograph of the purse you just

6    described?

7         A.   Yes.

8         Q.   And have you brought that purse to court today?

9         A.   Yes, should be inside that laptop bag.

10        Q.   Officer Lozano, I've just handed you Exhibit 31.

11   Is that the purse that Ms. Blake used during the course of

12   this investigation to capture recordings?

13        A.   Yes.

14        Q.   Could you show it to the jury, please?  And

15   could you explain how it was supposed to work?

16        A.   Yes.  What DEA did to this purse is that they

17   put a button camera right on this -- I don't know if you're

18   able to see it, but there's a small, black screw right

19   there, has a button camera that can record video.  And then

20   within the stitching, there's a microphone, also.  Real

21   small.  I was trying to find it earlier, I couldn't even

22   find it, but there's a small little microphone right there

23   to capture the audio and video.

24             And then it's a normal purse, so if somebody were

25   to try to find out what she has in there, it would be

1  difficult.

2          Within one of the zippers, that's where you have

3  the mechanism that will start the recording device.  You

4  have your switch, you have your, kind of like a thumb drive

5  that will hold the memory of what's being recorded.  And

6  every time we met with the Confidential Source, I would be

7  the one to turn it on before she headed out.

8      Q.   Did you provide her instructions on how it

9  worked?

10     A.   Yes.  One of the main things that I remember

11 instructing her is that where the button is, the chrome

12 button, that's where the camera faces forward because

13 there's no camera in the back.  So, the instruction was to

14 try to maintain that facing forward.

15     Q.   And turning your attention to Exhibit 35 in the

16 binder, do you recognize it?

17     A.   Yes.

18     Q.   And what is it?

19     A.   That's Ms. Blake right outside of El Reino.

20     Q.   How did the DEA acquire that photograph?

21     A.   Through surveillance.

22          MS. WILLIAMSON:  Could we show Exhibit 35,

23 please?

24 BY MS. WILLIAMSON:

25     Q.   It's hard to see in this lighting, but are you

1  able to see in your version there Ms. Blake walking into

2  El Reino as you described?

3       A.   Yes.

4       Q.   And did she have the purse with her?

5       A.   I believe so.

6       Q.   Are you aware of whether there was an attempt at

7  a recording of that meeting?

8       A.   Yes.

9       Q.   And at the end of that meeting delivery, did

10 Ms. Blake provide you with anything?

11      A.   I would have had to have been a receipt.

12      Q.   And turning to Exhibit 36A in the binder, do you

13 recognize it?

14      A.   Yes.

15      Q.   And what is it?

16      A.   It's a receipt from El Reino.

17      Q.   What's the dollar amount on that receipt?

18      A.   $30,000.

19           MS. WILLIAMSON:  Could we display Exhibit 36,

20 please?

21 BY MS. WILLIAMSON:

22      Q.   What did you do with the receipt after you

23 received it?

24      A.   We put it into evidence.

25      Q.   Are there particular DEA procedures associated

1  with that you just described?

2      A.   Yes.

3      Q.   Can you give a basic overview for the jury,

4  please?

5      A.   Yes.  So, if we were to receive -- once we

6  determine that we're going to make this receipt into what we

7  call a non-drug exhibit, we have evidence bags that we place

8  whatever item is going to be a non-drug exhibit, and there

9  is always a witness that'll sign their name saying that they

10 witnessed that the bag was sealed and, of course, it's a

11 self-sealing envelope, kind of, a transparent.  And so, we

12 seal that up then there's other paperwork that we have to

13 submit to our non-drug evidence custodian and then we submit

14 the item as a non-drug exhibit.

15     Q.   The receipt appears to say Corina.  Can you

16 remind us if you know who that is?

17     A.   Yes, Corina is Corina Blake, our Confidential

18 Source.

19          MS. WILLIAMSON:  And Mr. Chappa, if we could

20 switch over to --

21 BY MS. WILLIAMSON:

22     Q.   Was the $30,000 on that receipt consistent with

23 the amount of cash the DEA provided Ms. Blake on April 20,

24 2012, to deliver to El Reino --

25     A.   Yes.

1      Q.   -- as instructed by Mr. Ochoa-Rivera and

2   Mr. Rodriguez-Gonzalez?

3      A.   Yes.

4      Q.   Directing your attention next to BCT-5, and

5   specifically Exhibit 47A, do you recognize Exhibit 47A?

6      A.   Yes.

7      Q.   What is it?

8      A.   It's a conversation from the consensual intercept

9   that we had with the Confidential Source, Corina Blake.  A

10  conversation between her and Ippolito Ochoa-Rivera.

11     Q.   And are you looking at the transcript there as

12  Exhibit 47A?

13     A.   Yes.

14     Q.   Have you previously reviewed it?

15     A.   Yes.

16          MS. WILLIAMSON:  Could we play audio, please, of

17  47A?

18       (Pause in the proceedings.)

19          MS. WILLIAMSON:  Well, I had hoped that the

20  answer to that question would be, "yes."

21       (Pause in the proceedings.)

22          MR. O.J. PENA:  Your Honor, perhaps the

23  Government should turn off the screen for the jury looking

24  at their files.

25              THE COURT:  It's off.

1          MR. O.J. PENA:  There's a risk that it could --

2          THE COURT:  It's off, it's off.

3          MS. WILLIAMSON:  I believe that all of that

4    content has been admitted into evidence for the Record.

5          THE COURT:  And I guess, that's a good caveat for

6    everybody, if you publish anything to the jury, it needs to

7    be something that had already been admitted into evidence.

8        (Exhibit 47A, a recording, was played to the the Court

9    and jury.)

10          MALE SPEAKER:  What's the number of that exhibit?

11          MS. WILLIAMSON:  47.

12          MALE SPEAKER:  Thank you.

13   BY MS. WILLIAMSON:

14        Q.   Officer Lozano, Mr. Ochoa used the term

15   "documents" in that phone call.  Based on your

16   investigations -- or documentos in Spanish, documents on the

17   translation.  Based on your investigation, are you aware of

18   what he was referring to?

19        A.   Yes.

20        Q.   And what was that?

21        A.   He was referring to money.

22        Q.   How did you come to understand that?

23        A.   Based on CS information and based on my

24   experience investigating money laundering organizations.

25        Q.   I also heard "Los Torres" and saw a translation

1  on the screen.  What's Los Torres?

2       A.   Los Torres is --

3       Q.   In the context of this investigation.

4       A.   -- the code word that they use to describe New

5  York City.

6       Q.   And how did you come to understand that or

7  determine that?

8       A.   It's an unfortunate thing but it's from the twin

9  towers and that's what they use to describe New York City.

10      Q.   So, given the codewords that you've just

11 described to us, how did you interpret this conversation?

12 It's not about picking up documents at a set of towers, is

13 it?

14      A.   No.

15      Q.   What is it?

16      A.   That there was a money courier in New York that

17 had money.

18      Q.   And I also saw Arturo.  Who's Arturo?

19      A.   That's Gabriel Arturo Castillo.

20      Q.   And was he frequently referred to by his middle

21 name, Arturo, in the course of this investigation?

22      A.   Yes.

23      Q.   Would a diagram be helpful in explaining what

24 happened next?

25      A.   Yes.

1      Q.   Yeah, here we go.  This is 5.  Showing you what's

2  been marked as Government 403.  For identification, it's

3  labeled at the top as BCT-5.  Are you familiar with this

4  diagram?

5      A.   Yes.

6      Q.   Have you previously reviewed it before coming to

7  court?

8      A.   Yes.

9      Q.   Does it accurately depict the transactions in

10  BCT-5 that you investigated?

11      A.   Yes.

12      Q.   Will it aid you in explaining BCT-5 to the jury?

13      A.   Yes.

14      Q.   So, did Ms. Blake contact you after the

15  conversation we just heard that she had with Mr. Ochoa?

16      A.   Yes.

17      Q.   And did you do anything in particular after

18  speaking with her?

19      A.   Again, we set up our surveillance team and we

20  instructed Ms. Blake to meet us at a predetermined location.

21      Q.   You instructed her to meet you at a predetermined

22  location when?

23      A.   When she placed the call to me.

24      Q.   And did she proceed to Velasquez Forwarding,

25  Velasquez Transportes warehouse?

1        A.   Yes, after our brief meeting.

2        Q.   And was the DEA performing surveillance during

3   that time?

4        A.   Yes.

5        Q.   Now, directing your attention to Exhibit 57A, do

6   you recognize it?

7        A.   Yes.

8        Q.   What is it?

9        A.   It's another recorded call between Ochoa-Rivera

10  and the Confidential Source.

11       Q.   have you previously reviewed it?

12       A.   Yes.

13           MS. WILLIAMSON:  Could we play 57, please?

14      (Exhibit 57A, a recording, was played to the Court and

15  jury.)

16  BY MS. WILLIAMSON:

17       Q.   Based on your surveillance, where was Ms. Blake

18  when she had that communication?

19       A.   Inside the Velasquez Transportes warehouse.

20       Q.   And are you aware of whether Mr. Castillo arrived

21  that day with the $5,000 they mentioned?

22       A.   He didn't.

23       Q.   So, how much money did Ms. Blake receive at the

24  warehouse on April 27th, 2012?

25       A.   $20,000.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    138

1          Q.    From whom?

2          A.    From Mr. Adrian Arciniega-Hernandez.

3          Q.    And what happened to the $20,000 after Ms. Blake

4     received it?

5          A.    That money was taken to El Reino.

6          Q.    Did it stop at DEA in between?

7          A.    Yes.

8          Q.    And was it processed per the procedure you

9     previously described?

10         A.    Yes.

11         Q.    And did Ms. Blake deliver any of the money that

12    day?

13         A.    Yes.

14         Q.    How much?

15         A.    $20,000.

16         Q.    And you said she made that delivery to El Reino?

17         A.    Yes.

18         Q.    And what was the date?

19         A.    April 27, 2012.

20         Q.    And from whom did she receive the instructions on

21    her delivery, if anyone?

22         A.    From Ochoa-Rivera, Tio Polo.

23         Q.    And on whose behalf was she instructed to make

24    the delivery?

25         A.    On Jose Luis Rodriguez.

1      Q.   Did the DEA perform surveillance of that

2  delivery?

3      A. Yes.

4      Q.   And what, if anything, occurred immediately

5  following the delivery?  Did you meet the CS, Ms. Blake?

6      A.   Yeah, we met the CS again at a predetermined

7  location.

8      Q.   And did she provide you with anything during that

9  meeting?

10     A.   It would have had to have been a receipt, also.

11     Q.   And let me ask you, as part of your procedure in

12 meeting with her before and after her deliveries, you were

13 handing over bulk cash to make deliveries, right?

14     A.   Yes.

15     Q.   Are there any procedures that DEA agents should

16 observe in doing those kinds of meetings?

17     A.   Yes, we have to make sure that the Confidential

18 Source does not have any bulk cash on them --

19     Q.   Why?

20     A.   -- before or even after.

21     Q.   Why?

22     A.   To take an accurate account of how much money was

23 actually delivered.  And then many times, or every time we

24 would give her $20,000 and then she would come back with a

25 $20,000 receipt.

1      Q.   And did that happen in this instance?  That she

2  came back with a receipt that matched the amount that you

3  gave her?

4      A.   Yes.

5      Q.   And turning to Exhibit 45A in the book, do you

6  recognize it?

7      A.   Yes.

8      Q.   What is it?

9      A.   It's a receipt from El Reino.

10          MS. WILLIAMSON:  Could we put Exhibit 45 up,

11  please?

12          MR. O.J. PENA:  Your Honor, I thought that – this

13  doesn't pertain to me, but I imagine one will soon.  I

14  thought that they were going to redact.  That's what I

15  understood when we started putting these in.

16          THE COURT:  It is redacted to the extent you all

17  communicated anything.  Do you all want to approach?  Feel

18  free.

19      (Bench conference begins at 3:24 p.m.)

20          MR. O.J. PENA:  I thought they were being

21  redacted, but I assumed it would be unredacted as the

22  evidence was being presented and that was the way the first

23  one occurred.

24          THE COURT:  What are you referring to?  Be very

25  specific.

1          MR. O.J. PENA:  Look.  Okay, this one.  This part

2    should have been redacted, I would think, considering

3    they're presenting evidence on that.

4          THE COURT:  They were not redacted from we've not

5    heard I think three or four BCTs and that portion of it is

6    not redacted.  Well, see that sticky?  That was redacted.

7          MR. O.J. PENA:  But you can see right through the

8    sticky.

9          MS. WILLIAMSON:  That was not my intention.

10         THE COURT:  Well then, make sure that you can't

11   see through these stickies.

12         MS. WILLIAMSON:  I understand.

13         THE COURT:  But that's the only thing -- the only

14   question I have left.

15         MR. O.J. PENA:  No, no, I'm not, I'm not

16   objecting to the admission of the exhibit.  It's more of an

17   order of operations issue is that this evidence was coming

18   in before the testimony.

19         THE COURT:  No, sir, that's all part of the tape.

20   Those are the individual that were on the tape with the CS.

21         MALE SPEAKER:  It calls that argument.

22         THE COURT:  But he's testified to all of it

23   before he's publishing anything.

24         MR. O.J. PENA:  He testified that Puma gave the

25   money to Ochoa-Rivera.

1          THE COURT:  He testified that Ochoa-Rivera gave

2    instructions to the CS.  They're on the phone talking and --

3          MS. WILLIAMSON:  To deliver on behalf of.

4          THE COURT:  To delivery money on behalf of Ochoa.

5          MR. O.J. PENA:  This part was on there, Your

6    Honor.  I thought we were talking about up to here.  I must

7    be mistaken, Your Honor.  However, I will note though that

8    when it's on the screen you can see right through this.

9          MS. WILLIAMSON:  And I didn't realize that and I

10   will double sticky them.

11         MR. MORENO:  He's not going to testify about the

12   fact that (indiscernible).

13         THE COURT:  That is true.  The 8300s, that

14   portion that the sticky purports to cover are all in

15   evidence so all of yours.  The only reason that he's covered

16   them though is because he's not talking about that portion.

17         MS. WILLIAMSON:  But we will have some else at --

18         THE COURT:  They'll have someone else.

19         MR. O.J. PENA:  Well, but that --

20         THE COURT:  It's in evidence, but look --

21         MR. SCOTT MCCRUM:  The ones that weren't filed in

22   evidence, there's enough in evidence that one wasn't.  They

23   have been admitted or we have the report of.

24         MR. O.J. PENA:  This one, these were sent to us

25   yesterday.

1          THE COURT:  Look --

2          MS. WILLIAMSON:  No, those I sent today.

3          MR. O.J. PENA:  These were sent just today, Your

4    Honor.  I don't remember --

5          THE COURT:  They are demonstrative, they're not

6    evidence so (indiscernible) I think you said at one point

7    (indiscernible) admitted to be publish the demonstrative and

8    they're supposed to be in conjunction with this testimony.

9          MR. O.J. PENA:  Well, I --

10         THE COURT:  Can you formulate a specific

11   objection?

12         MR. O.J. PENA:  Yes, Your Honor.  I think that

13   they're getting ahead of themselves and it's confusing to

14   the jury.  And I understand that we agreed to admissibility

15   of certain evidence and I'm not disagreeing with that and

16   I'm not going back on that, Your Honor, but I received these

17   today is what I understand there are some other

18   demonstratives that we received yesterday as well --

19         THE COURT:  Okay.  Let me just give the jury and

20   afternoon break and then we can debate this, but why don't

21   you all think about this, talk about it amongst yourselves

22   and we'll circle back.

23      (End bench conference at 3:27 p.m.)

24         THE COURT:  All right.  Ladies and gentlemen,

25   let's that a 15-minute break and we'll come back.  Thank

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    144

1   you.

2              THE CLERK:  All rise.

3        (Jury exits the courtroom at 3:28 p.m.)

4        (Recess taken from 3:28 p.m. to 3:34 p.m.)

5                       AFTER RECESS

6        (Outside the presence of the jury.)

7              THE CLERK:  All rise.

8              THE COURT:  All lawyers back?  Not quite.

9              All right.  Well, you're the one that raised this

10  last objection -- disregard.

11             MR. O.J. PENA:  Your Honor?

12             THE COURT:  Hold on, Mr. Pena.  We're not on the

13  Record.  Hold on a second.  He's coming, he's coming.

14             In 21 seconds, we'll be on the Record so hold on.

15             THE CLERK:  He had it on.

16             THE COURT:  Oh, it was on?  Okay, all right.

17             Okay, Mr. Pena.  So, you prefaced your objection

18  with "This doesn't affect my client, but it's going to

19  affect future things" and -- what's your objection?

20             MR. O.J. PENA:  I think the Government is getting

21  ahead of themselves.  I think they're abusing these

22  demonstratives a little bit, Your Honor, in that --

23             THE COURT:  Okay.  Hold on, hold on, hold on.

24  I'm sorry.  Interpreters were not in place.

25             COURT INTERPRETER:  Your Honor, I thought it was

1   a 15-minute break.  I apologize.

2            THE COURT:  No, no.  I have a tendency to do

3   that.  I'll say 15 minutes and I come back in five and I'm

4   sorry.  I'm sorry.

5            No, no, no, no.  It's okay.

6        (Pause in the proceedings.)

7            THE COURT:  That's fine.  Let's just wait.

8            I guess, as we're waiting though, give me a

9   specific legal objection.  So, just be thinking about that.

10        (Pause in the proceedings.)

11            MR. O.J. PENA:  Am I still thinking?  Are we

12   waiting for somebody, Your Honor?

13            THE COURT:  I don't know. Let's make sure we have

14   everybody.  Looks like we've got the Spanish Interpreters,

15   our Hindi Interpreters.  Looks like we need one more --

16            MALE SPEAKER:  I'm here.

17            THE COURT:  Oh, no.  Okay.  Everybody's here.

18            No, he's drinking tea.  He doesn't drink coffee.

19   He's drinking his tea.

20            All right, Mr. Pena.  Go ahead, sir.

21            MR. O.J. PENA:  Your Honor, I guess the legal

22   argument is that it's not in evidence, Your Honor.  Let me

23   give you an example.  I'm looking at BCT-10, which hasn't

24   come in yet.

25            THE COURT:  All right.  Let's see.  I'd like to

1  see what you're looking at so hold on a second.  Let's put

2  it on the screen.

3            MALE VOICE:  The demonstrative?

4            MR. O.J. PENA:  BCT-10, BCT-5.  BCT-10 and BCT-

5  10, for example.

6            THE COURT:  Okay, but BCT-10 they haven't gotten

7  to.

8            MR. O.J. PENA:  Right.

9            THE COURT:  Right.

10           MR. O.J. PENA:  But I'm using it as an example.

11  But they have gotten to BCT-5.

12           THE COURT:  Right.

13           MR. O.J. PENA:  And for example, in BCT – may I

14  use your ELMO here?

15           THE COURT:  Yes, sir, of course.

16           MR. O.J. PENA:  In BCT-10 and BCT-5, we have --

17  well, I was putting them up -- we have pesos here and I know

18  that, for example, Your Honor corrected me and explained

19  that the link was made in that audio record.

20           THE COURT:  Yes.

21           MR. O.J. PENA:  But I don't think that they

22  specifically said, "It's going to be paid in pesos."  That's

23  an example of what I mean when I say that we've got things

24  on here, we have premises on here that have not been proven.

25  I think there's --

1        THE COURT:  Okay, and so that's what I'm going to

2   ask you.  Take it one by one.  Okay.  So, if nobody has

3   talked about pesos, do you want a sticky placed on the pesos

4   portion?

5        MR. O.J. PENA:  I would like them to reveal it

6   and the testimony is being revealed, Your Honor.  That's

7   all.

8        THE COURT:  Okay, so that's fine.

9        Government?

10       MS. WILLIAMSON:  It's in evidence, Your Honor.

11  The calls regarding that are in evidence and Officer Lozano

12  has listened to them.

13       THE COURT:  Okay, but is that the call that's

14  testifying about right now?

15       MS. WILLIAMSON:  It was not the literal words of

16  the call.  It is an inference based on the fact that, as far

17  as this particular segment of testimony goes, it is an

18  inference based on the fact that Tio Polo instructed

19  Ms. Blake to deliver on behalf of Puma.

20       THE COURT:  Right, but if it's not on this call,

21  how could he make that inference?  And he may have heard 300

22  other calls, but it's not on this call that's being played

23  and we're putting this up as a demonstrative on this

24  particular transaction, how can we make this leap right now?

25       MS. WILLIAMSON:  I can play additional calls,

1   Your Honor.

2             THE COURT:  Right.  Well then, I think that's

3   what they're saying.  Do that before those sections or

4   segments are revealed to the jury.  And so, only reveal the

5   portions that you've already presented information on.

6             I understand that it's in evidence but he's your

7   witness right now.  And so, I guess what I'm hearing from

8   Mr. Pena, in a way, you're getting ahead of yourself on the

9   things that you're publishing to the jury.

10            MS. WILLIAMSON:  It's in evidence, Your Honor.

11            MR. O.J. PENA:  Well, it's in evidence, Your

12  Honor, but it still has to be presented to the jury and I

13  don't think that --

14            THE COURT:  No, no.  Counsel, I agree with you.

15  All right?  I'm agreeing with you on that.

16            MR. O.J. PENA:  I'm not asking them to present

17  more phone calls.

18            THE COURT:  Right.

19            MR. O.J. PENA:  And I want to be clear because

20  Your Honor said, "I think that's what Mr. Pena's asking

21  for."  That's not what I'm asking for.  I'm just asking them

22  to reveal it as they go along so that it makes sense.

23            THE COURT:  I think I just restated what you just

24  said, Mr. Pena.

25            Government, the test is not "is something in

1  evidence?"  The problem is that when he's testifying and you

2  say, "is there a demonstrative that can be helpful to the

3  jury on this transaction," and you put it up there, the

4  inference is somehow that that's already been revealed in

5  this call or that he has personal knowledge of it somehow

6  and he may, and at some point this demonstrative can be used

7  at a later if you need to bring it back in, but right now,

8  that's just not before the jury, neither is the Form 8300

9  situation.

10         MS. WILLIAMSON:  No, and that one has not yet

11  been redacted and that's why that's there.

12         THE COURT:  Okay.  So, when you all look at these

13  demonstratives, just ask yourself whether you're going to

14  lay the foundation with this witness and the evidence that

15  they're hearing that is covered on there and if it's not,

16  then cover it up.

17         MR. MORENO:  And I was going to ask just for

18  future because sometimes it's just efficiency because the

19  only way to cover everything is to play everything and we

20  didn't intend to play every single call that was admitted

21  because if it's been admitted, it would be available because

22  otherwise, we have to play every day.

23         THE COURT:  Well, you're going to have to at

24  least play one call that covers, for example, the pesos,

25  which is that we are talking about on this slide.  I'm not

 1  saying play all 300 calls.  Play at least one that covers

 2  that portion of it.

 3          MS. WILLIAMSON:  Is it the Court's ruling that

 4  the Government needs to play that call or just that the

 5  Government needs to elicit testimony that that call exists?

 6          THE COURT:  Well, either/or and then, I guess, if

 7  we get on objections, we get an objection then.

 8          MR. SCOTT MCCRUM:  I think the issue, Judge, and

 9  I don't want to be objecting when we bring the jury in if we

10  can resolve this right now, I think the issue is confusion

11  to the jury when it's being put out of order.  So, even with

12  these covered, and the reason I'm saying I don't want to do

13  it later is I didn't make such an issue when they covered

14  this little 8300, but when you get to 10, look at all that

15  that's covered.  And so, it tends to confuse the jury even

16  if it's covered.

17          THE COURT:  Okay, there I disagree with you

18  because here's the situation.  I think if we can go back to

19  one of the final pretrials that we had, they wanted to

20  present these kind of like transaction by transaction,

21  witness by witness and if they had maybe been able to do

22  that, we wouldn't have anything cover, but you all

23  strenuously objected to that and I sided with all of you.

24          So, because of that, we now have this witness

25  that's going to cover whatever it is that he knows then

1    we're going to have maybe another witness where we may

2    uncover another little part of it, but that was based on the

3    objections launched by all of you.

4              MR. SCOTT MCCRUM:  Judge, the objection was that

5    it should come in as they're presenting this.  One

6    demonstrative at --

7              THE COURT:  No, I understand but that's the

8    reason things are covered and I'm going to hold them to

9    that.  I'm with you on that.  I'm going to hold them to

10   that.  It's just that now you're saying, "Well, we don't

11   want it even up there because there's still things that are

12   covered."

13             So, you can't have it both ways.  Either go back

14   to the origin proposed, transaction by transaction and we

15   can bring in five witnesses on one transaction then we go to

16   the second transaction or we do what you all wanted which

17   is, he's going to cover whatever he knows and whatever he's

18   done and whatever he has direct evidence of.

19             MR. SCOTT MCCRUM:  Forgive me, but I don't recall

20   -- and I trust the Court completely, but I just don't recall

21   that I agreed to this.

22             THE COURT:  I'm not saying that any of you agreed

23   to this.  I'm saying that this is a result of me not

24   allowing them to present their case the way they originally

25   wanted to present it.  That's what I'm saying.

1          MR. SCOTT MCCRUM:  How's that?

2          THE COURT:  Because the reason that some – this

3    is how I understand it, you all correct me if I'm wrong, but

4    what I'm understanding is these things that are covered

5    because there's other witnesses that would bring in that

6    information.

7          MR. SCOTT MCCRUM:  Right.

8          THE COURT:  But it's just that we now have this

9    witness that's going to talk about everything, then you all

10   are going to cross-examine him on everything and then these

11   other portions are going to come in through other witnesses.

12         MR. SCOTT MCCRUM:  Yes, ma'am, and I think that

13   was our intent then.  I think it would be better to do it

14   that way and it can be done that way.  What throws a kink in

15   it is when they want to display something that would create

16   that confusion that's not consistent with following this

17   order.

18         So, we can do it that way, Judge.  Just don't use

19   a demonstrative that has things on that are all covered up.

20         THE COURT:  Why?

21         MR. SCOTT MCCRUM:  Because it tends to confuse.

22   You have things covered up and the jury, as they're

23   receiving evidence, saying, "Well, that's covered, but what

24   is going on with this that we can't even know about."

25         THE COURT:  I will tell them not to worry about

1   that but that may or may not come in through later

2   testimony.

3           MR. O.J. PENA:  My concern, Your Honor, is that

4   we're getting ahead of ourselves.  I understand the use of

5   demonstrative evidence, but it shouldn't be used to -- it

6   should not be used in a way that confuses demonstrative

7   evidence with substantive evidence, and when you put the

8   demonstrative evidence into their minds before the

9   substantive evidence, it's confusing because I can tell you

10  my experience was I was sitting there and I looked up and I

11  thought to myself, "Did I miss that?"  Well, obviously, I

12  did miss one of them, but I went back through them but I

13  realize there was stuff that I didn't miss like they never

14  mentioned pesos.

15          THE COURT:  Well, that was the one thing,

16  counsel, and I agree with you there that if something hasn't

17  come in, that should be covered.  I agree with you on that.

18          MR. O.J. PENA:  And I use pesos as an example

19  only to illustrate the point I'm trying to make, Your Honor.

20  That's all.

21          THE COURT:  And you've made your point, I don't

22  disagree with you, and I've now instructed them to redact.

23          MR. MICHAEL MCCRUM:  I have a slightly thing.

24  It'll only take a minute, Judge.  I'm taking what I think

25  are the ones I've brought up here, Your Honor.

1          MR. SCOTT MCCRUM:  And just as we're finishing up
2    this issue, though, we trust that there'll be another
3    sticky.

4          MS. WILLIAMSON:  I have them right here.

5          THE COURT:  Triple sticky them so that nothing
6    bleeds through.

7          MS. WILLIAMSON:  And if I may have a moment
8    before the jury comes back?

9          THE COURT:  Yes.

10         And of course, you know, today's Thursday, we
11   don't have court tomorrow.  If you all are going to continue
12   with demonstratives, perhaps the best way to deal with it is
13   for you not to have these stickies.  Just build upon them, I
14   guess.  I don't know complicated that would be, but build
15   upon them as you go through your witnesses.

16         In other words, figure out what this witness has
17   to say and then if you're going to have a second witness,
18   then you can add that part of the puzzle and then a third
19   witness, you would add another part.  I don't know.

20         MR. O.J. PENA:  Or you could build them downward
21   and reveal them as you go downward, Your Honor, like a flow
22   chart going downward.

23         THE COURT:  There's ways that this problem can be
24   solved.  I agree.

25         All right, Michael McCrum.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    155

1          MR. MICHAEL MCCRUM:  Judge, thank you.  My issue

2    on this most recent which we did, which is BCT-5, it's a

3    transcript 20 and then there's a bottom thing here.  The

4    only call that was referencing Puma was that first exhibit

5    that they played, which was 47A with a transcript.

6          It says, "Go with Arturo with those 50 and give

7    them to Puma because they're pushing me here," now obviously

8    20 goes here.  There's a reference here that is an inference

9    from the agent so there's a couple problems here that I see.

10   This one is that it doesn't relate to the 50.  It was

11   April 26th, the phone call, but this is a $20,000

12   transaction and it shows to be a direct line.  That's the

13   evidence that this demonstrative is showing where the

14   transcript didn't support the testimony.

15         And so, it's a reach, for one, and so part of my

16   objection is that a demonstrative is supposed to be an

17   accurate reflection only the actual evidence coming in not

18   an inference being made, or they're asking the jury to make

19   an inference, that it relates to it.  This whole bottom half

20   of the transaction is nothing but an inference, I would

21   assume, by the Government agent based on a call the day

22   before regarding 50,000 going to Puma but not referencing

23   the Jaggis.

24         That is inference upon inference and my objection

25   to the Court is that that's an improper demonstrative

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                 156

1  exhibit when it's inference upon inference.  As I understand

2  demonstratives, they're like bank records.  You just put

3  exactly what the record said, put a summary in so that

4  there's no inference being built into it, there's no

5  argument.  They're not argumentative.

6                THE COURT:  I understand.

7                MR. O.J. PENA:  Okay.  You know where I'm going?

8                THE COURT:  And I agree with the bottom portion.

9                MR. O.J. PENA:  I'm sorry, Judge.  Sorry to

10 interrupt you.

11               THE COURT:  I agreed that there had been -- I

12 think we've established that the "pesos" down there was

13 inference and I've already said, "Let's take that out."

14               And then, the other portion that you referenced

15 though, you're saying that there is a call that talked about

16 50 but now we have -- is it the same?

17               MS. WILLIAMSON:  20.

18               THE COURT:  We only have 20 showing.

19               MR. O.J. PENA:  We only have 20.  We don't even

20 know where 50 is in this transaction.  Just if there was a

21 call and so they linked it together.

22               THE COURT:  All right.  Let me hear from the

23 Government.

24               Response?

25               MS. WILLIAMSON:  Your Honor, I think what the

1  call said was to go and pick up 25 and then as the agent --

2  or as the call demonstrated, Ms. Blake went to the

3  warehouse, she received 20.  She was waiting on Mr. Castillo

4  for the other five and Mr. Castillo did not arrive with the

5  other five, as the agent testified based on his

6  surveillance.  So, she got 20.

7            THE COURT:  Right.

8            MR. MICHAEL MCCRUM:  The first call they played

9  only says 50, there's nothing about 25.  She's referring to

10 the nest call they played, which is Government Exhibit 57A,

11 and that may refer to 25.  But again, we're now talking

12 about inference upon inference on a demonstrative exhibit.

13 It's one thing to -- I just find great fault with the

14 demonstrative exhibit that has argumentative and

15 inferential.

16           THE COURT:  All right.

17           MR. MICHAEL MCCRUM:  On BCT-3, just as a final

18 note, they put BCT-3 up there, I didn't say anything, they

19 have a whole bottom section here that apparently links all

20 of these people together.  They didn't put one call in there

21 about Puma or anything going to Mexico.  This just came out

22 of the blue on this chart.  There's nothing to support this

23 demonstrative exhibit so far with respect to the exhibits

24 admitted into evidence.

25           THE COURT:  Okay, and I think at this point you

1  indicated -- I'm sorry.  At this point you indicated on this

2  one you hadn't said anything.  So, the jury's already seen

3  this and heard this so that bell's been rung, but let me

4  figure this out though.

5           Government, you've heard the arguments.

6           MS. WILLIAMSON:  It's call 38 and call 40 respond

7  to Mr. McCrum's latest point about the connection with Puma

8  and the pesos.  Those are in evidence, we did not discuss

9  them at this juncture, but, as Officer Lozano testified, he

10  reviewed all of the transcripts.

11          THE COURT:  Right, but I think the point being

12  made here is, you know, I guess don't get ahead of yourself

13  on those and they're objecting.  And so, if you want to

14  eventually use a demonstrative, sounds to me what I'm

15  hearing from them all of them is you're going to have to

16  play the other tapes.

17          MS. WILLIAMSON:  We can certainly play more

18  tapes, Your Honor.

19          MR. O.J. PENA:  Your Honor, that's not the only

20  solution.  The other solution is that a demonstrative be

21  used as a summary once the evidence has been presented so

22  that we can then properly then look at these things and go

23  through the checklist and ask ourselves if there was

24  evidence presented here.  We could even confer about it the

25  night before and that would give us time to be able to go

1  through the exhibits and see what was presented and what is

2  supported in these.  I thought they went into a false sense

3  of security because on the first one I heard these are going

4  to be redacted and I was sitting back there taking notes and

5  I trusted that they were going to be redacted and then

6  uncovered as the evidence was being revealed.

7           Now, I thought it was a poor way of doing it

8  because it's just bad form.  I think the better way to do it

9  is at the end once the testimony has come on.

10          THE COURT:  All right, but hold on a second.  I'm

11 not going to direct them how to present their case.  All of

12 you need to understand that.  I'm not going to do it with

13 you.

14          What I am going to do though is observe the

15 principles that you all want me to observe, which is if

16 you're going to put on a demonstrative, you had to have

17 presented all of that evidence that backs up everything

18 that's in the demonstrative.  And so, you're going to have

19 to go through that checklist and so what I would recommend

20 that you do is hand them the demonstrative and as you're

21 playing tape by tape by or eliciting testimony, do it in

22 such a way that, you know, you all are going to be listening

23 to the tape.  You have the transcripts, be checking off.

24          And then when she says, "I'm now going to

25 publish," if you think that there's something that hasn't

 1  been checked off, then let me know.

 2          How does that sound?  Because we've got to find a

 3  solution here.

 4          MR. MICHAEL MCCRUM:  That's the way it should

 5  have been done.

 6          THE COURT:  I'm not going to direct them to do it

 7  at the very end because the defense things that's better.

 8  I'm not going to do that.  I'm not going to that to you.

 9          MR. O.J. PENA:  And that was just my opinion.

10          THE COURT:  Right.  No, I know.

11          Government?

12          MS. WILLIAMSON:  We can go back and play the

13  calls from BCT-3, Your Honor.

14          THE COURT:  Okay.

15          MS. WILLIAMSON:  We have them on the Exhibit

16  List.  May I have a moment to make sure they're queued up?

17          THE COURT:  Yes, that's fine.

18      (Pause in the proceedings.)

19          MS. WILLIAMSON:  Your Honor, we do have calls 38

20  and 40 queued up.  If I could just have a moment to make

21  sure that my affairs are in order and my double and triple

22  stickies are affixed?

23          THE COURT:  Yes, that's fine.  Yes, ma'am.

24  That's fine.

25          And then I guess, now all future demonstratives,

1  just get them over to the defense.  Do it the day before if

2  you can -- or I'm not going to say if you can.

3            MS. WILLIAMSON:  Yes.

4            THE COURT:  Just get it to them the day before

5  and we can avoid all of this because --

6            MR. MICHAEL MCCRUM:  Judge, I'm not asking that

7  they go backwards to BCT-3.  As a matter of fact, I object

8  to it.  It's just bolstering.  It doubles up evidence on

9  something.  Let's just move forward, I think, Judge, the way

10  it's supposed to.  What I ask the Court to --

11            THE COURT:  Okay.  No, that's fine.  So, you're

12  waiving then the objections you now raised on BCT-3?  You

13  don't want them to play those calls?

14            MR. MICHAEL MCCRUM:  I couldn't have waived.  I

15  just brought it up as an example.  I didn't object to BCT-3.

16            THE COURT:  All right.  So then, there is no

17  objection on the Record.  It's just something they're

18  highlighting for future BCTs.

19            MR. O.J. PENA:  I agree, Your Honor.  I feel the

20  same way.  I say let's move forward.  Whatever happened,

21  happened.  It got by me, but once I realized what was

22  happening --

23            MALE SPEAKER:  Your Honor, what is their plan to

24  play them anywhere?

25            THE COURT:  I'm sorry.  No.

1          MR. MORENO:  Because you have them.  And so,

2    they've been admitted into evidence and you all know what's

3    in the calls in between.  And understand the jury hasn't

4    heard them, but that would be our concern not the concern of

5    yours.  But they know what's in the evidence, they've seen

6    them all, they've all been admitted, they're all in between

7    but if we have to, we'll just play every single call.  This

8    is going to take, you know, three times as long.

9          MR. O.J. PENA:  How to we cross-examine a

10   demonstrative piece of evidence, Your Honor?  We can't, so

11   they are converting inference into evidence and depriving us

12   of our right to cross-examine, Your Honor.

13          THE COURT:  All right, time out.  And I think

14   that's what they're saying, counsel.  You've made an

15   objection; the Court finds it's a valid objection.  They're

16   willing to play every single tape that would end up on that

17   demonstrative, but you're saying right now, this is what I'm

18   understanding from both of you, there's no objection on the

19   record, you don't want them to go back on these BCTs that

20   have already been published, but on future ones you do want

21   them to play every single tape that supports whatever

22   happens to be on the demonstrative.

23          Am I understanding you all correctly?

24          MR. O.J. PENA:  Yes, Your Honor, and they're

25   making it sound like, "Okay, but now be careful what you

1  wish for," but, Your Honor, this is what I would expect the

2  Government would do.

3           THE COURT:  Right, right, right.  We don't have

4  to spend time on that.  That's fine.  Nobody is saying

5  otherwise.  They're all in evidence as you all know.  They

6  don't have to play every single one, but what I'm hearing

7  from you, if they're going to put a summary demonstrative

8  chart up at the end, that at least on those aids, that they

9  should play all those calls that backup everything on those.

10          Are we on the same page?

11          MR. O.J. PENA:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. SCOTT MCCRUM:  Actually, that was my

14  objection with number 1.  Should we go back to 1?

15          MS. WILLIAMSON:  You tell me.

16          MR. SCOTT MCCRUM:  There are no calls in No. 1.

17          THE COURT:  All right.  The Record has no humor.

18  That was a joke from Mr. Scott McCrum.  He's not really

19  raising an objection.

20          MS. WILLIAMSON:  And a joke from Ms. Williamson.

21          THE COURT:  All right.  Okay.

22          MS. WILLIAMSON:  And Your Honor, I have

23  additional demonstratives with one final one forthcoming

24  from the printer.

25          THE COURT:  Well, you know, and I guess,

1  Mr. Moreno, you said this is really going to prolong things

2  and delay everything.  I can't imagine you're going to have

3  demonstratives for every single transaction, right?

4           MS. WILLIAMSON:  No.

5           THE COURT:  Or call? Well, maybe transaction.  I

6  don't know how many transactions there are.  But calls?

7           MS. WILLIAMSON:  We are not presenting

8  demonstratives for all 41 bulk cash transactions in this

9  investigation.

10          THE COURT:  Okay, so we should be fine then.  All

11 right.

12          MS. WILLIAMSON:  I'm going to hand the rest of

13 these printouts to defense counsel and then I request just a

14 minute to organize my own papers.

15          THE COURT:  That's fine.

16      (Pause in the proceedings.)

17          MS. WILLIAMSON:  And I'm just going to test the

18 double stickies and make sure we're all covered.

19          THE COURT:  Okay, that's fine.

20          MS. WILLIAMSON:  How is that?

21          MR. O.J. PENA:  I'll not ahead of time that they

22 all say Mexico at the bottom corner and I'm not sure exactly

23 how that fact is going to be proven.

24          THE COURT:  All right.  I can't see the bottom,

25 the U.S. and the Mexico side.

1          What evidence do you have of that?  Well, I mean

2   the U.S. speaks for itself.

3          MR. MORENO:  They mentioned that at their

4   openings.  They've all talking about the money, not the

5   evidence.  Had a broker in Mexico, right in --

6          MS. WILLIAMSON:  Officer Lozano testified at the

7   beginning of his testimony that they identified Tio Polo as

8   a Mexican peso broker.

9          THE COURT:  They did.

10          MR. BALLI:  But I guess the objection is how are

11   we identifying that it's getting to him not that he's a

12   broker.

13          MALE SPEAKER:  From the beginning of this.

14          MS. WILLIAMSON:  That's a phone call.

15          THE COURT:  That's a phone call.

16          MS. WILLIAMSON:  That's what the phone is.

17          MR. O.J. PENA:  Right, but the U.S. and Mexico

18   denote geography, Your Honor, not nationality.

19          THE COURT:  Right.

20          MS. WILLIAMSON:  Yes.

21          MR. O.J. PENA:  And so --

22          THE COURT:  They've testified that he's in

23   Mexico.

24          MR. O.J. PENA:  That he's in Mexico?  They've

25   testified that he is in Mexico?

1      THE COURT:  That's my understanding.  I will tell

2 all of you, gets these demonstrative aids to each other a

3 day in advance and if we're going to debate them, we're

4 going to do so at 7:30 a.m. every day before we bring in the

5 jury because this is a waste of time for the jury.  But I'm

6 not blaming you all, I know you all got them today.  I'm

7 just telling everybody we've got to deal with this in a

8 different or we will never get done.

9      All right.  Are we ready?

10      MS. WILLIAMSON:  Yes, thank you.

11      THE COURT:  All right.  Let's bring the jury up.

12      THE CLERK:  Rise for the jury.

13   (Jury enters the courtroom at 4:01 p.m.)

14      THE COURT:  All right.  Thank you, ladies and

15 gentlemen.  It's 4:00 o'clock.  We're going to work for one

16 more hour.  You get tomorrow off and, you know, we'll come

17 back on Monday but we've got one more hour today.  Thank

18 you.

19   DIRECT EXAMINATION OF FRANCISCO LOZANO (RESUMED)

20 BY MS. WILLIAMSON:

21   Q.   Frankly, I don't recall whether we discussed

22 Exhibit 45A or not, so let's take a quick look at it to err

23 on the side of caution.

24      Could you flip through to 45A, Officer Lozano?

25   A.   Okay.

1       Q.   What is it?

2       A.   It's a receipt from El Reino.

3       Q.   And did you receive that receipt as part of your

4  investigation?

5       A.   Yes.

6       Q.   Who gave it to you?

7       A.   Corina Blake.

8       Q.   And was that in the context of BCT-5, which we

9  were discussing before the break?

10      A.   Yes.

11           MS. WILLIAMSON:  Could be put Exhibit 45A up for

12  the jury, please?

13  BY MS. WILLIAMSON:

14      Q.   Is the amount on the receipt consistent with the

15  amount of money that Ms. Blake was delivering to El Reino?

16      A.   Yes.

17      Q.   And was that on April 27th, 2012?

18      A.   Yes.

19      Q.   Very well.

20           MS. WILLIAMSON:  Thank you.  We can take that

21  down.

22  BY MS. WILLIAMSON:

23      Q.   Let's move on to BCT-6.  Directing your attention

24  to Exhibit 66A, do you recognize it?

25      A.   Yes.

1        Q.    What is it?

2        A.    It's an intercepted call between Adriana Galvan-

3   Constantini and Ippolito Ochoa-Rivera.

4        Q.    And turning to the front page of the exhibit,

5   what's the date of that phone?

6        A.    May 3rd, 2012.

7             MS. WILLIAMSON:  Could we play 66, please?

8        (Exhibit 66, a recording, was played to the Court and

9   jury.)

10            MS. WILLIAMSON:  Is there a second clip?

11       (Exhibit 66, clip 2 recording, was played to the Court

12  and jury.)

13  BY MS. WILLIAMSON:

14       Q.    Based on your investigation, were you able to

15  identify any codewords in this call?

16       A.    Yes.

17       Q.    Was "Teacher" one of them?

18       A.    Yes.

19            BY MR. O.J. PENA:  Your Honor, Your Honor, I

20  object on hearsay.

21            THE COURT:  Overruled.

22  BY MS. WILLIAMSON:

23       Q.    Were you able to determine who or what the

24  "Teacher" referred to?

25       A.    Yes.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                169

1        Q.    Who was that or what was that?

2        A.    At that point of the investigation, we had

3    determined the name, the alias, Teacher, belonged to a pilot

4    that Adriana Galvan-Constantini used.

5        Q.    And what about Secretary Carolina?

6        A.    That was a codeword used to describe North

7    Carolina.

8        Q.    What about Aunt Carrito?

9        A.    It was also within the same, North Carolina?

10       Q.    What about references to various floors of

11   buildings?  That call had the fifth floor to the seventh

12   floor and it also had the second floor.

13             Did that mean anything?

14       A.    Yes, the way that Ippolito Ochoa described it, it

15   was referencing 500,000 for the fifth floor and so for the

16   second floor, it was also 200,000.

17       Q.    So, for each additional floor, the codeword

18   attended an additional $100,000?

19       A.    Correct.

20       Q.    What about the sexy girl?

21       A.    The sexy girl, since it sounds similar to

22   Chicago, they would say "chica guapa."

23       Q.    And so, is sexy girl in the translation a

24   codeword for Chicago?

25       A.    Yes.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                170

1      Q.    So, what was the interpretation in the context of
2  your investigation about what it meant to have a ride with a
3  sexy girl?
4      A.    That meant that there was money available in
5  Chicago.
6      Q.    And directing your attention now to Exhibit 69A,
7  do you recognize it?
8      A.    Yes.
9      Q.    What is it?
10     A.    A conversation between Gabriel Arturo Castillo
11  and Adriana Alejandra Galvan.
12     Q.    And turning to the front page of that exhibit,
13  what's the date?
14     A.    May 3rd, 2012.
15          MS. WILLIAMSON:  Could we play Exhibit 69,
16  please?
17       (Exhibit 69, a recording, was played to the Court and
18  jury.)
19  BY MS. WILLIAMSON:
20     Q.    That's two calls in a row with a reference to
21  "cousin" or "little cousin" or "cuz."  Was that a nickname
22  that you became familiar with?
23     A.    Yes.
24     Q.    And in what context or to whom did it apply,
25  based on your investigation?

1      A.   Within the organization, it was used to describe

2  each other.

3      Q.   Was there any particular person who was regular a

4  female cousin that is a "Prima" in Spanish?

5      A.   Yes, Adriana was the female cousin.

6      Q.   Now, directing your attention to Exhibit 71A, do

7  you recognize it?

8      A.   Yes.

9      Q.   What is it?

10      A.   A conversation between Adriana Galvan-Constantini

11  and Luis Montes-Patino.

12      Q.   And did you become aware of any relationship that

13  they had?

14      A.   They were a couple.

15      Q.   Were they also both engaged in a business

16  relationship?

17      A.   Yes.

18      Q.   Were they also both engaged with your -- did your

19  investigation identify them both as subjects of the

20  investigation?

21      A.   Yes.

22      Q.   And what did you come to identify Mr. Montes-

23  Patino's role as?

24      A.   As a money courier.

25      Q.   And did you become familiar with who Mr. Luis

1   Montes-Patino is?

2        A.   Yes.

3        Q.   Do you see him in the courtroom today?

4        A.   Yes, I do.

5        Q.   Will you identify him based on where he's sitting

6   and something he's wearing?

7        A.   He's on the far right table at the bottom left.

8   He's wearing a black jacket with a possibly a light blue

9   shirt.

10            MS. WILLIAMSON:  Your Honor, will the Record

11  reflect the witness has correctly identified Mr. Montes-

12  Patino?

13            THE COURT:  Yes.

14       (Defendant Montes-Patino identified.)

15            MS. WILLIAMSON:  And now, can we play the audio

16  of Exhibit 71, please?  I believe there are two clips.

17       (Exhibit 71, a recording, was played to the Court and

18  jury.)

19  BY MS. WILLIAMSON:

20       Q.   There a reference in that conversation to

21  Mr. Montes-Patino asking Ms. Galvan-Constantini, "Have you

22  boarded yet?"  Did that mean anything to you in the context

23  of this investigation?

24       A.   The question was if she had boarded an airplane.

25       Q.   Did you become aware of where she was going?

1      A.   Yes.

2      Q.   Where was she going?

3      A.   At this point in time, I believe it was to

4 Chicago.

5      Q.   To like "chicas guapas?"

6      A.   Yes.

7      Q.   And directing your attention to 72A, do you

8 recognize it?

9           MS. WILLIAMSON:  Oh, actually, I beg your pardon.

10 Let's pause for a moment because there's a second clip of

11 Exhibit 71, isn't there?

12      (Exhibit 71, second clip of a recording, was played to

13 the Court and jury.)

14 BY MS. WILLIAMSON:

15      Q.   Based on your investigation, what would they be

16 referring to when they say they're going to "deposit" in

17 this call?

18      A.   Deposit some of the money that was to be picked

19 up in Chicago.

20      Q.   And deposit in hours, what is that?

21      A.   Just trying to go back to that section.  In their

22 bank account.

23      Q.   And now directing your attention to Exhibit 72A,

24 so we can follow this even through.  Do you recognize it?

25      A.   Yes.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                174

1        Q.    What is it?

2        A.    It's a call between Adriana Galvan and an

3   unidentified male.

4        Q.    And what's the date on that call?

5        A.    May 8th, 2012

6             MS. WILLIAMSON:  Could we play the audio, please,

7   of Exhibit 72?

8        (Exhibit 72, a recording, was played to the Court and

9   jury.)

10  BY MS. WILLIAMSON:

11       Q.    Based on your investigation, what's going on at

12  this point of BCT-6?

13       A.    They're setting up a place to meet.  Adriana

14  Galvan is setting up a place to meet with an unidentified

15  male in Chicago.

16       Q.    Do you know what they were intending to do at

17  that meeting?

18             BY MR. O.J. PENA:  Your Honor, it's an

19  unidentified male, Your Honor.  May I take the witness on

20  voir dire?  Only because it's an unidentified male, Your

21  Honor.

22             THE COURT:  Yes, sir.  Go ahead.

23             MR. O.J. PENA:  Now?

24             THE COURT:  Yes.

25             MR. O.J. PENA:  Yes, all right.

1            VOIR DIRE EXAMINATION OF FRANCISCO LOZANO

2   BY MR. O.J. PENA:

3       Q.   Agent Lozano, the male is unidentified to this

4   day, is that correct?

5       A.   Correct.

6       Q.   And so, am I right to assume that this was not

7   surveilled?

8       A.   Correct.

9       Q.   And they are talking about meeting in Chicago?

10      A.   Correct.

11      Q.   And you're assuming what they are meeting for,

12  aren't you?

13      A.   Based on my experience, I determined that that's

14  what the meeting was going to be about.

15           MS. WILLIAMSON:  Your Honor, perhaps the next

16  call will clear that up?

17           THE COURT:  Okay, all right.  Well then, let's

18  get to them.

19           MR. O.J. PENA:  Well, Your Honor, if that's the

20  case, then I would ask that we do that before we have the

21  agent, Your Honor.

22           THE COURT:  Yes, agreed.

23       DIRECT EXAMINATION OF FRANCISCO LOZANO (RESUMED)

24  BY MS. WILLIAMSON:

25      Q.   Directing your attention to Exhibit 75A, do you

1  recognize it?

2        A.   Yes.

3        Q.   What is it?

4        A.   A call between Adriana Galvan and Luis Montes-

5  Patino.

6        Q.   What's the date of that call?

7        A.   May 8th, 2012.

8             MS. WILLIAMSON:  Could we play Exhibit 75,

9  please?

10       (Exhibit 75, a recording, was played to the Court and

11  jury.)

12  BY MS. WILLIAMSON:

13       Q.   You previously testified that "documents" was a

14  codeword for cash delivery and "papers" is part of this

15  transaction.  Did "papers" mean anything to you in the

16  context of this investigation?

17       A.   It also meant money.

18       Q.   So, in context, what is the subject of this

19  discussion when Ms. Galvan says she received the papers?

20       A.   That she received the cash that she was in

21  Chicago for.

22       Q.   And looking at the timestamp on the transcript

23  for Exhibit 72A and the timestamp for the 75A transcript,

24  about how much time had passed between when Ms. Galvan was

25  arranging a meeting and when Ms. Galvan acknowledge to

1  Mr. Patino she had picked up what the describes as the

2  papers?

3          A.    Approximately three hours.

4          Q.    So, based on your investigation and the calls

5  available to you, were you able to determine what Ms. Galvan

6  was really describing in the phone call we just listened to?

7               BY MR. O.J. PENA:  Your Honor, I'm objecting.

8  Your Honor, it's a connection.  I understand the timing.

9  The connection is --

10              THE COURT:  Counsel, approach.  Approach.

11  Approach the bench.

12              MR. O.J. PENA:  Yes, I'm sorry, Your Honor.

13         (Bench conference begins at 4:26 pm.)

14              MR. O.J. PENA:  Your Honor, it's a pattern that

15  the Government has engaged in.  And I know that it sounds

16  like I'm being very nitpicky about this, Your Honor, but I

17  feel I need to put an end to this pattern of where they're

18  just saying whatever they want to say.

19              THE COURT:  First of all, they're not doing that.

20  There's very specific calls that have been played, your

21  client is on these calls.  Give me a specific objection.

22              MR. O.J. PENA:  He's using the word "determine."

23  The question is how did you determine what that previous

24  phone call was, Your Honor.  And I don't believe that you

25  have enough there to determine what that phone call was

1    about.  They don't mention anything about drugs, they don't

2    mention anything about money.  There's four hours apart.

3    That phone call --

4              THE COURT:  Three hours.

5              MR. O.J. PENA:  Three hours apart.  That phone

6    call could have been about anything and she could have

7    (indiscernible).

8              THE COURT:  Drug money when drug has not been

9    involved.  She's just saying, based on this, what is the

10   meaning of that.  To pick up money.  That's supported by

11   both these calls.

12             MR. O.J. PENA:  I just don't think it's supported

13   by the first one.  It may be supported by the second one --

14             THE COURT:  Right, and you objected.  I let you

15   take him on voir dire and then the Government played the

16   second call and now he's giving his opinion.

17             And now on the

18   second call, it is supported so what's your objection?

19             MR. O.J. PENA:  On the second call, Your Honor, I

20   understand that but the Government asked for a determination

21   after the first call.

22             THE COURT:  I know, sir, but I stopped that.  You

23   got to fast forward.  I stopped that, I didn't allow them to

24   do that.  I let you do the voir dire, he didn't give an

25   opinion, they played a second call.  So, what's your

1    objection now?  You've got the help me understand.

2          MR. O.J. PENA:  The objection is that I still

3    don't believe they have made the connection.  I believe that

4    that first call still could be about anything and the

5    objection is also -- that's the specific objection, Your

6    Honor.

7          THE COURT:  Yes.

8          MR. O.J. PENA:  The broader objection is that the

9    Government is getting in the habit of getting way ahead of

10   themselves, Your Honor, and they are --

11         THE COURT:  Okay, I'm going to disagree with you.

12   That's a very broad generalization.  These are specific

13   calls, your client is on them, he's providing an opinion.

14   If you think that thing is not supported by the call, please

15   object.  Take them on voir direct and do what you did, but

16   I'm going to overrule your objection.

17         MR. O.J. PENA:  I understand, Your Honor.  And I

18   also understand that I have an opportunity to pick this up

19   on cross-examination.

20         THE COURT:  Absolutely.

21         MR. O.J. PENA:  And I understand the role of

22   cross-examination, Your Honor, but -- I think I've said that

23   I want to.

24         THE COURT:  Thank you.

25       (Bench conference ends at 4:29 p.m.)

BY MS. WILLIAMSON:

Q.   Again, Officer Lozano, in the context of your investigation and considering Exhibit 72 and Exhibit 75 that we just listened to, which occurred, as you said, three hours apart, what was going on?

A.   Money pick up was being conducted by Adriana Galvan in Chicago.

Q.   And then, as far as what happened to that money, did the calls lead you to understand what happened to the money?

A.   Yes.

Q.   What was that?

A.   The money was put into banks.

Q.   Let's look at Exhibit 77A, please.  Do you recognize it?

A.   Yes.

Q.   What is it?

A.   It's a call between Adriana Galvan and Luis Montes-Patino on May 8th, 2012.

      MS. WILLIAMSON:  Could we play – I believe there's two clips.  Could we play the first one, please?

      (Exhibit 77, the first clip recording, was played to the Court and jury.)

BY MS. WILLIAMSON:

Q.   So, now adding that call into the mix, were you

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    181

1  able to determine what Ms. Galvan was doing after she picked

2  up the money?

3       A.   She was structuring the money into different bank

4  accounts.

5       Q.   What do you mean by that?

6       A.   As I described earlier, the structuring is

7  putting money into bank accounts in $10,000 or less to avoid

8  reporting requirements by the bank and identifying the

9  person that made the deposit into the account.

10      Q.   And now, could we turn to Exhibit 78A, please?

11 Do you recognize it?

12      A.   Yes.

13      Q.   What is it?

14      A.   It's a call between Luis Montes-Patino and

15 Adriana Galvan on May 8, 2012.

16           MS. WILLIAMSON:  And could we play Exhibit 78,

17 please?

18       (Exhibit 78, a recording, was played to the Court and

19 jury.)

20 BY MS. WILLIAMSON:

21      Q.   Based on your investigation, were you able to

22 determine or were you able to determine what Ms. Galvan was

23 communicating?

24      A.   The arrival time for her flight back to Dallas.

25      Q.   Was that on the same day that she went to

1  Chicago?

2      A.   Yes.

3      Q.   All these phone calls were May 8th, 2012?

4      A.   Yes.

5      Q.   Now, directing your attention to Exhibit 79A, do

6  you recognize it?

7      A.   Yes.

8      Q.   What is it?

9      A.   It's a call between Adriana Galvan and Andre

10  Arturo De Leon on May 9th, 2012.

11      Q.   And who is Andre De Leon?

12      A.   He is the person we used an alias earlier as the

13  Teacher, the pilot that was used by this organization.

14      Q.   And what's date on this phone call?

15      A.   May 9th, 2012.

16          MS. WILLIAMSON:  Could we play Exhibit 79,

17  please?

18      (Exhibit 79, a recording, was played to the Court and

19  jury.)

20  BY MS. WILLIAMSON:

21      Q.   Just we're all tracking, May 9th is the day after

22  Ms. Galvan went to Chicago on May 8th, right?

23      A.   Yes.

24      Q.   Directing your attention to Exhibit 82A, do you

25  recognize it?

1        A.    Yes.

2        Q.    What is it?

3        A.    It's a phone call between the operator and

4   Adriana Galvan-Constantini on May 9th, 2012.

5        Q.    So, the same day that the pilot said that he was

6   trying to ring the doorbell?

7        A.    Yes.

8             MS. WILLIAMSON:   And could we play Exhibit 82,

9   please?

10       (Exhibit 82, a recording, was played for the Court and

11   jury.)

12   BY MS. WILLIAMSON:

13       Q.    Did your investigation indicate that Ms. Galvan

14   was traveling again on May 9th?

15       A.    Yes.

16       Q.    Where?

17       A.    To North Carolina.

18       Q.    And directing your attention to Exhibit 84A, do

19   you recognize it?

20       A.    Yes.

21       Q.    What is it?

22       A.    It's a call between Adriana Galvan and Andre De

23   Leon on May 9th, 2012.

24             MS. WILLIAMSON:   Could we play Exhibit 84,

25   please?

1          (Exhibit 84, a recording, was played to the Court and

2     jury.)

3     BY MS. WILLIAMSON:

4          Q.   Now, turning to Exhibit 89A, do you recognize it?

5          A.   Yes.

6          Q.   What is it?

7          A.   It's a call between Patricia, last name unknown,

8     and Adriana Galvan on May 10th, 2012.

9               MS. WILLIAMSON:  Could we play Exhibit 89,

10    please?

11         (Exhibit 89, a recording, was played to the Court and

12    jury.)

13    BY MS. WILLIAMSON:

14         Q.   What the date on what phone call, Officer Lozano?

15         A.   It was May 10th, 2012.

16         Q.   And as far as you know, is North Carolina one

17    hour later or one time zone over from Dallas, Texas?

18         A.   Yes.

19         Q.   So, is this call consistent with Ms. Galvan being

20    in North Carolina?

21         A.   Yes.

22         Q.   Directing your attention to a new binder, which I

23    will bring you.

24              Directing your attention to Exhibit 111A, do you

25    recognize it?

 1       A.   Yes.

 2       Q.   What is it?

 3       A.   A call between Adriana Galvan and Ippolito Ochoa-

 4   Rivera.

 5       Q.   And what's the date on it?

 6       A.   May 10th, 2012.

 7            MS. WILLIAMSON:  Could we play Exhibit 111,

 8   please?

 9       (Exhibit 111, a recording, was played to the Court and

10   jury.)

11   BY MS. WILLIAMSON:

12       Q.   During the course of your investigation, did you

13   learn what geographic was home to Ms. Galvan?

14       A.   It was in Dallas.

15       Q.   And you testified previously that Ms. Galvan had

16   the nickname Prima or Primita, Cousin or Little Cousin.

17   Female Cousin, obviously.

18       A.   Yes.

19       Q.   We saw Primo in this conversation.  Was there

20   someone who was regularly referred to as the male cousin?

21       A.   Yes.

22       Q.   Who's that?

23       A.   That is Luis Montes-Patino.

24       Q.   And what's the time of that phone call?

25       A.   It is on May 10th, 2012 at 2:45 p.m.

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                186

1    Q.   So, given what you just described about who the

2  Primo is and what had been happening on May 9th and 10th,

3  who was Ms. Galvan waiting for who would arrive around 7:00

4  or 8:00 p.m.?

5    A.   On Luis Montes-Patino.

6    Q.   And based on all of these calls that we've just

7  heard discussing various travel plans and geographic

8  locations, did you do any follow-up with other law

9  enforcement agencies in your investigation?

10    A.   Yes.

11    Q.   What was that?

12    A.   We first identified the location where the plane

13  that was being used, where it took off from and through the

14  course of the investigation, we noticed that the plane was

15  landing at very small airfields that led up all the way to

16  North Carolina and then at the same time through the

17  investigation, saw the airplane coming back.

18         And so we reached out to DEA in the Dallas area

19  to conduct an interrogation of the subjects whenever they

20  arrived to the Dallas area airport.

21    Q.   To the best of your knowledge without getting

22  specifics, did the Dallas DEA made contact with Mr. Montes-

23  Patino that evening?

24    A.   Yes.

25         MS. WILLIAMSON:  Court's indulgence, Your Honor?

1          THE COURT:  It's fine.

2      (Pause in the proceedings.)

3  BY MS. WILLIAMSON:

4      Q.   Are you aware of what airport the plane you were

5  tracking eventually landed at?

6      A.   It was Sphinx Airport.

7      Q.   And is that close to a particular metropolitan

8  region?

9      A.   The Dallas-Fort Worth area.

10      Q.   And with reference to what's still on the screen

11  there, where it says, "Tomorrow you're going to see your

12  cousin, right?  Your aunt?" in context, do you know who the

13  aunt is in your investigation?

14      A.   Yes.

15      Q.   Who's that?

16      A.   That is our Confidential Source, Corina Blake.

17          MS. WILLIAMSON:  Your Honor, we're close to

18  5:00 p.m.  This might be a good stopping point for the

19  testimony.

20          THE COURT:  Okay, that's fine.

21          MS. WILLIAMSON:  Thank you, Your Honor.

22          THE COURT:  All right.  Ladies and gentlemen, we

23  are going to go ahead and break.  I am going to release you

24  for the long weekend.  And in case you're wondering, we will

25  be working next Friday but this week, the way it played out,

1   we're not going to continue with the trial tomorrow.

2          Those of you that are able to go back to work

3   tomorrow, feel free to do so, but remember all of the

4   instructions that I've been giving you throughout the trial,

5   the concepts that we discussed in voir dire, don't talk to

6   anybody, don't let anybody talk to you about the case, don't

7   do any research, don't go to any of these locations, don't

8   go on social media and post anything.

9          And you know, I know that your family and others

10  may ask you, you know, what you're up to and it's okay to

11  say, "I've been selected to serve as a juror, I'm in federal

12  court," but beyond that, just say, "The judge instructed us

13  not to talk about the case," and leave it at that and, you

14  know, if you tell them that, I'm sure they were will respect

15  your representations.

16         Let's start us again Monday at 8:30 and I guess

17  I'll say let's be in the room by 8:30 so that we can get

18  started.  If all of you are here by 8:30, we can get started

19  right at 8:30.  And if not, we'll start around 8:45, but be

20  in this room by 8:30 a.m. Monday.  Does anybody have any

21  questions about my instructions?  Any concerns?

22       (No audible response.)

23         THE COURT:  Everybody has -- I guess no, no

24  questions.  No.

25         All right, counsel.  Any additional instructions

FRANCISCO LOZANO - DIRECT BY MS. WILLIAMSON                    189

1    for the jurors before I release them to come back Monday?

2         (No audible response.)

3              THE COURT:  All right, nothing additional from

4    the lawyers.

5              Thank you, ladies and gentlemen.

6              THE CLERK:  All rise.

7              THE COURT:  You can go ahead and take your

8    notebooks.  Leave them in the room.  We'll lock it up.

9         (Jury exits the courtroom at 4:50 p.m.)

10        (Outside the presence of the jury.)

11             THE COURT:  All right, the jury has exited the

12   room.  Let me go ahead and spend a little bit of time

13   talking to all of you specifically regarding the

14   demonstratives.

15             How many other demonstratives are there,

16   Government?

17             MS. WILLIAMSON:  We have similar charts for

18   BCT-6, 8, 10, 19, 22, 27 – 8 more demonstratives of this

19   nature, Your Honor.

20             THE COURT:  Okay, and I trust that you've prepared

21   them?

22             MS. WILLIAMSON:  Yes, Your Honor, and we've given

23   them to defense except for 19 which I think one of our legal

24   assistants has to pass out now.

25             THE COURT:  Okay, all right.

1          So then, defense, you will have all the

2   demonstratives.  You'll have Friday, Saturday, Sunday to

3   review them.  These are my instructions to all of you:  If

4   you think you're going to have objections to them,

5   communicate that to Ms. Trevino, copy the Government and we

6   can come in extra early on Monday so that we can field all

7   those objections.

8          But I guess what I will say, Government, the main

9   issue seemed to be that there were inferences that were

10  being drawn on the demonstratives of items -- not that they

11  aren't in evidence and so I think that that's an important

12  caveat -- but that the jury could possibly be confused

13  because this agent hadn't talked about those items.

14          And so, seems to me one of the best ways to avoid

15  any objection from counsel is to make sure that before you

16  ask to publish the demonstrative (electronic noise) -- I

17  don't know what that.  Before you ask to publish those

18  demonstratives, that everything on there had been presented

19  to the jury.

20          MS. WILLIAMSON:  And I hope I've demonstrated with

21  BCT-6 that we are certainly willing to play as many calls as

22  necessary in order to get those points across.

23          THE COURT:  Right.

24          Okay.  So, defense, do you all -- can you all

25  think of anything else?  I mean, if it's done that way, is

1   it possibly going to work?

2          MR. O.J. PENA:  Your Honor, the Government can try

3   their case whichever way they want to.  If they want to play

4   these phone calls, then I guess they're going to do it.  I

5   can't necessarily stop them from doing it, but it seems to

6   me that the jury now knows that there is a phone tap, an

7   intercept and that the Government agent is collecting

8   information from that intercept--

9          THE COURT:  Yes.

10         MR. O.J. PENA:  And I would think that the

11  Government would need to think about why is it necessary to

12  listen to every single phone call --

13         THE COURT:  Counsel, they're doing so on these

14  particular exhibits because you all are saying that they

15  can't publish them unless they play them first.

16         MR. O.J. PENA:  No, that's not what I was saying,

17  Your Honor.  What I was saying was that there has to be

18  proper testimony or evidence.  I mean testimony in evidence.

19  I mean, I'm not requiring that it be the phone call, but

20  they were getting ahead of themselves, even in the

21  testimony.  They weren't providing the testimony and they

22  were getting the inference.

23         And then the other thing is, Your Honor, and I

24  will mention this.  There's a difference between

25  determination and conclusion and the Government is asking

1   questions of this witness and eliciting conclusions, but

2   using terminology as if they are fact and it is confusing to

3   the jury and it is forcing me to stand up every time.  And

4   every time the question is, "And did you determine what

5   happened in that city 2,000 miles away where you weren't

6   surveilling and you weren't there, based on this phone call

7   that lasted a minute that had nothing but codewords in it?

8   Were you able to determine what happened?"  And I think that

9   it is more accurate to say, "Based on your experience, do

10   you have an opinion as to what was going on here?"

11         THE COURT:  Okay, so let me stop you right there.

12         Can you do that?  Based on everything we just

13   heard and we see on there, what is your opinion?

14         MS. WILLIAMSON:  As long as it's not limited to

15   his experience but his experience in combination with the

16   evidence.

17         THE COURT:  Of course.  I think what he is

18   struggling with, and correct me if I'm wrong, is the term

19   "what did you determine," versus, "what is your opinion."

20         MS. WILLIAMSON:  Sure.

21         THE COURT:  Are we right?  Are we on the same page

22   on that?

23         MR. O.J. PENA:  Yes, yes.  Yes, Your Honor, that

24   crystalizes it.  It's presenting conclusion as if it were

25   fact and --

1          THE COURT:  Okay.  Well then, you've won that

2     point.  Got it.  All right.  You're right on that.

3          All right.  Now, the other thing you had said

4     though as far as I don't know that they necessarily have to

5     play every single tape, they can testify to it, but the

6     thing is, if there's not that kind of evidence and the

7     evidence is the tape, then based on the objection that you

8     have lodged, that's the only way that they can do that.

9          Are we on the same page on that?

10         MR. O.J. PENA:  Well, no, Your Honor.  I think

11    that they can identify the exhibit that is being referenced

12    and they can then say, "based on my opinion of Exhibit 89, I

13    determined or rather -- not determined, but rather I, in my

14    professional opinion as an experienced law enforcement

15    agent, I concluded that they were arranging a meeting in

16    Chicago --

17         THE COURT:  I'm sorry.  Isn't concluded another

18    word you were trying to avoid?  Determine and concluded?

19         MR. O.J. PENA:  Well, a conclusion is a result of

20    taking these premises and forming a logical conclusion but

21    that's not the same thing as stating, "This is what

22    happened.  I saw it happen.  The sun is going to rise

23    tomorrow morning at" --

24         THE COURT:  I'm sorry.  We're past that one.  I

25    don't want to go off on a tangent.

1          Okay.  So, what you're saying is you would be

2    satisfied -- I guess I have to hear from everyone else --

3    but you would be satisfied if they said to check off the

4    list, "Have you reviewed Exhibit 150, 160, 170, 180," "Yes,

5    I have," and then at that point, they wouldn't have to play

6    those tapes, if they didn't want to play the tapes.  And I

7    mean they, the Government.  And then at that point, the

8    demonstratives could come in and all of that is in evidence

9    and the jury would listen to those later on if they want.

10         MS. WILLIAMSON:  And Mr. Pena --

11         MR. O.J. PENA:  Well, I mean, I think that --

12         THE COURT:  Yay or nay?

13         MR. O.J. PENA:  Well, yes.  However, it would be

14   nice to say, "Based on what in that phone call?"  "Oh, well,

15   the use of the word Prima and the fact that there was a

16   location identified in Chicago."

17         THE COURT:  Right, but then I guess the way it

18   would go -- and I'm seeing the other lawyers going "no," and

19   I'll hear from them but the way that would go is, "okay,

20   look at Exhibit 160," "all right, "What terminology's in

21   there," "Well, they use the term Primo and Primo and

22   whatever," and then go to the next one, what terms do they

23   use there.  They use whatever and whatever.  I don't know, I

24   don't know.  I don't know what to do with that.

25         MR. O.J. PENA:  Yes, Your Honor.  You know what?

1  I'll withdraw that part of it, Your Honor, and if they want

2  to play all those phone calls, they can play the phone

3  calls.

4         THE COURT:  Well, I don't think they want to.  I

5  think that they're in evidence -- and the more I thought it

6  as this was all going on, it's in evidence and, you know, he

7  did say he's reviewed everything, but I'm trying to work

8  with you all on we don't want things up there that the jury

9  hasn't heard, even though they're going to hear about it

10  later.  So, I'm working with you on the timing of things

11  because it's admissible, it's already in evidence so that's

12  not really the issue, but let me hear from Mr. Balli or

13  Scott McCrum, since you all are standing up.

14         MR. BALLI:  I have nothing, Your Honor.  I'm just

15  stretching my legs.

16         THE COURT:  You're stretching?  All right.

17         Mr. Scott McCrum?

18         MR. SCOTT MCCRUM:  I don't like listening to and

19  don't want to listen to those calls or any of that either,

20  Judge, or spend more time than we have to, but I think

21  there's got to be some foundation for it.

22         THE COURT:  I understand, but the thing is, if

23  that happens to be the only foundation, that's the way it's

24  going to have to be done and I'm okay with that.  I don't

25  have any problem.  I don't want you all to think that I do.

1          Like I said, if this trial lasts a month, it lasts

2     a month.  The only thing I'm saying is that, if we're going

3     to have debates about exhibits and all of that, I just don't

4     want to have them in the room, the jury in the room while

5     we're having these debates because that's just not a good

6     use of their time.  And so, if we have to have that, that's

7     fine.  We will.  But we'll come in earlier, we'll stay late,

8     or we'll do whatever we need to do.

9          MR. SCOTT MCCRUM:  If you want to keep going

10    around the room.  Maybe on a majority room we can --

11         MR. O.J. PENA:  No, Your Honor, I've withdrawn

12    that part of the objection.

13         THE COURT:   No, that's fine.

14         MR. O.J. PENA:  I guess I'm frustrated because I'm

15    looking ahead into the future and I'm thinking to myself,

16    "what am I going to cross-examine," and so in that sense,

17    you're right, we play the phone calls --

18         THE COURT:  Right.

19         MR. O.J. PENA:  -- and then I will harken back to

20    the phone calls and say, "Well, you formed this conclusion

21    based on this terminology here and this terminology,

22    couldn't it have meant something else," and then we'll

23    address it in cross-examination.

24         THE COURT:  And he's going say, "No, I didn't form

25    a conclusion, I just gave my opinion."

1        MR. O.J. PENA:  Yes, Your Honor.  That is correct,

2   Your Honor.

3        THE COURT:  I don't know, I don't know.  Okay.

4   I'm trying to work with you.

5        MR. O.J. PENA:  I'm not trying to argue with you.

6        THE COURT:  No, no.  I know and I'm trying to work

7   with all of you and to understand what it is you're trying

8   to tell me so that I can make a decision.

9        All right.  Michael McCrum, you're standing up.

10        MR. MICHAEL MCCRUM:  Yes.  Thank you, Judge.

11        What I'm very concerned with is allowing our

12   Government to convict people based on a summary witness.  To

13   come in and just say, "Hey, I've reviewed all the evidence.

14   This is really what happened and so, find them guilty based

15   on that."  I know other countries do that, but I'd like to

16   think that we're different and so, I think the evidence

17   needs to come in and that includes, frankly, when they ask,

18   "What do you think is going on here?"  If it's something

19   that is not discernable to the fact finder, then maybe an

20   opinion is necessary and appropriate under our rules, but a

21   couple of these times -- and they're not affecting me so I'm

22   not saying anything -- but a couple of these times it's

23   pretty discernable what's going on and an opinion is

24   inappropriate because it's bolstering and it's allowing,

25   now, a conviction by a summary witness, by a man with great

1   experience and I have such great respect for his experience

2   when it's not the way to convict somebody and that's the

3   problem I've got with the type of evidence that the

4   Government is proposing to introduce.

5           THE COURT:  Okay.  And so, let me, I guess,

6   address your concerns in turn.  If I thought that something

7   was completely discernable and obvious that an opinion would

8   not be warranted, I would intervene whether any of you

9   intervened.

10          MR. MICHAEL MCCRUM:  Thank you.

11          THE COURT:  I have not seen that.

12          MR. MICHAEL MCCRUM:  Okay.

13          THE COURT:  But if you think that one of these

14  transcripts, and again you guys have had them now since

15  March, does that, you know, object.  You know, come up,

16  we'll talk about it and we'll see what I decide on that.

17          I think the second point you said was what?

18          MR. MORENO:  Convicting by a summary witness.

19          THE COURT:  Oh, by a summary witness.  Yes,

20  absolutely.  I mean, we're not going to allow that.  So, I

21  agree with you.  I think the evidence needs to come in and

22  if someone's going to give an opinion, it needs to be backed

23  up by the evidence before he's going to be allowed to give

24  an opinion.  I think we're in agreement on that.

25          Anything else?  Mr. Liddle?

1           MR. MORENO:  Mine are easy.

2           MR. LIDDLE:  Forgive me, Your Honor.  I forget

3  exactly how we left this, but there were these phone call

4  spreadsheets in Exhibit 116 and 369 that I think the last

5  thing I remember Your Honor was going to look into something

6  about authenticating them.  There was some discussion about

7  how we could possible authenticate them.

8           THE COURT:  They were the toll records.  What I

9  instructed all of you to do, especially the side that wants

10 to introduce them and the side that's objecting, is to do

11 your research and tell me why they come in and why there's

12 not problems.

13          So, did you all do that?

14          MR. LIDDLE:  I don't think so.  I didn't

15 remember --

16          MR. MORENO:  We had a debate about what your last

17 instruction was and so.

18          THE COURT:  And I can tell you that I did do my

19 own research but I think it should really come from the

20 proponent and the opponent.  What does the case law say?

21 Why are you allowed to get it in?  Why shouldn't they get it

22 in?

23          MR. O.J. PENA:  And if I recall, it was the

24 automatic, sort of, --

25          THE COURT:  It's the automatic.

1          MR. O.J. PENA:  -- collection of information and

2     transmission as a compilation, --

3          THE COURT:  Yes.

4          MR. O.J. PENA:  -- as opposed to human being

5     sitting and writing it down.

6          THE COURT:  It's the automatic, yes.  That is

7     correct and I can tell you all that I've already found an

8     answer to it but, you know, I think that's part of the

9     problem in my court, that I think that lawyers get used to

10    me doing -- it's just not my job, it's your job.

11         So, you want it in, you don't want it in, let's

12    talk about it next week or whenever.

13         MR. O.O. PENA:  Could I make an observation, Your

14    Honor?

15         THE COURT:  Yes.

16         MR. O.O. PENA:  We're talking about money

17    laundering, working with money that has been picked up in

18    connection with some drug deal.  It goes into a stream of

19    movement where it eventually gets to the Government.  The

20    Government takes control of it and they have the authority

21    to stop it there to keep it, and I think that at that point,

22    it loses its taint.  It is no longer money produced by

23    drugs; it is money produced by the Government.

24         THE COURT:  Mr. Pena, I'm sorry.  I'm going to

25    stop you.  I have a lot of respect for you, but that's just

1  not accurate.  But please spend some time, you're welcome to

2  do research.  Mr. Del Rio's there to work with you on --

3  that's just not accurate.  If that was the case, I would

4  have dismissed the charges already myself if that was the

5  case.

6         MR. O.O. PENA:  Like I said, Judge, an idea.

7         THE COURT:  Okay.  Thank you, sir.

8         All right, there was something else.  All right,

9  Mr. Moreno?

10         MR. MICHAEL MCCRUM:  Just two things.  One, I

11  think -- and I'm verifying it -- that the copies of the

12  documents that Mr. Mike McCrum wanted should either be here

13  or on their way so that we can get those to him.

14         THE COURT:  What happened yesterday?  Did

15  you-all --

16         MR. MICHAEL MCCRUM:  We narrowed it down to two

17  boxes.  We found that there was about five or six actual

18  books of ledgers that had not been given to us in discovery

19  that were in the box that has been seized from our client's

20  business.  We asked that we wanted copies of that, we want

21  scanned copies of that and that's, I think, what he's

22  referring to.  There's another couple folders that had been

23  given to us but were completely illegible because of the

24  scanning, we asked for those as well.

25         THE COURT:  All right.  That's fine.  I'm sorry,

1   anything else on that?

2          MR. MORENO:  The only other thing was just was the

3   Court going to use the courtroom or do you want us to unplug

4   everything or can we leave it that way?

5          THE COURT:  No.  No, I don't have any settings

6   tomorrow.  If anybody wants to leave your things here,

7   you're welcome to do so.  We'll lock up.

8          All right.  I did want to say something else.

9   Regarding the lineup of witnesses, what did you give them as

10  far as the lineup for today?  Was it just Agent Lozano?

11         MR. MORENO:  No, there were two other witnesses

12  that obviously we weren't going to get to so we'll move

13  them, well, now to Wednesday, Tuesday.  It just depends on

14  how fast we go.

15         THE COURT:  Safe to say Agent Lozano will take all

16  day Monday, I'm sure.  Right?

17         MS. WILLIAMSON:  I think so, Your Honor.

18         THE COURT:  Okay, and then you had already given

19  them the names of two other witnesses after that?

20         MR. MORENO:  Two others to follow and then

21  there's --

22         MR. LIDDLE:  And Your Honor, this could change a

23  lot of the witnesses from now are traveling.

24         THE COURT:  I understand.

25         MR. LIDDLE:  And so we will give them, you know,

1  updates and we know but I forget what we gave you guys

2  yesterday, but it may change by Monday.  I think that will

3  say the same.

4        (Several speakers at the same time.)

5            MR. LIDDLE:  That will stay the same, I believe.

6            THE COURT:  Okay, I think that's understood.  I'm

7  sure you all are on an email chain and you can copy

8  Ms. Trevino on that particular portion of it.  So, if

9  something changes, just let the lawyers know the day before,

10 "You know, this is the proposed lineup for tomorrow.  These

11 people are now in town and this is what we're planning on

12 doing," so that they can prepare and get ready to cross-

13 examine.

14           MR. SCOTT MCCRUM:  And I've got two out of state

15 witnesses, you know, not on my case-in-chief, Judge.  I

16 think it's safe for me to not have them fly in next week.

17           THE COURT:  I don't know, Mr. McCrum.  Let's just

18 see how we go, but I mean, I don't know.  We have a lot of

19 exhibits and most of them have been pre-admitted.  I've

20 admitted thousands of defense exhibits.  I don't know but

21 just gauging by this case, Government, what's your thought

22 as far as how much more time you think you'll take with your

23 witness -- your first witness?

24           MR. LIDDLE:  Just with the Government?

25           THE COURT:  Like your portion, how many more hours

1    do you think you'll take?

2           MS. WILLIAMSON:  Half a day to a day, Your Honor,

3    with Officer Lozano.

4           THE COURT:  Okay.  And then, so, see that possibly

5    puts us into Tuesday and I'm sure they're going to take a

6    majority of the day on Tuesday.

7           MR. LIDDLE:  I do, too.

8           THE COURT:  No, and here's the thing, too.  As

9    long as you all are not asking the same questions over and

10   over again, I'm not going to limit what you all are going.

11   I mean, you all are going to be able to Cross-examine as you

12   see fit and then we'll go back to Redirect and all of that.

13          The only thing that I ask from the objections and

14   all of that is number 1, really think about the legal

15   objection, be as concise as possible, don't repeat the same

16   thing over and over, and to the extent possible, let's do it

17   before the jury comes in and so forth.

18          So, if you all already know you want to debate

19   something, notify my staff and then we all come in earlier.

20          MR. MORENO:  One last thing just to be sure, did

21   the Court say at one point when we were looking for one of

22   the transcripts that the Court is missing one of the

23   transcripts?

24          THE COURT:  Apparently number 24, but it's fine.

25   I don't --

1          MR. MORENO:  Well, no.  I was going to say because

2     24 is the call, 24A is the transcript.  I just want to make

3     sure you are missing the transcript.

4          THE COURT:  I guess we were missing the

5     transcript, right?

6          THE COURT:  Yes.

7          THE COURT:  We were missing the transcript, but

8     don't worry about it.  I don't need copies.  I guess we have

9     our set.  I needed them when I was making determinations on

10    admissibility, but that was the extent of my need for the

11    transcripts.

12         MR. MORENO:  I just want to make sure that the

13    evidence set is complete.

14         THE COURT:  Well, and that's a good point.  You

15    referenced the folders there.  That's going to be on you all

16    to make sure that everything is there and everything is

17    complete.  Nobody's taking exhibits out of the courtroom,

18    nobody's writing on the originals, but you all are going to

19    have to check all of that.  So, that's on all of the

20    lawyers.

21         Is there anything else that I can consider from

22    anyone?

23         Mr. McCrum?

24         MR. MICHAEL MCCRUM:  Brief follow-up on the items

25    that I wanted copied yesterday, Judge, and I told Mr. Moreno

1  I was going to ask you to hear this.  These are original

2  ledger books.  I've told Mr. Moreno I want to either

3  introduce those as evidence or, at the very least, show the

4  jury these are the book forms or real forms of the

5  electronic versions.  They're sealed, they're top secret,

6  Government now sealed documents or whatever and so there's

7  some difficulties in having there here or having them

8  transported or breaking chains of custody, but I want these

9  exhibits, Judge, the originals.

10       THE COURT:  I'm sure you're being slightly

11 sarcastic when you say top secret because I'm sure they're

12 not top secret.  I mean, these are their books, right?

13       MR. MICHAEL MCCRUM:  It's more like treatment,

14 Judge, is the inference that I'm making, but I thought

15 inferences were okay in this courtroom.

16    (Laughter)

17       THE COURT:  Do you all want to push me on that one

18 because I actually have been ruling in your favor on only

19 proper inferences.

20       MR. DEL RIO:  Just to remind you.

21       THE COURT:  And I'm sensing that, Mr. Del Rio.

22 Thank you.

23       MR. MORENO:  I will tell the Court that, and Agent

24 Lozano can verify it, but there are some obstacles and I

25 think to convince their supervisors and their agencies to do

1  it this only because I told them there was a Court Order for

2  it because otherwise what they normally would have done was

3  to do a 48A form which basically released this out of their

4  custody but then one of us gets stuck with the exhibit

5  because they won't take it back once they get released

6  because they're not going to be responsible for --

7           THE COURT:  Okay.  What do I have to do to just

8  cut through all of this red tape?  Tell me what do I need to

9  do.

10          MR. MORENO:  They're here and he's already signed

11  the Form 12 to take custody of them.  As far as we're

12  concerned, they're in his custody --

13          MR. MICHAEL MCCRUM:  No, I turned it back last

14  night.  I did do that, but I turned them back last night and

15  I signed a different form.

16          MR. MORENO:  I believe last night (indiscernible).

17          THE COURT:  Okay.  So, we're going to make this

18  happen.  I think what he is requesting is he wants to be

19  able to show the actual books to the jury and whether or

20  not, I doubt that we would send those to the back unless you

21  are asking at the end that we send those or copies are going

22  to be okay.  I guess we'll cross that bridge when we get to

23  it but for the time being, just make sure that whenever they

24  tell you, tell them the day before, "It's going to be

25  tomorrow.  Bring me the original."  Then we're ready to go.

1          MR. MORENO:  Can we take the rest of the boxes

2     back that's just notes?

3          MR. MICHAEL MCCRUM:  Yes, sir.  Yes, sir.

4          THE COURT:  Everybody, same page so far?

5          MR. MICHAEL MCCRUM:  On the rest of the boxes,

6     I'll get with you, Mr. Moreno, but I want to check with my

7     assistant on one thing because I didn't think of the ones

8     that are already into evidence.  I didn't ask to see those

9     and if those are in different boxes, I may need you to get

10    those boxes as well, but we'll check.

11         THE COURT:  Okay.  Here's a question that I have

12    that you all, I guess, you're okay with, but they did say

13    there was these other books that were not produced in

14    evidence.  Of course, these are the Defendant's own

15    documents though.

16         MR. MICHAEL MCCRUM:  Yes.

17         THE COURT:  Yes.  Why were they not produced in

18    evidence?

19         MR. MORENO:  Actually, we didn't have them either.

20    Apparently, what happened was when they first did them, and

21    he was showing me this last night there, the books that were

22    not copied had a sticker on them that said "IRS Copy" or

23    something and I think may the IRS did, but then all of that

24    was sent to the documents people, so they could just copy

25    everything and I think when they saw "IRS Copy" they figured

1    they've already been copied so they didn't scan those.

2            THE COURT:  Okay.

3            MR. MORENO:  And so, they left them all there.

4    They just didn't scan those that had the sticker that said

5    "IRS Copy."

6            THE COURT:  Okay, and I'm not hearing them say,

7    "We're surprised," or anything like that.  They're just

8    saying, "We want copies now."

9            MR. MORENO:  Right.

10            THE COURT:  And you've got the copies.

11            MR. MORENO:  And so, they're bringing us a copy

12    and they're bringing them a copy.

13            THE COURT:  All right.  Anything else I can assist

14    any of you gentlemen and lady with?

15        (No audible response.)

16            THE COURT:  No?

17            MALE SPEAKER:  Thank you for the copy, Your Honor.

18            THE COURT:  You're welcome.

19            MS. TREVINO:  Are there issues we need to address

20    before 8:30?

21            THE COURT:  I'm sorry.  What?

22            MS. TREVINO:  If there's any objections to address

23    before 8:30, what time do you want them so I can tell

24    them --

25            THE COURT:  I think we could probably to that in

1  -- that's a good point.

2          Ms. Trevino is saying if you all do decide that

3  there's objections that you address, you know, Interpreters

4  have to be here so it's not as simple as we all show up, you

5  know, at 7:00 and we're ready to go.  I guess I would say

6  8:00 a.m.  So, you know, I think we could get this done

7  before 8:00 and 9:00 kind of thing, but I think with some of

8  these caveats and you all having the exhibits and all of

9  that that hopefully, it will not come to that but, you know,

10  if it does, it does.

11          All right.  Any concerns from the Interpreters?

12  Anything you all want me to know?

13      (No audible response.)

14          THE COURT:  No?  All right.  Everybody is saying

15  no.

16          MS. WILLIAMSON:  Your Honor, could we request that

17  the court technology person be here Monday morning a few

18  minutes before we convene to make sure that we don't

19  encounter the problem on Monday that we had today?

20          THE COURT:  No, that's fine.

21          MS. WILLIAMSON:  Thank you.

22          THE COURT:  I like how you did that.  The court

23  technology person.

24          MS. WILLIAMSON:  The wizard.

25          THE COURT:  Yes, I hear you.  He's actually here

1    right now if you need his help with anything.  He's my

2    right --

3              MS. WILLIAMSON:  No, Monday.

4              THE COURT:  They're actually fine now.

5              MS. WILLIAMSON:  Oh, can we come tomorrow?

6              MALE SPEAKER:  Yes.

7              THE COURT:  Are you here Monday?

8              MR. BLANCO:  Yes.

9              THE COURT:  This is Albert Blanco.

10             MS. WILLIAMSON:  We could potential come tomorrow

11   if that would be --

12             MR. BLANCO:  That would be good.

13             THE COURT:  What time, Mr. Blanco?

14             MR. BLANCO:  Anytime.  I'll be here all day.

15             THE COURT:  Okay.

16             MS. WILLIAMSON:  I'll talk to you after we --

17             THE COURT:  Right, you all can coordinate all of

18   that.

19             MS. WILLIAMSON:  Thank you.  Thank you, Your

20   Honor.

21             THE COURT:  All right, everybody.  Thank you.

22   Have a nice weekend.  I'll see you Monday, God willing.

23             THE CLERK:  All rise.

24        (Proceedings adjourned at 5:15 p.m.)

25                         *  *  *  *  *

1              I certify that the foregoing is a correct

2     transcript to the best of my ability produced from the

3     electronic sound recording of the proceedings in the above-

4     entitled matter.

5     /S/ MARY D. HENRY

6     CERTIFIED BY THE AMERICAN ASSOCIATION OF

7     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9     JTT TRANSCRIPT #60440

10    DATE FILED:  JULY 8, 2019

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25